# No. 15-1342
## (IPR2013-00219, IPR2013-0327)

# United States Court of Appeals
# For The Federal Circuit

YISSUM RESEARCH DEVELOPMENT COMPANY OF THE
HEBREW UNIVERSITY OF JERUSALEM,

*Appellant,*

v.

SONY CORPORATION,

*Appellee.*

Appeals from the Patent Trial and Appeal Board,
IPR2013-00219 & IPR2013-00327

## YISSUM'S OPENING BRIEF

Craig E. Countryman
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

John A. Dragseth
  *Counsel of Record*
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
(612) 335-5070

*Attorneys for Yissum Research Development Company
of the Hebrew University of Jerusalem*

**April 20, 2015**

## CERTIFICATE OF INTEREST

Counsel for Appellant Yissum certifies the following:

1.      The full name of every party represented by me is:  Yissum Research Development Company of the Hebrew University of Jerusalem and HumanEyes Technologies.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Appellant notes that HumanEyes Technologies is the exclusive licensee of the patent on-appeal, while Yissum is the patent's owner.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  N/A.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

Fish & Richardson P.C.:  John A. Dragseth and Craig E. Countryman

Browdy & Neimark, PLLC:  Roger L. Browdy and Ronni S. Jillions

Haynes & Boone, LLP:  David L. McCombs, David O'Dell, and Gregory Huh

Tensegrity Law Group LLP: Robert Gerrity and William Nelson

Dated:  April 20, 2015

/s/ John A. Dragseth
John A. Dragseth

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................................. i

STATEMENT OF RELATED CASES ................................................................. viii

STATEMENT OF JURISDICTION .......................................................................ix

STATEMENT OF THE ISSUES............................................................................. x

INTRODUCTION ................................................................................................... 1

STATEMENT OF THE FACTS ............................................................................. 2

I.    The '284 Patent:  Tricking the Brain Into "Perceiving" 3D
for Panoramic Images. ............................................................................... 2

II.    The Cited Art:  Not Concerned With User Perception of a
Scene. .......................................................................................................... 8

A.    Asahi:  Aerial Topographical Mapping With Triangulation
to Determine Distances, and no "Perception of Depth"
for a Human Viewer ........................................................................ 9

B.    Kawakita: An Incomplete Attempt in Japan at Panoramic
Stereoscopic Viewing.................................................................... 12

III.    The *Inter Partes* Review Proceedings....................................................... 15

A.    Institution:  Changing Positions by Petitioner and
Acceptance of Those Positions by the Board............................. 15

B.    The Board's Decision and Rehearing Decision:  Removing
Explicit Claim Requirements to Find Invalidity........................ 15

SUMMARY OF THE ARGUMENT ....................................................................... 17

STANDARD OF REVIEW .................................................................................... 18

ARGUMENT .......................................................................................................... 18

# <u>TABLE OF CONTENTS</u> (continued)

<u>Page</u>

I.     The Board Erred by Ignoring Explicit Limitations on the
       Claims ................................................................................................18

       A.     The Board Erred in Not Requiring that the Mosaicing
              Recited in the Claims Result in the Sense of Depth ................18

       B.     The Board Erred in Construing a "sense of depth of
              the scene" to Cover a Sense of Depth of Only a Small
              Part of the Scene, When the Claims Contrast that Sense
              of Depth and the full Panoramic Mosaics of "the scene"
              with narrower input images that represent "portions
              of the scene" ..................................................................................22

II.    None of the Prior Art Provides a Sense of Depth for a Panoramic
       Scene ..................................................................................................24

       C.     Asahi Does Not Even Attempt to Provide a Sense of
              Depth Because it is Building a Topographical Map ................24

       D.     Kawakita at Most Shows Depth For Parts of a Scene, but
              the Claims Require Depth for the Scene, and Not Mere
              Parts, Because That is How Users Obtain the Illusion of
              Depth ............................................................................................27

III.   The Board Acted Arbitrarily and Capriciously Its Treatment of
       Asahi and Kawakita Given the Discrepancies Between Sony's
       Two Translations. ..............................................................................28

IV.    The Board's Final Decision on Claims 4, 7, and 38 of the '284
       Patent Must Be Vacated As Exceeding Its Statutory Power..............30

       A.     The Board Had No Power to Join Sony's Second Petition
              Adding New Claims That Was Filed Over a Year After
              It Had Been Sued. ........................................................................30

       B.     No Procedural Obstacles Bar Evaluating The PTO's
              Authority to Address Claims 4, 7, and 38. ................................34

CONCLUSION ............................................................................................36

## **TABLE OF CONTENTS** **(continued)**

**Page**

CERTIFICATE OF SERVICE AND FILING ......................................................... 37

CERTIFICATE OF COMPLIANCE ........................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alappat,*
33 F.3d 1526 (Fed. Cir. 1994) (*en banc*) ...........................................................34

*Bowen v. Michigan Acad. of Family Physicians,*
476 U.S. 667 (1986) .........................................................................................35

*Business Roundtable v. S.E.C.*
647 F.3d 1144 (D.C. Cir. 2011) .......................................................................28

*In re Cuozzo Speed Techs., LLC,*
778 F.3d 1271 (Fed. Cir. 2015) ........................................................................35

*HumanEyes Technologies Ltd. v. Sony Electronics Inc. et al.,*
1-12-cv-00398 (D. Del.) .................................................................................viii

Inv. No.
337-TA-842 ....................................................................................................viii

*Killip v. Office of Pers. Mgmt.,*
991 F.2d 1564 (Fed. Cir. 1993) ........................................................................30

*Lyng v. Payne,*
476 U.S. 926 (1986) .........................................................................................30

*In re NTP,*
654 F.3d 1279 (Fed. Cir. 2011) ........................................................................21

*Pacing Techs., LLC v. Garmin Int'l, Inc.,*
778. F3d 1021, 1023 (Fed. Cir. 2015) ..............................................................18

*Railroad Yardmasters of Am. v. Harris,*
721 F.2d 1332 (D.C. Cir. 1982) .......................................................................34

*In re Rambus, Inc.,*
753 F.3d 1253 (Fed. Cir. 2014) ........................................................................18

# TABLE OF AUTHORITIES (Continued)

**Page**

*Randall Mfg. v. Rea,*
733 F.3d 1355 (Fed. Cir. 2013) ...................................................................18

*In re Sang Su Lee,*
277 F.3d 1338 (Fed. Cir. 2000) ..................................................................28

*Social Security Bd. v. Nierotko,*
327 U.S. 358 (1946) ....................................................................................36

*St. Jude Medical v. Volcano Corp.,*
749 F.3d 1373 (Fed. Cir. 2014) ..................................................................35

*In re Suitco Surface, Inc.,*
603 F.3d 1255 (Fed. Cir. 2010) ..................................................................21

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
135 S. Ct. 831 (2015) ..................................................................................18

*Thomas Jefferson Univ. v. Shalala,*
512 U.S. 504 (1994) ....................................................................................33

*United States v. L.A. Tucker Truck Lines,*
344 U.S. 33 (1952) ......................................................................................34

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................28

28 U.S.C. § 1295(a)(4)(A) ................................................................................ix

28 U.S.C. § 2072(a) ..........................................................................................32

35 U.S.C. § 141(c) ............................................................................................ix

35 U.S.C. § 142 .................................................................................................ix

35 U.S.C. § 315 ..........................................................................................*passim*

35 U.S.C. § 315(b) .................................................................................30, 31, 34

## TABLE OF AUTHORITIES (Continued)

**Page**

35 U.S.C. § 315(c) ..................................................................................30, 31, 32

35 U.S.C. §§ 319, 141(c) ...................................................................................35

**Other Authorities**

16 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3932.1 (3d ed. 2012) ....................................................35

H.R. Rep. No. 112-98, pt.1, at 76 (2011) ...........................................................31

## STATEMENT OF RELATED CASES

Pursuant to Fed. R. App. P. 47.5, counsel for Yissum states that there has been no prior appeal to the Federal Circuit in these *inter partes* review proceedings of U.S. Patent No. 7,477,284.

These appeals are related to a prior litigation in the U.S. International Trade Commission against products imported by Sony Corporation, and captioned *Certain Cameras and Mobile Devices, Related Software and Firmware, and Components Thereof and Products Containing the Same* (Inv. No. 337-TA-842). That action was subsequently dismissed due to Sony ceasing the identified importing activity. The '284 patent is also asserted against Sony in the U.S. District Court for the District of Delaware, in the matter captioned *HumanEyes Technologies Ltd. v. Sony Electronics Inc. et al.*, 1-12-cv-00398 (D. Del.). That action has been stayed pending the outcome of this appeal. An appeal from IPRs addressing related U.S. Patent 6,665,003 (IPR21013-00219 and IPR2013-00327), Federal Circuit Appeal No. 15-1343, is co-pending with this appeal.

## <u>S<small>TATEMENT OF</small> J<small>URISDICTION</small></u>

This is an appeal from a final written decision of the Patent Trial & Appeal Board in two *inter partes* review proceedings, both concerning Yissum's U.S. Patent 7,477,284 (IPR2013-00219 and IPR2013-00327). The Board issued its final written decision September 22, 2014. [A1-54] The Board denied Yissum's petition for rehearing November 6, 2014. [A55-62] Yissum filed its notice of appeal January 7, 2015 [A80-84], which was within the 63-day time limit set by 35 U.S.C. § 142 and 37 C.F.R. § 90.3(a)(1). This Court therefore has jurisdiction over this appeal under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.    Whether the Board acted arbitrarily and capriciously or lacked substantial record evidence when invalidating claims 1-4, 7, 10, 20, 27-29, and 36-38, directed to systems that create panoramic stereoscopic presentations, where:

    a.  It failed to give any weight to a cause-and-effect relationship recited in the claims between actions of generating "mosaics of [a] scene," and the resulting mosaics whose display provides a "sense of depth of the scene."

    b.  It construed the "sense of depth of the scene" to apply to mere portions of the scene (or even less), even though the claims require the depth to be "of the scene" itself and not a portion, and the claims separately recite "portions of the scene" when reciting what the originally-captured non-panoramic images show.

    c.  It thus found anticipation and obviousness based on art that did not provide any sense of depth to a viewer from mosaicing (Asahi), or provided varying output across a scene so the scene was not shown with depth, and manual correction by a viewer was required just to obtain a sense of depth at a particular location in the scene (Kawakita).

    d.  It both stated that it was not relying on differences in the translations that Sony provided of the prior art, and also relied on the differences.

2.    Whether the Board erred in permitting joinder of claims 4, 7, and 38 to the present IPR, when those claims were part of an IPR petition filed after the statutory 12-month deadline for such filings, and where 35 U.S.C. § 315 permits joinder of parties, but not joinder of claims.

## INTRODUCTION

The '284 patent on appeal relates to the creation of panoramic "stereoscopic images." Such images provide a doubly-immersive experience to someone who views them, such as using video googles, because (a) they are wide so that a person can scan his or her direction of view across and around them, and (b) they use stereoscopy to trick the person's brain into seeing the panorama with a "sense of depth." The trick of the patent is how it creates such images using an ordinary (not 3D or panoramic) camera. With quotes from the '284 claims, that trick involves taking vertical segments out of many images captured by a camera, where those images show "portions of [a] scene." From those images, the invention stiches those segments together to "generate a plurality of mosaics of the scene such that" four things are produced—the fourth being "a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene." The Board found invalidity based on two primary references (Asahi and Kawakita), without finding that the mosaicing in those references (as opposed to subsequent processing) resulted in a sense of depth, or that the sense of depth was for the scene itself rather than a mere part of the scene.

The Board, in fact, did not care that the prior art lacked those features because the Board read them out of the claims. It read out the "such that" cause-and-effect requirement that connected the action of creating mosaics to the result of providing a sense of depth. And it read out the requirement that the sense of depth be for the scene

1

itself, in contrast to the claims elsewhere reciting "portions of the scene" for the input images that donate segments to the panoramas.

Apart from the technical merits, the Board acted *ultra vires* by joining an IPR that Sony filed after the one-year statutory deadline of 35 U.S.C. § 315. Congress there permitted only too-late joinder of "a party," but not joinder of claims.

The Board's erroneous decisions on these issues led to this appeal.

<u>STATEMENT OF THE FACTS</u>

## I.    The '284 Patent:  Tricking the Brain Into "Perceiving" 3D for Panoramic Images.

The '284 patent is directed to producing the effect of a panorama in 3D using stereoscopic images. Stereoscopic images have long been used to provide impressive displays—whether in penny arcades, the familiar ViewMaster toy, or 3D movies:



Stereoscopy simultaneously presents two images—one to each eye—that are slightly offset from each other (but not too far), thus tricking the visual cortex into perceiving 3D. One common way to acquire stereoscopic images is via special 3D cameras whose two spaced-apart lenses recreate the perception of spaced-apart human eyes:



The '284 patent starts out in its "Field of the Invention" by identifying this visual

trickery as what the invention is all about:

> The invention relates generally to the field of recording and generating images, and more particularly to the generation, displaying and printing of panoramic images stereoscopically. The invention specifically provides a system and method for generating and displaying a stereoscopic panoramic image set, comprising respective at least two panoramic images of a scene, each having a different viewing direction, for contemporaneous viewing by respective left and right eyes of a viewer to provide an apparent stereoscopic image of the scene to the viewer.

[A71(1:44-53)]

The trick of the '284 patent is that it builds images that are both panoramic (they

have a very wide field of view) ***and*** stereoscopic with a standard single-lens camera—

avoiding the need for an expensive, specialized camera with two lenses.

Here's how it works. The inventors of the '284 patent recognized that an image

captured by a single lens includes many portions of a scene, from the left edge to the

right edge of the image. They then noted that two vertical spaced-apart strips or

segments from an image could represent, respectively, parts of what the left and right

eyes see of the scene. [A847(3:26-41 & 4:27-49); A A70-79] The patent's Figure 12

represents this idea in the context of a camera viewed from above, and different light rays (154A-C) of what the camera currently sees (through a special prism) hit different regions 156(A-C) of a sensor in the camera.



**_F I G. 12_**

[A69; A76(11:1-29)]  Of course, that just gives two three disjointed slices from a part of the scene—not a stereoscopic panorama of the scene itself.  To get there, the inventors have the camera move in an arc—e.g., with a user holding the camera at arm's length while rotating in place—so that it captures many distinct images, each just part of the overall scene, as the rotation occurs.  [A74(8:29-44); A849(7:39-8:11)]  From each such image, a the various segments or slices may be digitally extracted, and each of the extracted slices from a particular matching position in the images may be digitally stitched, or mosaiced, together, as may each of the other slices into their own respective mosaics, until the camera is done moving and panoramic images are generated that are full mosaics of each of the corresponding strip or segment locations.  [A847(4:27-49); A849(8:11-22)]

Figure 4 below from the related U.S. Patent 6, 665,003, which the "284 patent incorporates by reference, shows such extraction and mosaicing conceptually for two constructed mosaics that represent what would be seen by the left and right eye. The multiple acquired images of a portion of the scene are in the middle row, and the right and left panoramas of the scene itself (not just a portion) are shown in the top and bottom rows, respectively. Dashed vertical lines show the image slices in the images, and arrows show how particular slices are copied from the captured images into the respective panoramas.



*F I G. 4*

[A839] The left and right panoramic images, which are correctly offset from each so that they are "stereoscopic images," may then be stored together and presented together to a user—e.g., like in old stereoscope, though with a digital twist. [A846(1:46-59); A847(3:26-41 & 4:40-49)] Neither panoramic image on its own provides a perception

of depth, but rather it is the combination of the two, slightly offset, where the perception of depth arrives.

Figure 5 of the '284 patent below shows the same general concept in a more complex implementation, where five different panoramic mosaics of the whole scene are created from strips in "successive images" 50(1), 50(2), and 50(3), that each capture part of the scene:



*FIG. 5*

[A67; A74(8:29-44)]  Note especially the relatively narrow images at the top (and even narrower slices) that capture only portions of the panoramic scene, as compared to the much wider stitched-together panoramic mosaic images which show all of the scene.

Certain types of processing of the mosaic images is a necessary part of properly displaying the images.  For example, as a person viewing a scene with goggles turns his or her head to look at different parts of a 3D panorama, the images displayed to each eye are panned in coordination to maintain the 3D effect.  [A851(11:65 to 12:3) ("The

display control module enables the left and right panoramic images [to] be aligned so as to display images relating to the same portion of the panorama at the same relative position in the viewer's field of vision.")]  But such processing cannot, under the invention, substitute for the mosaicing operations themselves producing images having a sense of depth.

Consistent with this description of the invention, claim 1 addresses an apparatus that captures images of "portions of [a] scene," and combines segments of the images into "mosaics of the scene such that … a display that receives [] the mosaics and displays them so as to provide a sense of depth of the scene":

> 1. Imaging apparatus comprising:
>
> at least one imager that moves relative to a scene so as to acquire a plurality of optical images of at least portions of the scene, each of at least two of said optical images being viewed from a different respective viewing position;
>
> a processor that receives image data representative of said at least two of the optical images and processes the data to divide each image into a plurality of segments and to generate a plurality of mosaics of the scene, such that:
>
>> each mosaic contains segments taken from different ones of said optical images;
>>
>> segments relating to at least one part of the scene are derived from at least two optical images and appear in at least two mosaics;
>>
>> the different segments of the two optical images in a given mosaic represent different parts of the scene; and
>>
>> a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene.

[A77(13:62 to 14:13)]  As shown the processor takes certain recited actions with respect to mosaicing, and thus actions result in the four recited things, including resulting in the creating mosaics providing a sense of depth to the scene.

The other claims are similar or are dependent claims.  Although some of the ultimate rejections were based on obviousness rather than anticipation, the Board relied wholly on its analysis with respect to anticipation of claim 1 [A24; A35], so the remaining claims rise or fall on substantive grounds with claim 1. (Certain claims, however, fall in a separate group on procedural grounds relating to joinder, discussed below.)

The centerpiece of this appeal are (a) the explicit "such that" connection between the mosaicing actions that the "sense of depth" result, a cause-and-effect that the Board read out by reasoning that the sense of depth could come from other processing and not from the mosaicing, and (b) the explicit claimed distinction between the panoramic mosaics and the sense of depth applying to "the scene," in contrast to the images that donate segments to the mosacis, which are "***portions*** of the scene."

## II.    The Cited Art:  Not Concerned With User Perception of a Scene.

The IPRs here were instituted and decided on two primary references—Asahi and Kawakita.[1]

---

[1] Asahi, JP 8-159762 (June 21, 1996) [A1095-1109; A2048-90]; Kawakita et al., Generation of Panoramic Stereo Images from Monocular Moving Images, SIG-CyberSpace,Virtual Reality Society of Japan (VRSJ) Research Report, VCR 97-12

### A.    Asahi:    Aerial Topographical Mapping With Triangulation to Determine Distances, and no "Perception of Depth" for a Human Viewer

The Asahi reference is directed, not to the perception a human gets in looking at a pair of images (a sense of depth), but at allowing a computer to generate a topographical map using the height of objects in images captured from an aircraft.  As shown in FIG. 10 of Asahi below, a video camera shoots down from a helicopter flying over terrain, while the system also captures GPS, gyroscope, and other data:

**[FIG.10]**



[A1107; A2083]  Asahi determines distance using triangulation techniques, by computing angles between and among items it images.  [A1097-1104; A2037-43]  Rather than being directed to making images to show to humans to give them a perception of depth, Asahi refers throughout merely to computer distance calculations—what it terms a "data extraction method" and "data generation step"—and never discusses displaying

---

(Nov. 27, 1997) [A906-12; A2091-99].  As noted above both the Board's anticipation and obviousness conclusions were premised entirely on its resolution of issues for claim 1, so we too address claim 1 here, and the rejections of the other claims must fall if the rejection of claim 1 falls.

a mosaic image pair to a person so as to provide a perception of depth  [A1095-97;

A2038-39]

Asahi works as follows.  It starts by taking successive images as the helicopter

moves, where the images overlap 60% frame-to-frame, as shown in Figure 5:



[A1105; A2079]  As shown in Figure 9 below, from each such captured "field" image,

or "frame," Asahi extracts three lines that are each a pixel wide—a "leading line" that

represents a forward view from the helicopter, a "middle line" that represents a view

straight down, and a "final line" that represents a view looking slightly backward.

**[FIG.9]**



[A1105; A2082]   As the figure further shows, these lines are combined with corresponding lines from other frames into respective rearward, nadir, and rearward "view" images.  The Asahi sensor has 2 million pixels so its length is on the order of 1000-2000 lines of pixels—so that the three overlapping frames are over 4000 lines of pixels, from which 9 are extracted to compute distances.  [A1099]  The sparseness of this coverage prevents Asahi from forming a perception of depth, even if Asahi were concerned with user viewing rather than distance computation. As Sony's own expert admitted, although "the frame [capture] rate would be high enough that you would not miss parts of the scene," consistent with the 60% overlap shown above, you would be "needing almost 99 percent overlap" of lines in successive frames to obtain human perception of depth.  [A2207]

One of Sony's translations of Asahi does mention "stereoscopic viewing" [A1100 ¶0035], which the Board relied upon in finding anticipation.  [A27]  But it was

undisputed that Asahi was using the term in its broader sense, which Sony's expert stated is a "pair of images that view a scene from … two different viewpoints." [A1862] That, of course, is much broader than the sense of depth for a human viewer recited in the '284 claims.

In short, Asahi is directed wholly to computing distance—what it refers to throughout as a "data extraction method" and "data generation step." [A1095-97] Asahi does not form pairs of images that provide the perception of depth when they are viewed, nor does to. And it captures images from tens or hundreds of meters apart, not from "slightly displaced positions" in the range of the spacing of human eyes.

### B.    Kawakita: An Incomplete Attempt in Japan at Panoramic Stereoscopic Viewing

Kawakita was a conference submission that was an incomplete attempt at producing a scene with stereoscopic images. It used a rotating camera and vertical strips, but it did not actually produce depth perception for a human viewer across a panoramic "scene" (which the '284 claims require) as opposed to just portions of the scene (which the claims contrasts with the "scene" for which the perception of depth must be provided).

The issue with Kawakita originates in its use of "optical flow" in computing the width of its strips. Optical flow is the distance a particular point in an image moves as

a camera is rotated from a first position to a second position.[2]  [A907-08]  For a given

rotation angle, objects closer to the camera will have longer "optical flow" than objects

farther from the camera, as shown in Kawakita's Figure 2, which shows an image of

part of a scene, and the different flow lengths in different parts of the scene for the

same amount of panning across that part of the scene [A908]:



    (a) Frame Image              (b) Optical Flow                (c) Slit

In Kawakita, the width of a captured strip varies based on the degree of the identified

flow, so that the width of a "left" slice will be different than the width of a "right" slice

when the objects in those slices are at different distances from the camera.  [A907-09]

This is not a problem when the objects are the same distance to the camera, but then

there is no depth to perceive, as Yissum's expert and Sony's experts both agreed.

[A1883; A2029]

---

[2] Computers can identify such motion by looking at visual discontinuities in an image—
e.g., where there is a sudden change from a black area to a white area.  For example,
a vertical corner for a wall or cabinet will be light on a side facing a light, and dark
in the shade—the lateral movement of the vertical light-to-dark line at the corner
thus shows the flow cleanly (as shown in the figures above).

Kawakita discloses a single pair of panoramic images, in Figure 5, taken adjacent an elevator lobby in an office building.  [A896]



But these images contain inconsistencies from one point to another that introduce distortions into any resulting attempt to view the images stereoscopically.  [A909-10] Only certain portions of the scene could be viewed with depth effect, and others could not, "making faithful stereoscopic viewing impossible," in Kawakita's words.  [A910] Kawakita solved this problem manually—having "10 research personnel" manually stretch and squeeze the images relative to each other so as to remove "noticeable double images" at particular positions in the scene as they viewed the scene and perceived or failed to perceive any depth.  [A911; A2035-36]  As noted, without such manual adjustment, "objects appear to overlap or [have] some other fault, making faithful stereoscopic viewing impossible," according to Kawakita.  [A910]

Kawakita's ultimate problem then, is that its mosaicing did not result in something that would provide a "sense of depth of the scene" from the mosaicing operations—which the '284 claims require.  Rather, Kawakita admittedly needed manual user intervention wholly separate from the mosaicing.

III.    The *Inter Partes* Review Proceedings.

A.    <u>Institution</u>:  Changing Positions by Petitioner and Acceptance of Those Positions by the Board

Sony filed two IPR petitions here—one before the statutory one-year bar on filing petitions had expired (addressing claims 1-3, 10, 20, 27-29, 36, and 37 [A2]) and one after (addressing claims 4, 7, and 38 [A2]).  Sony's excuse for the too-late filing was that Yissum had since identified new claims in the co-pending district court litigation— suggesting that Yissum had unfairly broadened the litigation late in the game.  In fact, Yissum had actually narrowed the litigation.  While Yissum had identified particular claims in its ITC proceeding, all claims were in play in its district court litigation when Sony filed its first IPR, and Yissum subsequently narrowed the case by identifying particular claims.  In other words, Sony was on notice before its first IPR petition that all claims were in play, yet it chose to file on a particular subset.  More important, 35 U.S.C. § 315 on joinder speaks only of joining "a party," and Congress was silent about giving the Board power to join claims too-late.  Nonetheless, the Board granted Sony's motion to merge the too-late proceeding into the timely proceeding.  [A2570-77]

B.    <u>The Board's Decision and Rehearing Decision</u>:  Removing Explicit Claim Requirements to Find Invalidity.

The Board's result in the IPR was driven by its adopted claim constructions.  For Asahi, there was no real dispute that, even if its mosaiced images were viewed by a human, there was no disclosure that they would actually provide a sense of depth.  The Board avoided that problem by refusing to accept the connection, express in the claims,

15

between the generation of the mosaiced images and the result of a sense of depth. That led the Board to conclude that "in order to anticipate, Asahi need only disclose 'a processor [to] generate a plurality of mosaics'" [A33]—when in fact the "such that" connection in the claims requires the generation mosaics that can be displayed to provide a sense of depth. The Board also tried to backfill for Asahi's lack of disclosure by noting its reference to "stereoscopic viewing," but  The Board missed that point.

For Kawakita, the Board reached rejection of the claims by the simple one-two punch of (a) not requiring the mosaicing to result in the sense of depth (and thus reasoning that it could be the result of "further processing"), and (b) allowing the sense of depth to be for mere small "portions of the scene" rather than of the scene, as the claims recited.

Yissum pointed out these problems in a petition for rehearing. [A412-26] But the Board simply repeated its assertion that "further processing" is not prohibited by the claims (which in the abstract is true, but is not true if that further processing is required in order to make the images into something that permits a sense of depth). [A55-62] But again, the Board's reasoning was centered on its inability to make the connected between the moasicing operations and the sense of depth result of those operations—identified explicitly in the claims.

This appeal followed.

16

## SUMMARY OF THE ARGUMENT

**Claim Construction**:  The Board committed legal error by reading limitations out of the '284 claims.  It first refused to apply the cause-and-effect connection between the mosaicing operations and the images with sense of depth that must result from those operations.  It then refused to accepted the explicit distinction in the claims between a "scene" and "portions of a scene"—hold that the former effectively equals the latter despite the law's requirement that they be distinguished from each other if possible.  Both these points were plain errors of claim construction that ignored explicit claim language.  They were not mere judgments about meaning of claim terms, or debates about reading limitations into the claims from the specification.  They should be reversed.

**Invalidity**:  The Board erred in finding that Asahi provided a human sense of depth at all, and finding that Kawakita had it for "the scene."  The Board recognized that both references require extra processing to make the images show depth even under a most charitable reading—therefore, neither had depth that resulted from the mosaicing actions, as the '284 claims explicitly require.  Even ignoring that problem, neither reference provided such depth across the scene—all that the camera captured, rather than a "portion" of the scene.

**Joinder**:  The Board's decision to join new claims, rather than a new party, to the initially-filed IPRs was contrary to the unambiguous language of 35 U.S.C. § 315, which speaks only to joinder of a "party," and has no provision of claims filed too-late

17

by a petitioner that is already a party to the IPR. The Board itself has recognized in subsequent decisions (since reversed by larger reconstituted panels) that the statute is "clear and unambiguous" in this regard.

## STANDARD OF REVIEW

Claim construction is a question of law reviewed de novo when, as here, the constructions were based on intrinsic evidence. *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778. F3d 1021, 1023 (Fed. Cir. 2015); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). Anticipation is a fact question reviewed for substantial evidence. *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014). Obviousness is a question of law that depends on underlying facts, *i.e.*, the scope and content of the prior art, differences between the prior art and the claimed invention, the level of ordinary skill, and any secondary indicia. *Randall Mfg. v. Rea,* 733 F.3d 1355, 1362 (Fed. Cir. 2013). This Court reviews the Board's ultimate legal determination *de novo* and its factual findings for substantial evidence. *Id.*

## ARGUMENT

### I.    The Board Erred by Ignoring Explicit Limitations on the Claims

#### A.    The Board Erred in Not Requiring that the Mosaicing Recited in the Claims Result in the Sense of Depth

The '284 claims include an express cause-and-effect requirement—i.e., the actions of generating mosaics must result in mosaics that provide a "sense of depth" when they are displayed. Claim 1 expresses this requirement by indicating that there

18

are four results from the mosaicing—one of them being the images that "provide a sense of depth" when a display shows them. And claim 1 ties these four results to the mosaicing actions using the connecting phrase "such that"—which indicates that the sense of depth results from the mosaicing, not from something else. Indeed, the claim recites nothing else before the term "such that" which would serve as an input/cause for the cause-and-effect relationship.

Such a construction matches completely with the '284 specification and the '003 specification that the '284 patent incorporates. As shown by figure 4 of the former and figure 5 of the latter, the panoramic images are the direct cause-and-effect result of the mosaicing process:



[A839; A67] The patents explicitly say that this process leads right to depth in display: "It will be appreciated that, if the images 51(i), are viewed in pairs, they will provide stereoscopic depth …" [A74(8:42-44)] While the '003 speaks of "alignment" for

display of the images, that is not an alteration of the images themselves to turn them from not having depth to having depth (which is what the claims do not allow). Rather, it is simply a statement that the two images have to be panned in coordination, so that a user wearing goggles will see the right position of each image even when he turns his head. [A851(11:65 to 12:2) "The display control module enables the left and right panoramic images [to] be aligned so as to display images relating to the same portion of the panorama at the same relative position in the viewer's field of vision."]

The Board failed to recognize this cause-and-effect connection at all, and even criticized Yissum for making the connection. The Board started its claim construction analysis by criticizing Yissum for connecting the "cause" language before the term "such that" with the "effect" language after, agreeing with Sony that Yissum "relies on a non-existent claim limitation." [A11] The Board then asserted that Yissum did "not identify any language recited in claim 1 … that requires or prohibits the adjustment of the generated mosaics …  before viewing." [A11] What both these statement miss entirely is that Yissum does not allege there is an express "no adjustment" clause in the claim. Rather, Yissum's position is that, as a natural result of the connection explicitly recited in the claims and discussed above, the mosaicing needs to result in images with depth. Thus, a system that does not create depth for the images from the mosaicing, and must rely on subsequent processing to get there, cannot meet the claim.

This construction does not read out all "further processing" or "require" or "prohibit" any further processing, as the Board seemed to believe. Instead, it only

20

prevents further processing that turns the mosaics from a form that cannot be displayed so as to provide a sense of depth, into mosaics that can. In more general terms, claim 1 by its cause-and-effect connection, requires the mosaicing to get the job done, and if it doesn't—if further processing is required to do that particular job, then the reference cannot meet the claims.

It will also be no answer for Sony to invoke the "broadest reasonable interpretation" rule to defend the Board's construction. "While the Board must give the terms their broadest reasonable construction, the construction cannot be divorced from the specification and the record evidence." *In re NTP*, 654 F.3d 1279, 1288 (Fed. Cir. 2011). The broadest reasonable interpretation standard is not "an unfettered license to interpret claims to embrace anything remotely related to the claimed invention." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Here, the features that support Yissum's claim construction are explicit in the claims—there is no issue about determining whether read a limitation into the claims via interpretation. Therefore, the broadest reasonable interpretation standard cannot be used to erase the Board's errors.

### B. The Board Erred in Construing a "sense of depth of the scene" to Cover a Sense of Depth of Only a Small Part of the Scene, When the Claims Contrast that Sense of Depth and the full Panoramic Mosaics of "the scene" with narrower input images that represent "portions of the scene"

Claim 1 requires the mosaics to "provide a sense of depth of the scene." [A77(14:13)]  The Board construed "'scene' to refer to all or a portion of an imaged scene."  [A12]  That was error.

The Board's construction is inconsistent with the express language of the claim. In particular, the claim identifies two types of elements as applying to "the scene," and one as applying to a "portions of the scene."  The first "scene" element is the "mosaics of the scene"—these are the wide items that are stitched together to show the full view around the user from moving the camera—they cover the full scene.  The second "scene" element is the "sense of depth of the scene"—and by  natural reading, it too should cover the full scene.  But there is more.  The "portions of the scene" element is the many "optical images" that the camera initially captures as it is moved, and they each undeniable capture less than the whole scene—they are narrow, non-panoramic, and donate their own portions to be stitched together to build the panoramic mosaics that do represent the scene.  Thus, the claim sets off  perfect contrast between things that can be a mere part of a scene and those that cannot.  The district court's construction wipes out that contrast and reads the words that create it right out of the claim.

The specifications of the '284 and '003 patents both show exactly why this is the right reading of the claim.  For example, Figure 4 of the '003 patent shows the narrow captured images in the middle, and they are narrow and naturally only capture a part of the scene.



*F I G. 4*

[A839]  In contrast, the mosaics (top and bottom) are built-up to provide the immersive panoramic view for a person.  They are very wide.  They address "the scene," and not a mere part of it.  Figure 5 of the '284 patent is to the same effect.  [A67]  The distinction between "portions of the scene" and "the scene" are plain , logical, easy to comprehend, explicit In claim 1, and thus a required part of the invention.

It is not entirely clear how the Board missed this straightforward distinction.  The Board's analysis was short and tucked inside its analysis on the point discussed in the prior section.  But the analysis appears to be summed up in the following two sentences:

Moreover, claim 1 recites that at least one imager acquires "a plurality of optical images of at least portions of the scene." Thus, we construe "scene" to refer to all or a portion of an imaged scene.

[A12 (citations omitted)][3] This passage from the claim does nothing to get the Board to its destination, however. That is because the "optical images" in the passage are the images acquired by the camera—the relatively narrow images shown in Figure 3 above, that are undeniably a mere portion of the scene. Perhaps the Board erroneously believed the quoted language referred to the wide, panoramic mosaiced images—it is not clear. But it does not matter in the end because the passage does not support the Board conclusory result. The Board's construction of "scene" as including a mere portion of a scene should also be reversed.

## II. None of the Prior Art Provides a Sense of Depth for a Panoramic Scene

With the Board's improper claim constructions cleared away, its invalidity decisions fall quickly. That is because neither reference discloses depth for a scene that results from mosaicing rather than from wholly separate operations

### C. Asahi Does Not Even Attempt to Provide a Sense of Depth Because it is Building a Topographical Map

It was undisputed before the Board that Asahi's focus was on machine measurement for generating topographical maps, and Asahi said nothing about providing a sense of depth via a stereoscopic pair of images. It was also undisputed

---

[3] Although the lead-in of "moreover" would normally suggest that the Board was following up a prior observation on this issue, its immediately prior statements were instead addressed to the other claim construction point. [A11-12]

that Asahi showed the use of a small collection of one-pixel-wide lines from images having millions of pixels, and as admitted by Sony's Dr. Darrell, although "the frame [capture] rate would be high enough that you would not miss parts of the scene," consistent with the 60% overlap shown below, you would need 99% overlap of lines in successive frames to obtain human perception of depth.  [A2207]



Thus, most certainly there can be no question that Asahi does not explicitly disclose the presence of stereoscopic image pairs that provide a "sense of depth of the scene" to someone who would look at them (and there is no suggestion in Asahi to show them to a human in that way in any event).

The mechanisms the Board used to fill these gaps each depended on a legally improper approach.

**First**, the Board relied centrally on Dr. Darrell's observation that the term "stereoscopic viewing" appears in one translation of Asahi that Sony obtained, and that "viewing" implies involvement of a human.  [A27-28, A30]  Even if that is true,

however, Dr. Darrell separately explained that his definition of "stereoscopic images" was "a pair of images that view a scene from … two [or multiple] different viewpoints." [A1862]  That is much broader than a pair of mosaiced images that provide a sense of depth for a scene to a viewer.  Thus, even if the words "stereoscopic viewing" are read to involve human involvement, they are not magic words because they still do not meet the requirements of the '284 claims for generating a sense of depth via mosaicing.

**Second**, the Board reasoned that "to anticipate, Asahi need only disclose 'a processor [to] generate a plurality of mosaics."  [A33]  But this reasoning depends wholly on the Board's faulty belief that there is no connection between the actions performed by the processor in the limitation that ends with "such that," and the four results that are recited as the result of the processor's operations.  As explained above, when the connection recited in the claims is properly credited, the mosaic generation by the processor not only needs to occur, but needs to result in the mosaics that have a "sense of depth of the scene" when they are displayed.  [A77]

In sum, Asahi is centered on computing distances rather than getting people to see depth in images.  Even if one assumes that the portions on which the Board relied show the presence of people, those portions do not show that the people were receiving a perception of depth, as opposed to just seeing pictures taken from different locations.

### D.    Kawakita at Most Shows Depth For Parts of a Scene, but the Claims Require Depth for the Scene, and Not Mere Parts, Because That is How Users Obtain the Illusion of Depth

As discussed above, it was undisputed before the Board that Kawakita introduced errors into its images where there was variation in distance from the camera, so that "objects appear to overlap or [have] some other fault, making faithful stereoscopic viewing impossible." The Board's anticipation findings were premised on its view that such problems could be overcome or were not relevant.

**First**, the Board reasoned that Kawakita discusses making adjustments to turn the images shown in Kawakita into stereoscopic images. [A18-19] But the fact that the adjustments to the content of the images was needed shows that the mosaicing of the images did not produce images having a sense of depth of the scene. Again, this is simply the Board misunderstanding about what the claims require vis-à-vis additional processing. Aside from the issue of further processing, if the mosaicing does not result in images having a sense of breadth, they do not teach what is claimed in claim 1 and the other '284 claims.

**Second**, the Board reasoned that adjustments weren't required where imaged items were very far away from the camera or were the same distance as each other from the camera. But in those situations, Kawakita still fails to meet the express definition because there is no depth to perceive—each portion of the scene is the same depth. Even Dr. Darrell admitted this—i.e., though he called such a situation a "degenerate sense of depth," he answered "no" to the question of whether a perception of depth

would be delivered in such a situation.  [A1883]  Dr. Darnell did hypothesize a situation in which all items in a scene were at the correct distance from the camera and the correct distance from each other that the scene could have depth perception but not too much in terms of errors.  But the problem is again that such a teaching comes wholly from Dr. Darnell adding onto Kawakita, as Kawakita shows only a single scene with paired images, and it is undisputed that "10 research personnel" had to make adjustments to the images.

In short, there can be no dispute that the claims require a sense of depth caused by the mosaicing for the scene, in contradistinction to only portions of a scene, and it is equally undisputed that Kawakita does not shows this.  As a result, Kawakita cannot anticipate or provide the necessary teachings to make an obviousness case.

## III.    The Board Acted Arbitrarily and Capriciously Its Treatment of Asahi and Kawakita Given the Discrepancies Between Sony's Two Translations.

Agency action cannot stand when it is arbitrary and capricious.  *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2000); 5 U.S.C. § 706(2)(A).  Agency reasoning that is self-contradictory is itself arbitrary and capricious.  *See, e.g., Business Roundtable v. S.E.C.* 647 F.3d 1144, 1153 (D.C. Cir. 2011) (holding an agency's explanation for its rule was "internally inconsistent and therefore arbitrary").  The Board's analysis of Asahi and Kawakita fits that description to a tee, so a remand is required for the Board to reanalyze anticipation free from a self-contradictory rationale.

The Board's problem was that, while analyzing the merits of anticipation, it relied on specific language in the new Asahi and Kawakita translations, but that, when addressing inconsistencies between the old and new translations, it disclaimed reliance on that same language. Start with Asahi. As described above, the Board placed great weight on a sentence from Sony's new Asahi translation, which said that "stereoscopic viewing is possible using this forward view image, this nadir view image, and this rearward view image," [A23], and on testimony from Sony's expert, who relied on this passage. [A1681-84] But then, in responding to Yissum's argument that the original translation did not include the "stereoscopic viewing" terminology, the Board agreed with Sony that the original translation "does not differ materially or contradict the thrust" of the new translation. [A37] The Board should not be permitted to have it both ways. If the Board was going to dismiss the differences in terminology, then it should have conducted its analysis of Asahi without relying on the disputed words "stereoscopic viewing."

The situation was similar with Kawakita. The Board relied on the fact that Sony's new translation of Kawakita stated that "a stereoscopic view is possible that *faithfully* reproduces the positional relationships," [*e.g.*, A19-20], and on testimony from Sony's expert, who relied on that terminology and admitted he placed "significant weight" on it. [A1678-81; A1899.] Yet Sony's original translation of Kawakita did not use this type of relative term—instead, it referred to "normal" or "proper" image reproduction. [A2095-99] The Board addressed the discrepancy by again agreeing with Sony that the

original translation "does not differ materially from or contradict the thrust of" the new translation. [A38] Having reached this conclusion, however, the Board could not then rely on the term "faithfully" in finding the claims anticipated. This Court should thus vacate the Board's anticipation determinations based on Asahi and Kawakita and remand for reconsideration without reliance on the disputed language in Sony's new translations.

## IV. The Board's Final Decision on Claims 4, 7, and 38 of the '284 Patent Must Be Vacated As Exceeding Its Statutory Power.

### A. The Board Had No Power to Join Sony's Second Petition Adding New Claims That Was Filed Over a Year After It Had Been Sued.

An agency's decision must be set aside as *ulta vires* where the agency exceeds the authority granted by Congress. *See, e.g., Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."); *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) ("An agency is but a creature of statute. Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress."). Here, the statute prohibits the PTO from instituting an IPR based on a petition filed over a year after the petitioner was sued for infringement, unless particular prerequisites for joinder are met. *See* 35 U.S.C. § 315(b). The joinder exception, however, allows only the addition of a new "party" to an existing IPR, not the addition of new grounds or claims at the behest of the same party that is already part of the existing IPR. See 35 U.S.C. § 315(c). The PTO thus exceeded its authority in issuing a final written decision on claims 4, 7, and 38, because it had no

authority to join those claims in response to an IPR request Sony filed over a year after it was sued.

Section 315 governs the PTO's authority in this area, and its text prohibits what the PTO did here.  Section 315(b) blocks IPR for any petition "filed more than 1 year after the date on which the petitioner … is served with a complaint alleging infringement of the patent."  The single exception is for joinder, but that joinder is also clearly limited, allowing the Director to "join *as a party* [to an instituted IPR] any person who properly files a petition."  35 U.S.C. § 315(c) (emphasis added).  This plain statutory language empowers the PTO only to join a *party*, not to join new *claims* from the party that is already in the IPR.  Congress's utter silence with respect to joinder of new claims from the same party shows it did not grant the PTO any authority in that area.

The legislative history confirms that Congress intended the joinder provision to cover adding new parties, not adding new claims from existing parties.  The Final Committee Report explained that, under this provision, "[t]he Director may allow *other* petitioners to join the *inter partes* or post-grant review."  H.R. Rep. No. 112-98, pt.1, at 76 (2011) (emphasis added).  Thus, what Congress is saying in Section 315(c) is that anyone can join an existing IPR (though without mentioning the obvious practical point that a party cannot "join" an IPR that it is already a part of).  Nothing suggests Congress intended to throw the doors open to all sorts of other joinder.

When Congress has wanted to permit joinder of claims, it has done so expressly. For example, the Federal Rules of Civil Procedure, which carry the force of statutes, *see* 28 U.S.C. § 2072(a), have separate provisions for joinder of claims and parties. Rule 18 is directed at joinder of claims (and is titled "joinder of claims"), while Rule 19 and 20 deal, respectively, with required and permissive joinder of parties. So Congress's omission of joinder of claims from section 315(c) demonstrates that the PTO is not authorized to do so, making its action here *ulta vires*.

Congress's distinction between joinder of parties and claims also makes perfect logical sense. Congress created IPRs to be fast, stream-lined mechanisms for challenging patent validity. Allowing parties to join ongoing IPRs furthers that goal by efficiently merging all related disputes into one proceeding. By contrast, allowing too-late expansion of IPRs undermines those goals by denying patent owners predictability and quick resolution (particularly where the patent owner must wait out a stay of litigation pending completion of the IPR process). And there is nothing unfair about making a petitioner pick its claims before the 1-year deadline—it will know whether the litigation posture permits the patentee to identify particular infringed claims after the 1-year deadline, or to change such identification, and it can plan accordingly by initially requesting IPR on all claims that are a threat to it. Indeed, here all claims were in play in the district court litigation when Sony filed its initial IPR, and Yissum later narrowed the litigation to a subset of the claims, so there was no unfairness that needed correction by joinder here.

The PTO's contrary reading of the statute isn't entitled to deference because it can't make up its mind about the proper interpretation. *See, e.g., Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) ("[A]n agency's interpretation of a statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view."). Although the PTAB started by granting motions to join claims, it more recently has flipped and then flopped on the issue. The flip occurred in *Target Corp. v. Destination Maternity Cop.*, IPR2014-00508 (Paper 18), where an enlarged PTAB panel voted 3-2 to prohibit joinder of claims after the 1-year time limit, noting that the statute "unambiguously does not" permit late joinder of issues, and that the legislative history showed that Congress intended only late joinder of parties, and not of issues. *Id.* at 7. The PTO then added two more judges to the panel, which switched the outcome to a 4-3 decision the other way, with the new majority holding that section 315(c)'s statement that "any person" can file a joinder motion meant that the initial petitioner could file the motion. But, as the dissenting judges (who were previously the majority) pointed out, the question of who can bring a motion does not address the fact that the content of the motion may be directed only (by the plain and unambiguous statutory language) to adding parties, and not adding claims.

The PTO thus exceeded its authority by permitting joinder of claims 4, 7, and 38 here. Sony filed its petition on those claims over a year after it was sued—the Delaware complaint on the '284 patent was filed March 29, 2012, and Sony filed its petition on

July 3, 2013. Section 315(b) thus barred the PTO from evaluating the validity of those claims, so its final written decision invalidating them was *ultra vires* and must be vacated.

## B. No Procedural Obstacles Bar Evaluating The PTO's Authority to Address Claims 4, 7, and 38.

For completeness, we note that this Court has the authority and duty to set aside the *ultra vires* part of the PTAB's final written decision, regardless of whatever procedural objections Sony (or the PTO) might raise.

As an initial matter, this Court must review whether the PTAB exceeded its statutory authority regardless of whether Yissum raised this issue to the agency. A defect that deprives an agency "of power or jurisdiction" must be "set aside as a nullity" even "in the absence of timely objection." *See, e.g., United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 38 (1952). Applying that rule, this Court and others first review whether the agency had authority to make a decision before addressing that decision's merits. *See, e.g., In re Alappat*, 33 F.3d 1526, 1530 (Fed. Cir. 1994) (*en banc*) (raising *sua sponte* an issue regarding whether the Board's decision was decided by a "legally constituted panel" because "jurisdiction cannot be conferred on this court by waiver or acquiescence"); *Railroad Yardmasters of Am. v. Harris*, 721 F.2d 1332 (D.C. Cir. 1982) (holding appellant could present an issue regarding the agency's "competency to act" despite not having raised it to the agency).

Furthermore, this Court has jurisdiction to evaluate the PTO's joinder authority, because the improper joinder impacted the PTAB's final written decision on claims 4,

7, and 38.  *See* 35 U.S.C. §§ 319, 141(c).  The final written decision found those claims

unpatentable, yet the PTAB had no authority to do that because those claims never

should have been joined in the first place.  Yissum is thus seeking review of this error

in the final written decision, not making a jurisdictionally-barred challenge to the

PTAB's institution decision like the types prohibited in *St. Jude Medical v. Volcano Corp.*,

749 F.3d 1373 (Fed. Cir. 2014) and *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271 (Fed.

Cir. 2015).

Nevertheless, even if this Court were to conclude that Yissum's challenge is

directed at the institution decision, it should still resolve it on the merits by treating this

as a petition for *mandamus*.  *See In re Cuozzo, LLC*, 778 F.3d at 1278 & n.5; 16 Charles

A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3932.1

(3d ed. 2012).  This case meets all three prerequisites for *mandamus*—(1) "the party

seeking issuance of the writ [must] have no other adequate means to attain the relief he

desires," (2) the "right to issuance of the writ is clear and indisputable," and (3) "the

writ is appropriate under the circumstances" in the exercise of this Court's discretion.

*Id.*  Yissum would have no alternative avenue to remedy the PTO's overstepping of its

statutory authority, and the discussion above shows the PTO made a "clear and

indisputable error" in reading section 315 to permit joinder of claims.  Use of the writ

is consistent with the "strong presumption" in favor of judicial review of agency action,

*Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), and it appropriately

prevents the PTO from having the unreviewable ability to ignore the strict limits

Congress placed on its power.  Withholding *mandamus* would contradict the Supreme Court's admonition that "[a]n agency may not finally decide the limits of its statutory power.  That is a judicial function."  *Social Security Bd. v. Nierotko*, 327 U.S. 358, 369 (1946).  No matter the route, the Court should vacate the PTO's *ultra vires* decision on claims 4, 7, and 38.

## CONCLUSION

For the reasons above, the Court should thus reverse and determine that claims 1-4, 7, 10, 20, 27-29, and 36-38 are patentable, or, at a minimum, vacate and remand to the Board for further consideration of the issues under a correct legal analysis and considering all relevant evidence.

Dated:  April 20, 2015                    Respectfully submitted,

*/s/ John A. Dragseth*
John A. Dragseth
Fish & Richardson P.C.
3200 RBC Plaza
60 S. Sixth Street
Minneapolis, MN 55402
(612) 335-5070

*Attorneys for Appellant,*
Yissum, Inc.

Trials@uspto.gov                                              Paper 60
Tel: 571-272-7822                          Entered: September 22, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SONY CORPORATION,
Petitioner,

v.

YISSUM RESEARCH DEVELOPMENT COMPANY OF THE HEBREW
UNIVERSITY OF JERUSALEM,
Patent Owner.
_____

Case IPR2013-00219
Patent 7,477,284 B2[1]
_____

Before SALLY C. MEDLEY, KARL D. EASTHOM, and
JAMES B. ARPIN, *Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

---

[1] *Sony Corp. v. Yissum Research Co.*, Case IPR2013-00327 ("IPR2013-00327")
has been joined with the instant Case IPR2013-00219.  IPR2013-00327, Paper 15
(PTAB Sept. 24, 2013).  This Final Written Decision is entered in both cases.

IPR2013-00219
Patent 7,477,284 B2

## I. INTRODUCTION

Sony Corporation ("Petitioner") filed Petitions requesting *inter partes* review of claims 1–3, 10, 20, 27–29, 36, and 37 (IPR2013-00219, Paper 3, "Petition" or "Pet."), and claims 4, 7, and 38 (IPR2013-00327, Paper 10)[2] of U.S. Patent No. 7,477,284 B2 (Ex. 1001, "the '284 Patent").[3]  In response, Yissum Research Development Company of the Hebrew University of Jerusalem ("Patent Owner") filed Preliminary Responses.  Paper 13 ("Prelim. Resp."); IPR2013-00327, Paper 13.

We joined Case IPR2013-00327 to Case IPR2013-00219 (*see* IPR2013-00327, Paper 15) and instituted *inter partes* review of claims 1–4, 7, 10, 20, 27–29, and 36–38 of the '284 Patent on several grounds of unpatentability, as identified below.  *See* Paper 16 ("Dec. on Inst."); IPR2013-00327, Paper 14.  Pursuant to the Joinder Decision, the parties filed all further papers and exhibits in Case IPR2013-00219.  Subsequent to institution and joinder, Patent Owner filed a Patent Owner Response (Paper 35, "PO Resp."), and Petitioner filed a Reply (Paper 37, "Pet. Reply") thereto.

In addition, Patent Owner filed a Motion for Observation (Paper 43) on the cross-examination testimony of Petitioner's declarant, Dr. Trevor Darrell, and a Motion to Exclude certain evidence (Paper 44).  Petitioner filed a Response to the Motion for Observation (Paper 52) and an Opposition to Patent Owner's Motion to Exclude (Paper 51).  Patent Owner filed a Reply to Petitioner's Opposition.  Paper 53.

---

[2] Unless otherwise indicated, reference hereinafter is to papers and exhibits filed in IPR2013-00219.

[3] The '284 Patent is a child of U.S. Patent No. 6,665,003 B1 (Ex. 1002, "the '003 Patent"), which is at issue in related Cases IPR2013-00218 and IPR2013-00326.

2

IPR2013-00219
Patent 7,477,284 B2

Petitioner also filed a Motion to Exclude certain evidence.  Paper 47.  Patent Owner filed an Opposition to Petitioner's Motion to Exclude (Paper 50), and Petitioner filed a Reply to Patent Owner's Opposition (Paper 54).

The parties requested and appeared at an oral hearing before the panel on June 18, 2014.  The record includes a transcript of the hearing.  Paper 59 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during trial.  For the reasons that follow, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–4, 7, 10, 20, 27–29, and 36–38 of the '284 Patent are unpatentable.

### A. The '284 Patent

The '284 Patent describes methods and apparatus for generating mosaics of a scene from image data of the scene and displaying the mosaics to provide a sense of depth.  *See* Ex. 1001, Abstract.  In particular, the '284 Patent relates generally to the field of recording and generating images and, more particularly, to the generation and display of panoramic images stereoscopically.  *Id.* at col. 1, ll. 44–47.  The '284 Patent specifically describes generating and displaying a stereoscopic, panoramic image set, comprising respectively at least two panoramic images of a scene, each having a different viewing direction or line, for contemporaneous viewing by respective left and right eyes of a viewer to provide an apparent stereoscopic image of the scene to the viewer.  *Id.* at col. 1, ll. 47–53.

According to the '003 Patent,[4] creating and displaying non-panoramic, stereoscopic images was known in the art, but "currently, there are no such arrangements for generating and displaying stereoscopically *panoramic* images."

---

[4] The '284 Patent claims the benefit of and incorporates by reference the disclosure of the application from which the '003 Patent issued.  Ex. 1001, col. 1, ll. 7–13,

3

IPR2013-00219
Patent 7,477,284 B2

Ex. 1002, col. 1, ll. 41–43(emphasis added); *see* Ex. 1001, col. 1, l. 66–col. 2, l. 1.

Figure 3 of the '284 Patent is reproduced below:



Figure 3 schematically depicts a functional block diagram of the
stereoscopic data source according to the '284 Patent.

In Figure 3, a functional block diagram of the stereoscopic data source, such
as data source 11n of Figure 2 (not reproduced), is depicted. Stereoscopic data
source 11*n* of Figure 2 "includes an image capture unit 30, a local memory unit 31,
a processing unit 32, one or more local displays 33A, 33B, . . . and a
communication unit 34, as well as [an] operator control panel 22." Ex. 1001,

27–33.

4

IPR2013-00219
Patent 7,477,284 B2

col. 6, ll. 58–61.  Image capture unit 30, local memory unit 31, processing unit 32, and local displays 33A and 33B may be housed together and form a video camera 21, such as that described in connection with Figure 2.  *See id.* at col. 6, ll. 61–64, Fig. 2.  Capture unit 30 may include, for example, an image sensor, aperture, lenses, and/or the like to facilitate capturing or acquiring of images.  *Id.* at col. 6, ll. 64–67.  A suitable image sensor may be any of a number of "conventional" image sensors, including, for example, charge coupled devices, film, and the like. *Id.* at col. 6, l. 67–col. 7, l. 3.

> The '003 Patent describes stereoscopic viewing and images as follows:
>
> A person can see stereoscopically because his or her eyes are displaced horizontally (when standing) which, will provide a perception of depth when viewing a scene, which would not be present otherwise.  *Stereoscopic images comprise two images recorded of a scene recorded from slightly displaced positions, which, when viewed simultaneously by the respective eyes, provides a perception of depth.*

Ex. 1002, col. 1, ll. 32–39 (emphasis added).

Figure 5 of the '284 Patent, which depicts the generation of a stereoscopic, panoramic set of images that may be used to display a scene or portions of a scene to provide a sense of depth of the scene to a viewing person, is reproduced below:

5

IPR2013-00219
Patent 7,477,284 B2



Figure 5 presents the operations performed by the stereoscopic panoramic image arrangement in connection with generating a stereoscopic panoramic set according to the '284 Patent.

Figure 5 depicts a stereoscopic, panoramic image set which comprises a plurality of panoramic images. When the panoramic images are viewed in sets, a stereoscopic image is perceived. In particular, Figure 5 represents a series of successive images 50(1), 50(2), . . . 50(i), that are recorded by the stereoscopic data

6

IPR2013-00219
Patent 7,477,284 B2

source 11*n* as stereoscopic data source 11*n* is translated and/or rotated with respect

to a scene or a portion of a scene.  Ex. 1001, col. 8, ll. 25–33.

As the Specification of the '284 Patent explains,

[a] plurality of panoramic images 51a, 51b . . . comprising a stereoscopic panoramic image set are generated using respective strips a1, a2, . . . a3, b1, b2, . . . b3, . . . from the respective images 50(i). Strips a1, a2, . . . a3 that are used in image 51a all from the same horizontal displacement from the center of the respective images 50(i), strips b1, b2,. . . b3 that are used in image 51b are all from [sic] same horizontal displacement from the center of the respective images 50(i), and so forth.  *It will be appreciated that, if the images 51(i) are viewed in pairs, they will provide stereoscopic depth since they will effectively have different viewing directions.*

*Id.* at col. 8, ll. 34–44 (emphasis added).

## B. Illustrative Claim

Of the challenged claims, claims 1, 27, and 38 are independent claims.

Independent claims 1 and 27 are directed to imaging apparatus (*id.* at col. 13, l. 62,

col. 16, l. 5), and independent claim 38 is directed to methods for processing image

data (*id.* at col. 17, ll. 3–7).  Each of dependent claims 2–4, 7, 10, and 20 depends

directly from claim 1.  Each of dependent claims 28, 29, 36, and 37 depends

directly from claim 27.  Challenged claim 1 is illustrative and is reproduced below,

with some additional indentation and line spacing, solely for the sake of clarity:

1.  Imaging apparatus comprising:

at least one imager that moves relative to a scene so as to acquire a plurality of optical images of at least portions of the scene, each of at least two of said optical images being viewed from a different respective viewing position;

a processor that receives image data representative of said at least two of the optical images and processes the data to divide each

7

IPR2013-00219
Patent 7,477,284 B2

image into a plurality of segments and to generate a plurality of mosaics of the scene, such that:

each mosaic contains segments taken from different ones of said optical images;

segments relating to at least one part of the scene are derived from at least two optical images and appear in at least two mosaics;

the different segments of the two optical images in a given mosaic represent different parts of the scene; and

a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene.

### C. References, Declarations, and Depositions

Petitioner and Patent Owner primarily rely upon the following references, declarations, and depositions:[5]

| Exhibit | References, Declarations, and Depositions |
|---------|-------------------------------------------|
| 1004 | Kawakita et al., *Generation of Panoramic Stereo Images from Monocular Moving Images*, SIG-CyberSpace ,Virtual Reality Society of Japan (VRSJ) Research Report, VCR 97-12 (Nov. 27, 1997) ("Kawakita")[6] |
| 1006 | US 2001/0010546 A1 (published Aug. 2, 2001/filed Sep. 26, 1997) ("Chen") |
| 1007 | Eastman Kodak Company, *Kodak Digital Science™ DC50 Zoom Camera User's Guide* (Jan. 1996) ("Kodak"). |
| 1010 | Inoue, JP H08-159762 (June 21, 1996) ("Asahi") |
| 1013 | First Declaration of Dr. Trevor Darrell ("first declaration") |
| 1039 | US 5,737,491 (issued Apr. 7, 1998) ("Allen") |
| 1040 | Joined Declaration of Dr. Darrell[7] |

[5] Unless otherwise noted, each of "Kawakita" (Ex. 1004) and "Asahi" (Ex. 1010) refers to a respective certified English language translation of a Japanese language document (Exs. 1003 and 1009, respectively) provided by Petitioner.

[6] Petitioner has added page numbers 13–19 to Kawakita.

[7] This declaration is from joined Case IPR2013-00327.

IPR2013-00219
Patent 7,477,284 B2

| 1042 | Wikipedia article entitled "Stereoscopy" |
| 1043 | Deposition of Dr. Irfan Essa |
| 1044 | Second Declaration of Dr. Darrell ("second declaration") |
| 2008 | First Deposition of Dr. Darrell |
| 2010 | Declaration of Dr. Essa |
| 2014 | Second Deposition of Dr. Darrell |
| 2019 | Declaration of Mr. Barton |
| 2020 | Deposition of Mr. Barton |

### D.  Grounds of Unpatentability

This *inter partes* review involves the following grounds of unpatentability:

| References | Basis | Claims |
|---|---|---|
| Kawakita | 35 U.S.C. § 102(a) | 1, 10, 27, 36, and 38 |
| Kawakita | 35 U.S.C. § 103(a) | 1, 10, 27, and 36 |
| Kawakita and Chen | 35 U.S.C. § 103(a) | 1, 2, 10, 27, 28, and 36 |
| Kawakita, Chen, and Kodak | 35 U.S.C. § 103(a) | 3 and 29 |
| Asahi | 35 U.S.C. § 102(b) | 1, 3, 20, 27, 29, and 37 |
| Kawakita, Chen, and Allen | 35 U.S.C. § 103(a) | 4 and 7 |

## II. ANALYSIS

### A. Claim Construction

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *see also Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012) (*Claim Construction*).  Under the broadest reasonable construction standard, a claim term is presumed to have an ordinary and customary meaning as would be understood by one of ordinary skill

in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). A patentee may act as his or her own lexicographer by providing a special definition for a claim term in the specification with "reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Generally, in the absence of such a special definition or other considerations, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

In our Decision on Institution, we provided constructions for various terms of the challenged claims. Dec. on Inst. 10–19. Neither party expressly challenges our constructions of these terms or suggests that other terms require express construction in order to render our final decision in this review. Nevertheless, as discussed below, Patent Owner contends that neither Kawakita nor Asahi discloses or suggests "***a processor [to] generate a plurality of mosaics . . . . [that] provide a sense of depth of the scene***" or "***a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene***." PO Resp. 3. Therefore, for purposes of this final decision, we expressly construe each of these terms.

>   1. *"a processor [to] generate a plurality of mosaics . . . [that] provide a sense of depth of the scene"*

In our Decision on Institution, we construed the term "processor that processes the data to divide each image [of the scene] into a plurality of segments" to mean a processor that divides, e.g., separates, each image into a plurality of segments or strips. Dec. on Inst. 14. Referring to claim 1, reproduced above in Section I.B., we note that Patent Owner combines the language of the "processor" element, namely, "***a processor [to] generate a plurality of mosaics . . .***" with that of the "display" element, namely, "***[that] provide a sense of depth of the scene***," to

IPR2013-00219
Patent 7,477,284 B2

create the term "***processor [to] generate a plurality of mosaics . . . [that] provide a sense of depth of the scene***."  PO Resp. 3, 8, 13, 15, 17, 18, 21, 30, 32.  Petitioner contends that Patent Owner's argument

> relies on a non-existent claim limitation.  None of the claims call for a processor that generates mosaics that provide a sense of depth of the scene.  [Patent Owner] rewrites the claims to incorporate a function of the display ("displays them so as to provide a sense of depth of the scene") into the processor element.

Pet. Reply 1; *see id.* at 4, 10.  We agree with Petitioner and determine that this term language is not recited in claim 1.

As discussed in greater detail below, Patent Owner argues that the "plurality of mosaics of the scene" generated by the processor must "provide a sense of depth of the scene," *without further adjustment*.  *See* PO Resp. 16–17 (referring to Kawakita); 31–32 (referring to Asahi).  Further, Patent Owner argues that the processor must provide a sense of depth for the entire scene, rather than a partial scene.  *Id.* at 17 (referring to Kawakita).  Initially, we are not persuaded based on the language of claim 1 that the function recited with respect to the "display" may be attributed necessarily to the "processor."  *See* Tr. 62:20–63:4 (Petitioner arguing that the display and processor may function together).

In addition, Patent Owner does not identify any language recited in claim 1, or, for that matter, in the Specification of the '284 Patent, that requires or prohibits the adjustment of the generated mosaics, either by the processor or by the display, before viewing.  *See* PO Resp. 5–7.  Finally, we note that claim 1 recites an "[i]maging apparatus *comprising*" elements, including the processor and the display.  Ex. 1001, col. 13, l. 62 (emphasis added).  "'Comprising' is a term of art used in claim language which means that the named elements are essential, *but other elements may be added and still form a construct within the scope of the*

11

IPR2013-00219
Patent 7,477,284 B2

*claim.*" *Genentech, Inc. v. Chiron Corp.,* 112 F.3d 495, 501 (Fed. Cir. 1997) (emphasis added).

Moreover, claim 1 recites that at least one imager acquires "a plurality of optical images *of at least portions* of the scene." Ex. 1001, col. 13, ll. 64–65 (emphasis added). Thus, we construe the "scene" to refer to all or a portion of an imaged scene. *See, e.g.*, Ex. 1001, col. 4, ll. 53–55 ("The display, if provided, will display at least a portion of one or more of the images comprising a stereoscopic panoramic image set."); col. 5, ll. 19–23 ("the respective viewing device 12*m* can include a control to facilitate selection of a stereoscopic panoramic image set for display, selection of display mode, and selection of a portion of the stereoscopic panoramic image set to be displayed.").

Therefore, we construe the recited processor as functioning to generate the plurality of mosaics of the scene or a portion of a scene, but the processor is neither required to perform, nor prohibited from performing, adjustments to the generated mosaics, and the generated mosaics are not required themselves to "provide a sense of depth of the scene."

> 2. *"a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene"*

In our Decision on Institution, we construed the term "display" to mean

> one or more elements that receive a plurality of the mosaics and display the plurality of the mosaics so as to provide, in conjunction with an "appliance" or a "binocular device," a sense of depth of the scene from which the mosaics were generated for viewing by a person. *In other words, the Specification makes clear that a display does not preclude, and some embodiments may utilize, a further viewing appliance or device to help provide a sense of depth to the viewer.*

12

IPR2013-00219
Patent 7,477,284 B2

Dec. on Inst. 16–17 (emphasis added).  We similarly construed the term "sense of
depth of the scene" to mean the visual perception of differential distances among
objects, where "the sense of depth must be perceived by a person viewing the
display, albeit with appliances or other devices," as noted above with respect to our
construction of the term "display."  *Id.* at 17–18; *see* Tr. 60:21–61:2.

In addition, as we noted in our Decision on Institution (Dec. on Inst. 24),
challenged claim 10 depends directly from claim 1, and claim 10 recites an
imaging apparatus "wherein *the display* displays the at least two mosaics so that
each eye sees a different one of the mosaics."  Ex. 1001, col. 14, ll. 42–44.  Other
claims of the '284 Patent can be valuable sources of enlightenment as to the
meaning of a term of a challenged claim.  *Vitronics Corp. v. Conceptronic, Inc.*, 90
F.3d 1576, 1582 (Fed. Cir. 1996).  Because claim terms generally are used
consistently throughout a patent, the usage of a term, e.g., display, in one claim
may illuminate the meaning of the same term in other claims.  *See Rexnord Corp.
v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).  Given that claim 10
narrows the scope of the display of claim 1 (*see* 35 U.S.C. § 112, ¶ 4), the meaning
of the term "display," as used in claim 1, encompasses the stereoscopic[8] display
described in claim 10.

Although, as discussed in greater detail below, Patent Owner argues that
Asahi does not disclose or suggest this limitation because Asahi does not disclose
displaying mosaic images to a person to provide a perception of depth (PO Resp.
25), Patent Owner again does not identify any language recited in claim 1 or in the

---

[8] A relevant definition of the term "stereoscopic" is "[o]f or pertaining to
stereoscopy; especially, three dimensional," or "[o]f or pertaining to a
stereoscope."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE
1264 (1976) (Ex. 3001).  The '284 Patent relates specifically to "human stereo
panoramic perception."  *See* Ex. 1001, col. 2, ll. 10–11.

IPR2013-00219
Patent 7,477,284 B2

Specification of the '284 Patent, that requires or prohibits the adjustment of the generated mosaics, by the display before viewing (*see id.* at 5–7). *See* Tr. 62:20–63:4. Petitioner does not contest our previous construction of these terms. Pet. Reply 3–4. For reasons similar to those set forth above with respect to the "processor" element of claim 1, we also are persuaded that the "display" of claim 1 is neither required to perform, nor prohibited from performing, adjustments to the received mosaics and that the received mosaics are not required themselves to "provide a sense of depth of the scene."

For this decision, we adopt and apply the foregoing constructions, as well as our constructions of other claim terms, as set forth in our Decision on Institution. Dec. on Inst. 10–19. All remaining claim terms and phrases recited in the challenged claims are given their ordinary and customary meanings, consistent with the Specification, as would be understood by one with ordinary skill in the art, and need not be construed expressly here.

*B. Asserted Grounds of Unpatentability*

1. Introduction

Petitioner asserts that that claims 1–4, 7, 10, 20, 27–29, and 36–38 of the '284 Patent are unpatentable, and, in particular, that a) claims 1, 10, 27, 36, and 38 are anticipated by Kawakita; b) claims 1, 10, 27, and 36 are rendered obvious over Kawakita; c) claims 1, 2, 10, 27, 28, and 36 are rendered obvious over Kawakita and Chen; d) claims 3 and 29 are rendered obvious over Kawakita, Chen, and Kodak; e) claims 1, 3, 20, 27, 29, and 37 are anticipated by Asahi; and f) claims 4 and 7 are rendered obvious over Kawakita, Chen, and Allen. To support these asserted grounds of unpatentability in its Petitions, Petitioner provides detailed explanations, and the declaration of Dr. Darrell, to show how each reference

14

IPR2013-00219
Patent 7,477,284 B2

discloses each claim limitation.[9]  *See* Pet. 16–33, 45–50; IPR2013-00327, Paper

10, 17–26, 38–40; Ex. 1013.

     Relying partially on the declaration of Dr. Irfan Essa, Patent Owner counters

that neither Kawakita nor Asahi discloses or suggests each and every element of

claim 1 and that "[c]laim 1 is representative" of the challenged claims in this trial.

*See* PO Resp. 9, 20, 32; Ex. 2010.  Claims 2–4, 7, 10, and 20 depend from claim 1.

Independent claims 27 and 38 are similar in scope to claim 1, and claims 28, 29,

36, and 37 depend from claim 27.  Patent Owner only raises substantive arguments

with respect to claim 1 of the '284 Patent, and does not argue any of the other

independent claims or any of the dependent claims, separately from claim 1.  Other

arguments, not presented in the Patent Owner Response, are deemed waived.

Paper 17, 2 ("The patent owner is cautioned that any arguments for patentability

not raised in the response will be deemed waived.")

     Upon consideration of the parties' arguments and contentions and their

supporting evidence, we determine that Petitioner has demonstrated by a

preponderance of evidence that claims 1–4, 7, 10, 20, 27–29, and 36–38 of the

'284 Patent are unpatentable based on the foregoing grounds.  In our analysis

below, we focus on Patent Owner's arguments presented in the Patent Owner

Response, which dispute whether the applied references disclose or suggest certain

elements allegedly recited in claim 1.  *See Office Patent Trial Practice Guide*, 77

Fed. Reg. at 48,766 ("The [Patent Owner] [R]esponse should identify all the

involved claims that are believed to be patentable and state the basis for that

---

[9] Petitioner's declarant, Dr. Darrell, and Patent Owner's declarant, Dr. Essa, each provide a description of a person of ordinary skill in the relevant art.  Ex. 1013 ¶ 8; Ex. 2010 ¶ 13.  These descriptions are substantially similar.  For purposes of this decision, we adopt Dr. Essa's description which encompasses the qualifications of each declarant.

IPR2013-00219
Patent 7,477,284 B2

belief.").

2. Kawakita
Anticipation—Claims 1, 10, 27, 36, and 38
Obviousness—Claim 2–4, 7, 28, and 29

*1. Processor*

Petitioner reads the elements of independent claim 1 of the '284 Patent on the disclosure of Kawakita.  Pet. 16–20.  In particular, claim 1 recites "a *processor* that receives image data representative of said at least two of the optical images and processes the data to divide each image into a plurality of segments and to generate a plurality of mosaics of the scene" (emphasis added).

Petitioner contends that Kawakita discloses excising, e.g., dividing, vertical slit images from the video frame images, and these vertical slit images are used to derive left eye and right eye slit images.  Pet. 16–17 (citing Ex. 1004, 15).  Thus, Petitioner contends that Kawakita discloses receiving "image data representative of said at least two of the optical images" and processing "the data to divide each image into a plurality of segments."  *Id.*  Although Petitioner acknowledges that Kawakita does not disclose expressly the use of a processor, Petitioner contends that

> Kawakita's system *necessarily* uses, and, therefore, *inherently* discloses, a processor to generate the mosaics, because, among other things, digital image data corresponding to each video frame is captured by a 320x240 pixel imager and digital processing steps including "template matching" is performed on the image data as part of the procedure for determining slit widths.

Pet. 17 (emphases added).  "It is well settled that a prior art reference may anticipate when the claim limitations not expressly found in that reference are nonetheless inherent in it.  'Under the principles of inherency, if the prior art *necessarily* functions in accordance with, or includes, the claimed limitations, it

16

IPR2013-00219
Patent 7,477,284 B2

anticipates.'" *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002) (emphasis added; citations and internal quotation marks omitted). In support of Petitioner's contention of inherency, Petitioner's declarant, Dr. Darrell (Ex. 1013 ¶¶ 1–4), states that "[i]t would have been *necessary* and obvious to employ a processor to perform these steps, especially in light of the number of pixels being processed, which would be unfeasible to perform by hand." Ex. 1013 ¶ 10.b. (emphasis added); *see* Pet. 17. In view of this evidence, we are persuaded here that Kawakita inherently discloses the use of a processor.

Nevertheless, Patent Owner argues that Kawakita fails to disclose or suggest "a processor [to] generate a plurality of mosaics … [that] provide a sense of depth of the scene," as allegedly recited in claim 1. PO Resp. 13–21. Specifically, Patent Owner argues that Kawakita describes two different situations that may occur, based on the relative distances of the objects in the scene, namely:

> When the left and right panoramic images obtained using the foregoing procedure are viewed binocular stereoscopically, a stereoscopic view is possible that faithfully reproduces the positional relationships. However, if the camera was placed at a comparatively close distance, or if the distance from the camera to the objects varies greatly, the positions representing the left and the right panoramic images must be adjusted.

PO Resp. 10 (quoting Ex. 1004, 16–17). Thus, Patent Owner contends that Kawakita teaches that the objects viewed stereoscopically either (1) are at roughly the same distance from each other or (2) are at different distances from each other. PO Resp. 10–11. In the first situation, Patent Owner contends that perception of, or sensing depth by, a person viewing displayed images is not possible because objects are roughly the same distance from the camera. *Id.* at 13–15. In the second situation, Patent Owner contends that, although perception of, or sensing depth by,

17

IPR2013-00219
Patent 7,477,284 B2

a person viewing displayed images is possible, Kawakita's display must be subjected to a parallax adjustment process to align the images. *Id.* at 15–17.

First, Patent Owner argues that Petitioner's declarant, Dr. Darrell, acknowledges that there must be "differential distance of objects in the scene to provide a perception of depth" (PO Resp. 14 (quoting Ex. 2008, 32:16–23)) and that, if there is no such "differential distance," no perception of depth of viewed mosaicked images is possible (PO Resp. 14–15 (quoting Ex. 2008, 47:9–19)). Thus, in Patent Owner's alleged first situation of Kawakita, no perception of depth is possible, *with or without adjustment*. PO Resp. 15 (citing Ex. 2010 ¶ 35).

Second, Patent Owner argues that that Dr. Darrell acknowledges that "Kawakita performs multiple alignment adjustments to the images, one for each sight line direction that an observer looks" (PO Resp. 16 (citing Ex. 2008, 72:2–9)) and that, "if no subsequent adjustment is made when a viewer shifts to a different line of direction[,] faithful stereoscopic viewing is that portion of the scene is not possible" (PO Resp. 16 (citing Ex. 2008, 84:15–24). Thus, in the Patent Owner's alleged second situation of Kawakita, no perception of depth is possible, *without adjustment*, and then a perception of depth is provided for only a portion of the displayed image. PO Resp. 17 (citing Ex. 2010 ¶¶ 41–42).

Initially, we note that, given our construction of the language of claim 1, even if a parallax adjustment process to align the images or a similar adjustment process is performed, so that the mosaics displayed to a person provide a "sense of depth," such adjustments to the generated mosaics are neither required nor prohibited to "provide a sense of depth of the scene." *See supra* 10–14 (Sections II.A.1. and II.A.2.). Nevertheless, Petitioner contends that Patent Owner misunderstands Kawakita's disclosure as requiring adjustment in order to display

18

IPR2013-00219
Patent 7,477,284 B2

(or view) *any* mosaics "to provide a sense of depth to the scene." Pet. Reply 5–6. We agree with Petitioner.

Contrary to Patent Owner's interpretation of Kawakita, Petitioner contends that Kawakita discloses at least three situations by the text quoted above. *Id.* at 5 (quoting Ex. 1004, 16–17). In particular, Kawakita states that "[w]hen the left and right panoramic images obtained using the foregoing procedure are viewed binocular stereoscopically, *a stereoscopic view is possible that faithfully reproduces the positional relationships, if the image was captured from a sufficient distance*." Ex. 1004, 16 (emphasis added). Petitioner contends that, by this first sentence, Kawakita indicates that unadjusted mosaic pairs may "faithfully reproduce[] the positional relationships [of objects in the imaged scene], if the image was captured from a sufficient distance." Pet. Reply 5. Petitioner further contends that the second sentence of this quoted passage describes two situations in which adjustments may be necessary. *Id.* First, adjustments may be necessary when "the camera was placed at a *comparatively* close distance," and, second, adjustments may be necessary when "the distance from the camera to the objects varies *greatly*." Ex. 1004, 16–17 (emphases added). Petitioner contends that Kawakita's use of the adverb "greatly" makes clear that Kawakita was not requiring adjustment in every situation, but, instead, only in those situations in which the distances between the camera and the objects vary "greatly." Pet. Reply 5–6.

Further, contrary to Patent Owner's arguments, Petitioner contends that Dr. Darrell did not make statements inconsistent with Petitioner's reading of Kawakita during his cross-examination. Pet. Reply 6; *see* PO Resp. 17–21. "Kawakita equates 'faithful stereoscopic viewing' with no noticeable double images at all, *i.e.*, near perfect stereoscopic viewing." Pet. Reply 7 (citing Ex. 2008, 59:8–16).

19

IPR2013-00219
Patent 7,477,284 B2

Petitioner contends, however, that Dr. Darrell's testimony supports the conclusion that "an image pair that produces an imperfect perception of depth is still a stereoscopic image pair." *Id.* (citing Ex. 2008, 59:17–60:5). At the oral hearing, however, Patent Owner argued that the recited display "provide[s] a sense of depth of the scene," but Kawakita only teaches "providing . . . a sense of depth of a partial scene." Tr. 82:24–83:2. Thus, Patent Owner argues that Kawakita does not "provide a sense of depth of *the scene*" (emphasis added).

Nevertheless, Petitioner notes that the testimony of Dr. Essa, Patent Owner's declarant, supports the conclusion that, despite disparities along different lines of sight, a pair of images still may be considered a stereoscopic pair. *Id.* at 7–8 (citing Ex. 2010 ¶ 25); *see also* Ex. 2008, 34:19–35:8 (discussing appearance of flagpole in the background of Ex. 2007). Further, Dr. Essa states that "the term 'stereoscopic image' is a broad term, which generally refers to a pair of images that view a scene from two different viewpoints." Ex. 2010 ¶ 48. Dr. Darrell agreed with this interpretation during his deposition, as follows: "'Stereoscopic image' is a broad term but most naturally would be defined as a pair of images that view a scene from [at least] . . . two different viewpoints." Ex. 2008, 26:11–14. Therefore, based on testimony of both declarants, we are persuaded that, although a viewer may not perceive a sense of depth of every portion of a scene from every sight line, the viewer still may perceive a "sense of depth of the scene" despite the presence of disparities in portions of the scene.

Petitioner contends that

Kawakita discloses excising (i.e., dividing) "vertical slit images" (i.e., segments) from the frame images (i.e., optical images). [Kawakita,] Secs. 1, 3, 4 ("The slit image that is ultimate[ly] excised is a slit image of width sw from the position w/2+x for the left eye and w/2-x-sw for the right eye."), 5. "All of the slit images excised from the frame images are continuously composited [(i.e., mosaicked)] in sequence."

> *Id.*, Sec. 5; Sec. 6; *see also id.* English Abstract ("this technique cuts and connects vertical slit images"). Mosaicing the slit images results in two mosaics of the scene, as depicted in Fig. 5 (the elevator hallway).

Pet. 16–17. Thus, Petitioner contends that the "mosaicing" of Kawakita's slit images results in two mosaics of the scene, as depicted in Kawakita's Figure 5, and discloses the generation of "a plurality of mosaics of the scene," as recited in claim 1. *Id.* at 17.

Given our claim construction of the processor element (*see supra* 10–12 (Section II.A.1.)), we conclude that the recited claims encompass the generation of mosaics with respect to all or a portion of a scene. Consequently, we are persuaded that Petitioner's reading of Kawakita disclosure is accurate and that Kawakita discloses or suggests the processor element, as recited in claim 1.

### 2. Display

Finally, claim 1 recites that the imaging apparatus comprises "a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene." As noted above, we construe a display to mean one or more elements that receive a plurality of the mosaics and display the plurality of the mosaics so as to provide a sense of depth of the scene from which the mosaics were generated for viewing by a person. *See supra* 12–14 (Section II.A.2.). Kawakita discloses that a field test was conducted based on the mosaics generated by Kawakita's apparatus. Ex. 1004, 18. Kawakita further discloses that "[a]s a result of stereoscopic viewing with alignment control of the panoramic images using the calculated depth parallax angles with [ten] research personnel, there were no noticeable double images in the objects attended to, and *the sense of depth* was faithfully reproduced." *Id.* (emphasis added). In view of this field test, Petitioner contends that "'a display' that displays the mosaics to provide a sense of depth was

21

IPR2013-00219
Patent 7,477,284 B2

*necessarily* used, and, therefore, is *inherently* disclosed." Pet. 20 (emphases added). Patent Owner argues that the display of Kawakita's mosaics does not "provide a sense of depth of the scene." PO Resp. 13–17. For the reasons discussed above, we are persuaded that Kawakita discloses or suggests this limitation.

Kawakita discloses generating stereoscopic images in the manner disclosed in the '284 Patent. *See* Ex. 1004, 14–18. In support of Petitioner's contention, Dr. Darrell declares that "Kawakita discloses a technique *to generate stereoscopic panoramic images* by excising slit images from images captured by a rotating camera and mosaicing the respective slit images together." Ex. 1013 ¶ 10.a. (emphasis added). In particular, Kawakita discloses that "it is possible to generate panoramic images with a sense of realism and view them stereoscopically with few limitations during image capture and without using special equipment." Ex. 1004, 18–19. In addition, Kawakita discloses a rotating camera in which "the left and right camera positions correspond to the left and right eye positions when viewing a panoramic image stereoscopically." Ex. 1004, 15.

In Kawakita's field test, the left eye and right eye panoramic images of Kawakita's Figure 5 allegedly were displayed to ten researchers to determine whether "the sense of depth was faithfully reproduced" by these images. *See* Ex. 1004, 18. Patent Owner argues that the two images of Kawakita's Figure 5 cannot provide a sense of depth without further adjustment. PO Resp. 12.

IPR2013-00219
Patent 7,477,284 B2

Figure 5 of Kawakita is reproduced below:



Fig. 5: Panoramic Images of an Elevator Hallway

Figure 5 of Kawakita depicts "left and right panoramic images created from images taken of an elevator hallway," with the upper and lower rows of mosaic slits respectively representing the left and right eye panoramic images. Ex. 1004, 16. Kawakita states that, "[a]s a result of stereoscopic viewing with alignment control of the panoramic images using the calculated depth parallax angles with [ten] research personnel, there were no noticeable double images in the objects attended to, and the sense of depth was faithfully reproduced." *Id*. at 18.

It is sufficient to demonstrate anticipation, that Kawakita discloses each and every element of the claimed invention, in some situations. In particular, Kawakita discloses that its mosaicked images may reproduce faithfully the positional relationships between objects in a scene. Ex. 1004, 18. Thus, we are persuaded that Petitioner has demonstrated, contrary to Patent Owner's arguments, that the two images of Kawakita's Figure 5 provide a sense of depth, without further adjustment, and that the ten researchers could detect a sense of depth by viewing the two images of Kawakita's Figure 5. *See id*. at 17–18. Therefore, pursuant to the foregoing discussion, we conclude that Petitioner demonstrates by a preponderance of the evidence that Kawakita discloses or suggests the display element, as recited in claim 1.

As noted above, Patent Owner only argues that certain elements of claim 1, i.e., the processor and display elements, are not disclosed or suggested by

23

IPR2013-00219
Patent 7,477,284 B2

Kawakita. Patent Owner does not argue that other elements of claim 1 are not disclosed or suggested by Kawakita and does not argue that independent claim 27 or 38, or any of the dependent claims, are separately distinguishable over Kawakita or the other references combined with Kawakita. PO Resp. 21. Because we are not persuaded by Patent Owner's arguments regarding alleged deficiencies in the disclosure or suggestions of Kawakita with respect to the challenged elements of claim 1, and because we conclude based on our review of the parties' arguments and contentions and the record evidence that the other elements of claim 1 are disclosed by Kawakita, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is anticipated by Kawakita. As noted in our Decision on Institution, a disclosure that anticipates under 35 U.S.C. § 102 also renders the claim unpatentable under 35 U.S.C. § 103, for anticipation is the epitome of obviousness. Dec. on Inst. 24–25 (citing *In re Pearson*, 494 F.2d 1399, 1402 (CCPA 1974); *In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982)).

Consequently, we also conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is rendered obvious over Kawakita. Further, because Patent Owner does not argue separately any of claims 2–4, 7, 10, 27–29, 36, and 38, we conclude that, based on our review of the parties' arguments and contentions and the record evidence, Petitioner has demonstrated by a preponderance of the evidence that claims 10, 27, 36, and 38 of the '284 Patent also are anticipated by Kawakita and that claims 2–4, 7, 10, 27–29, and 36 are rendered obvious over Kawakita, alone or in combination with other references. Pet. 20–23, 29–33; IPR3013-00327, Paper 10, 17–26; 38–40; *see* Dec. on Inst. 20–29.

3. <u>Asahi</u>
<u>Anticipation—Claims 1, 3, 20, 27, 29, and 37</u>

The Petition in IPR2013-00219 details how Asahi anticipates claims 1, 3, 20, 27, 29, and 37. Dec. on Inst. 29–34. In response, Patent Owner asserts that "[c]laim 1 is representative" of the claims challenged based on Asahi. PO Resp. 21. In other words, in the Patent Owner Response, Patent Owner does not contend that the challenged claims are patentably distinct from claim 1. *Id.*.

Asahi's method "relates to a method and a device for three-dimensional data extraction, and to a stereo image formation device; more specifically, it relates to a method and a device for extracting three-dimensional data from video images, and to a stereo image formation device that forms stereo images from video images." Ex. 1010 ¶ 1. The method takes video images of a target region using an aircraft. *Id.* ¶¶ 1, 35, 36. The method creates continuous "mosaic images" from forward, middle, and rear lines of fields in video frames, which respectively form "the forward view image," "the nadir view image," and "the rearward view image." *Id.* ¶ 35. Changes in variable factors, such as flying speed, flight path deviations, altitude, pitch, roll, and yaw, require a vertical parallax removal process to calculate a parallax difference, create the mosaic images, calculate height, and create 3D topographical maps by using the stereo mosaic images. *See id.* ¶¶ 1, 3, 7, 11, 29, 36, 55–57, 61, 63, 70, claims 1, 11. In other words, to create 3D maps, Asahi creates "stereo images" to calculate heights as an intermediate step in the process. *See id.* ¶ 29; *see also* Ex. 2014, 87:3–21, 92–100:8 (Dr. Darrell describing Asahi's system and testifying that Asahi's system uses "two stereo images" to calculate three-dimensional height data to form maps). Asahi also states that "stereoscopic viewing is possible using this forward view image, this nadir view image, and this rearward view image." Ex. 1010 ¶ 35.

Regarding operation of the processor, claim 1 recites that "each mosaic

25

IPR2013-00219
Patent 7,477,284 B2

contains segments taken from different ones of said optical images [and] segments relating to at least one part of the scene are derived from at least two optical images and appear in at least two mosaics."  Petitioner contends that Asahi discloses each of these features.  Pet. 47–49 (citing Ex. 1010 ¶¶ 34, 35; Figs. 8, 9, 12, 19).

As with the grounds of unpatentability based on Kawakita, Patent Owner argues that "[c]laim 1 is representative" (PO Resp. 21) and focuses solely on distinguishing claim 1 over Asahi (*id.* at 21–32).  In particular, Patent Owner argues that Asahi fails to disclose two elements of claim 1 of the '284 Patent.  First, Patent Owner argues that Asahi fails to disclose "a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene."  PO Resp. 24–30.  Second, Patent Owner argues that Asahi fails to disclose "a processor [to] generate a plurality of mosaics … [that] provide a sense of depth of the scene."  *Id.* at 30–32.  For the reasons set forth below, we are not persuaded that, to the extent that both these elements actually are recited in claim 1 of the '284 Patent, Asahi fails to disclose them.  Consequently, we conclude that Petitioner demonstrates by a preponderance of the evidence that Asahi anticipates claims 1, 3, 20, 27, 29, and 37 of the '284 Patent.

1. *a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene*

Claim 1 recites that the imaging apparatus comprises "a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene."  Ex. 1001, col. 14, ll. 12–13.  As noted above, we construe a display to mean one or more elements that receive a plurality of the mosaics and display the plurality of the mosaics so as to provide a sense of depth of the scene, from which the mosaics were generated, for viewing by a person.  *See supra* 12–14 (Section

IPR2013-00219
Patent 7,477,284 B2

II.A.2.).  Petitioner contends that Asahi discloses a "*stereo image* formation device" (Pet. 49 (citing Ex. 1010, claim 24 (emphasis added))) and discloses that "*stereoscopic viewing* is possible using [the] forward view image, [the] nadir view image, and [the] rearward view image" (*id.* (quoting Ex. 1010 ¶ 35 (emphasis added))).  *See* PO Resp. 25.  In our Decision on Institution, we were persuaded that "[i]n view of the quoted disclosure from Asahi (Ex. 1010 ¶ 35; claim 11) and the known definition of 'stereoscopic,'[10] . . . Asahi's '*stereoscopic viewing*' discloses displaying mosaic images to a person so as to provide a sense of depth of a scene." Dec. on Inst. 32 (emphasis added).

Patent Owner argues that "the term 'stereoscopic' [in Asahi] does not, by itself, teach the claimed mosaic images that ***provide a sense of depth of the scene*** to a person."  PO Resp. 25.  Moreover, Patent Owner argues that Asahi's use of the term "stereoscopic image" is not limited to images that, when viewed, provide a perception of depth to a person.  *Id.* at 25–26.  Instead, Patent Owner argues that

> Asahi's use of the term "*stereoscopic viewing*" (as well as the terms "*stereo images*," "*stereoscopic images*," and "*stereo matching*") is referring to calculating height of a terrain and not to generating and displaying images to a person to thereby provide a perception of depth of the scene.  Asahi states:
>
>> "*stereo images* needed for *stereo matching* are obtained from images resulting from video imaging, and by which *heights are calculated*."

*Id.* at 26 (quoting Ex. 1010 ¶ 10 (emphases added)).  Thus, Patent Owner argues that each of these terms, when properly read together, discloses only its reference to the calculation of heights, and not to the display of mosaics "***to provide a sense of depth of the scene***."  PO Resp. 30.

---

[10] *See supra* 13 n.8.

IPR2013-00219
Patent 7,477,284 B2

In particular, Patent Owner argues that the reliance on the disclosure of Asahi's claims 11 and 24 in our Decision on Institution is misplaced. *Id.* at 26–27. Patent Owner further argues that Asahi's claims 11 and 24 describe "a data extraction device" and "extraction means," respectively, and that these descriptions relate to height calculations, rather than the display of mosaicked images. *Id.* Further, Patent Owner argues that Petitioner's declarant, Dr. Darrell, acknowledges that stereoscopic images may include both images that involve human vision, but also images that are viewed by algorithms or machine vision. *Id.* at 26–27 (citing Ex. 2008, 26:9–16, 29:7–15). Moreover, with respect to a specific academic subfield, Dr. Darrell stated that "one can have stereoscopic images that are computed solely for robotic vision." PO Resp. 28 (quoting Ex. 2008, 30:23–31:5).

In addition, Patent Owner's declarant, Dr. Essa, states that the meaning of "stereoscopic image" depends upon the context within which the term is used. PO Resp. 28–29. Dr. Essa explains that

> For example, when speaking with a colleague that is working on images generated to be suitable for human viewing, I would understand the term as referring to human perception of depth and when speaking with a colleague that is performing depth calculation of objects, I would understand that the term "*stereoscopic image*" solely refers to an image for computer vision which is used to calculate the depth of the objects in the scene.

*Id.* at 29 (quoting Ex. 2010 ¶ 48 (emphasis added)). Consequently, Patent Owner argues that the term "stereoscopic viewing" alone does not disclose that there is a display, as recited in claim 1, and that, within the context of Asahi's disclosure, Asahi's use of the term "stereoscopic viewing" refers to a machine calculation of height, rather than the display of mosaics "***to provide a sense of depth of the scene***." PO Resp. 29–30.

28

IPR2013-00219
Patent 7,477,284 B2

Petitioner disagrees and contests each of Patent Owner's arguments as applying a limited scope to Asahi's disclosure regarding the term "stereoscopic viewing." Pet. Reply 8–10. Petitioner contends that "height calculation is specifically addressed extensively in Asahi, and where addressed, the language is clear." *Id.* at 9. In particular, Petitioner cites to several portions of Asahi's disclosure, including claim 11, in which Asahi addresses the calculation of height. *Id.* (citing Ex. 1010, Abstract ("height is calculated"), Claim 1 ("height calculation step"), Claim 11 ("height calculation means"), ¶ 8 ("Heights are calculated"), ¶ 10 ("heights are calculated"), ¶ 56 ("calculating height"), ¶ 63 ("height can be calculated"), ¶ 70 ("height data can be computed")).

Moreover, we conclude that Patent Owner misunderstands our citations to Asahi's claims 11 and 24 in our Decision on Institution. Dec. on Inst. 31–32. The three-dimensional data extraction device of Asahi's claim 11 comprises both a continuous mosaic image generation means and a height calculation means. In particular, we noted that Asahi discloses "*a continuous mosaic image generation means that extracts image data of prescribed lines in prescribed screens in consecutive screens of captured images, and generates at least two continuous mosaic images from among a forward view image, a nadir view image, and a rearward view image.*" *Id.* at 32 (quoting Ex. 1010, claim 11 (emphases added)). Thus, as applied to claim 1 of the '284 Patent, our citation to Asahi's claim 11 was due to its recitation of the "continuous mosaic image generation means," rather than of the "height calculation means."

Similarly, Asahi's claim 24 describes a stereo image formation device, and Asahi's claim 25, which depends from claim 24, recites that the stereo image formation device further comprises "a vertical parallax removal means *that removes vertical parallax from the images* combined by said combining means,

29

IPR2013-00219
Patent 7,477,284 B2

based on exterior orientation elements of each of the line image data on which [the images] are based" (emphasis added). Thus, claim 24 also is directed to an embodiment for the display of images, rather than solely to the calculation of height. *See* PO Resp. 22–23 (citing Ex. 1010 ¶¶ 50–52, 58; Figs. 10, 11, 14, 15).

Petitioner contends that the term "stereoscopic viewing" refers to human viewing of stereoscopic images. In particular, Petitioner argues that the ordinary meaning of "viewing" is not "calculating." Pet. Reply 9. Initially, we note that a relevant definition of the word "viewing" is "the act of looking at or watching, as of watching television." WEBSTER'S NEW WORLD DICTIONARY 1488 (3rd College ed. 1988) (Ex. 3004).[11] Moreover, as Petitioner notes, the term "stereoscopic viewing" is used in contexts distinct from the calculation of height. *See* Ex. 1010 ¶ 35 ("If the travel speed when imaging is constant, and the orientation of the camera is also constant, *stereoscopic viewing* is possible using this forward view image, this nadir view image, and this rearward view image. Note that lenses of short focal length may be used *to emphasize height*, which is to say, to increase the resolution." (emphases added)). Neither Patent Owner nor Dr. Essa identifies a definition of the term "stereoscopic viewing" in Asahi's disclosure — or elsewhere — that is limited to the calculation of height.

Petitioner also points out that

the term "stereoscopic viewing" appears only once in Asahi's disclosure, in reference to mosaics of images recorded under special conditions: where the "travel speed when imaging is constant, and the orientation of the camera is also constant." [Ex. 1010 ¶ 35.] Asahi then addresses the need for vertical parallax removal as part of the

---

[11] Petitioner cites to other dictionaries for definitions of the word "viewing." *See* Pet. Reply 9 (citing Exs. 1045 and 1046). We note, however, that those definitions may not predate the earliest application from which the '284 Patent claims benefit. Ex. 1001, Cover Page (item (60)).

30

> process of calculating height under the variables of flying speed, flight
> path deviations, and altitude changes, among other things, that typify
> video imaging from aircraft.  [Ex. 1010 ¶¶ 36–71; *see also id.* Fig. 4.]

Pet. Reply 9.  Dr. Essa opines that stereoscopic viewing "does not refer to displaying images to a person," but bases this opinion on citations to other terms in Asahi, specifically, "stereoscopic image," "stereo images," and "stereo matching." Ex. 2010 ¶¶ 48, 49.  Further, referring to Figure 11 of Asahi, Dr. Essa indicates that the defects (i.e., waves) in the letter "F" "result[] from flight turbulence/deviation, imaging limitations, and instrumentation inaccuracy, etc." Ex. 2010 ¶ 52.

Nevertheless, as noted above, Asahi's stereoscopic viewing is of mosaics of images captured "if the travel speed when imaging is constant, and the orientation of the camera is also constant."  Ex. 1010 ¶ 35.  Although Dr. Essa relies on the alleged defects in the reproduction of letter "F" to show that Asahi's unadjusted images do not provide depth perception (Ex. 2010 ¶ 61), according to Dr. Darrell, those defects typically do not occur in stereoscopic images produced for viewing (Ex. 1044 ¶ 30).  *See also* Ex. 1043, 174:21–176:8 (acknowledging that "three-dimensional topographical maps" produced according to Asahi may be suitable for human viewing).  Even if some defects were produced (when speed or camera orientation was *not* constant), the defects would "not be so severe in every case as to preclude depth from being perceived upon viewing an appropriate display of a pair of the mosaics."  Ex. 1044 ¶ 25.  Consequently, we are not persuaded that defects, such as those depicted in Asahi's Figure 11, would be present in all such images displayed for "stereoscopic viewing," within the context of that term's use in Asahi.

Finally, we are not persuaded by Patent Owner that Dr. Darrell's testimony

IPR2013-00219
Patent 7,477,284 B2

shows that Asahi's use of the term "stereoscopic viewing" applies solely to robotic vision and the calculation of height.  *See* PO Resp. 27–28.  Patent Owner fails to persuade us that Dr. Darrell's testimony regarding how the term "stereoscopic viewing" might be understood by colleagues in different contexts, explains how that term should be understood in view of Asahi's disclosure.  *Id.*  Dr. Darrell opines that, "although a person of ordinary skill in the art as of 1998 might understand terms such as 'stereo images' and 'stereoscopic images' to refer to images for calculating distance, depending on the context, the word 'viewing' would have been understood to refer to human observation."  Pet. Reply 10 (citing Ex.1044 ¶ 24).  Consequently, Dr. Darrell concludes that "Asahi's [images] . . . could be viewed using an appropriate display and provide a perception of depth."  Ex. 1044 ¶ 23.  In particular, we note that, during cross-examination, Dr. Darrell responded "yes" when asked:  "Is it your opinion . . . that the stereo images . . . in Asahi are capable of being viewed so as to produce a depth - - or perception of depth in a human."  Ex. 2014, 100:5–9.

After considering Petitioner's contentions and supporting evidence that Asahi discloses "a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene," as recited in claim 1, and Patent Owner's arguments and supporting evidence to the contrary, we conclude that Petitioner has shown by a preponderance of the evidence that Asahi discloses this element, as recited in claim 1.

2. *a processor [to] generate a plurality of mosaics ... [that] provide a sense of depth of the scene*

Patent Owner argues that, "to construct images capable of providing a perception of depth to a person, the images must be generated in accordance with the separation and from the perspective of human eyes."  PO Resp. 30 (citing Ex.

32

IPR2013-00219
Patent 7,477,284 B2

1001, 2:55–59, 3:8–31).  Patent Owner further argues that Asahi fails to disclose this requirement in constructing its images because Asahi only calculates the height of objects — and does not generate images that can be viewed by a person "**to provide a sense of depth of the scene**."  *Id.* at 30–31; *see* Ex. 2010 ¶ 47. Initially, we note that this element is not recited in claim 1.  *See supra* 10–12 (Section II.A.1.).  Consequently, in order to anticipate, Asahi need only disclose "a processor [to] generate a plurality of mosaics."  Neither party contests that Asahi discloses this element.

Nevertheless, Petitioner also contends that Patent Owner's assertion that the pair of images must be generated in accordance with the separation and from the perspective of human eyes is incorrect.  Pet. Reply 11.  In particular, Petitioner notes that "[n]either of [the passages cited by Patent Owner] supports the proposition that only images 'generated in accordance with the separation and from the perspective of human eyes' can provide a perception of depth to a person."  *Id.* Moreover, Petitioner contends that the '003 Patent, which is incorporated by reference into the '284 Patent, explicitly discloses "that images recorded from viewpoints separated by distances (called the 'baseline') that are larger or smaller than the distance between human eyes will provide a sense of depth when viewed by a person."  *Id.* (quoting Ex. 1002, 7:17–26); *see* Ex. 1044 ¶ 9.  Further, referring to the example taught in the Wikipedia article (Ex. 1042, 13), Petitioner notes that stereoscopic images may be generated from cameras disposed 100 feet apart.  Pet. Reply 12–13; *see* Ex. 1044 ¶ 16.  Patent Owner's declarant, Dr. Essa, acknowledged that images that provide a sense of depth to a human viewer may be generated with a baseline greater than the separation between human eyes.  Ex. 1043, 168:2–25.

Patent Owner argues that, although Asahi discloses performing a vertical

33

IPR2013-00219
Patent 7,477,284 B2

parallax adjustment to the generated images (Ex. 1010, Figs. 14, 15), such vertical parallax adjustment alone does not remedy the wavy image defects.  PO Resp. 31–32; *see* Ex. 2010 ¶¶ 52–53.  Patent Owner argues that such vertical parallax adjustment adjusts the forward and rearward images vertically relative to each other.  PO Resp. 32.  Although such adjustments "would result in the letter 'F' having a more upright orientation," other image defects would remain.  *Id.*  In particular, Patent Owner argues that "the vertical parallax adjustment of the mosaic images does not generate horizontal aligned images suitable for human viewing."  PO Resp. 23 (citing Ex. 2010 ¶¶ 50–51).  Patent Owner argues that those defects would prevent a person from viewing the images so as to perceive "a sense of depth of the scene."  *Id.* (citing Ex. 2010 ¶¶ 52–53.)

As discussed above, Petitioner contends that the presence of some defects in the image does not prevent the images from being viewed stereoscopically.  Pet. Reply 13.  In particular, according to Dr. Darrell, "if some defects were introduced in the mosaic images recorded under that circumstance, . . . the defects would not be so severe in every case as to preclude depth from being perceived upon viewing an appropriate display of a pair of the mosaics."  *Id.* at 13–14 (quoting Ex. 1044 ¶ 30).  Further, according to Dr. Darrell, "a person of ordinary skill in the art as of 1998 'would understand that the left and right eye images must be horizontally aligned and would understand how to align the images,' as evidenced by 'the numerous anaglyph images that were available at the time.'"  Pet. Reply 14 (quoting Ex. 1044 ¶ 26).  On the other hand, Dr. Essa could not be sure whether a person skilled in the art as of 1998 would know how to perform the kind of horizontal alignment required to address further any defects in Asahi's images.  Pet. Reply 14; *see* Ex. 1043, 170:9–171:16.

As Petitioner notes, prior art references "must be 'considered together with

34

the knowledge of one of ordinary skill in the art'." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (quoting *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).  In view of the unrebutted testimony of Petitioner's declarant, Dr. Darrell, we are persuaded that such horizontal adjustments, in addition to the vertical adjustments disclosed by Asahi, were within the abilities of a person of ordinary skill in the relevant art in 1998.  Given our construction of the language of claim 1, neither vertical nor horizontal adjustments are required to be, or prohibited from being, performed on the generated mosaics adjustments to "provide a sense of depth of the scene."  *See supra* 10-14 (Sections II.A.1. and II.A.2.).  Therefore, after considering Petitioner's contentions and supporting evidence that Asahi discloses "a processor [to] generate a plurality of mosaics . . . [that] provide a sense of depth of the scene," as recited in claim 1, and Patent Owner's arguments and supporting evidence that Asahi does not disclose generating such images, we conclude that Petitioner has shown by a preponderance of the evidence that Asahi discloses this element, as recited in claim 1.

As noted above, Patent Owner only argues that certain elements of claim 1 are not disclosed by Asahi.  Patent Owner does not argue that other elements of claim 1 are not disclosed by Asahi and does not argue that independent claim 27 or any of the dependent claims are separately distinguishable over Asahi.  PO Resp. 21.  Because we are not persuaded by Patent Owner's arguments regarding alleged deficiencies in the disclosure of Asahi with respect to claim 1, and considering the record evidence and the contentions and arguments by the parties, we also conclude that Petitioner demonstrates by a preponderance of the evidence that claims 3, 20, 27, 29, and 37 of the '284 Patent are anticipated by Asahi.  Pet. 45–50; *see* Dec. on Inst. 29–34.

IPR2013-00219
Patent 7,477,284 B2

## C. Motions to Exclude Evidence

### 1. Petitioner's Motion to Exclude Evidence

Petitioner moves to exclude Exhibits 2012 and 2013 filed by Patent Owner. Paper 47.  As discussed below, Exhibits 2012 and 2013 respectively correspond to "other translations" of Asahi, Exhibit 1010, and Kawakita, Exhibit 1004, which, according to Petitioner, were submitted to Patent Owner's exclusive licensee, a real party-in-interest in these proceedings, during an ITC Investigation.  Paper 47, 2–3.[12]  Petitioner challenges these translations for lack of relevancy and as beyond the scope of Dr. Darrell's testimony.  *Id.* at 4–7.  As to the former, Petitioner asserts that Exhibits 2012 and 2013 are not relevant to show the accuracy of the translations filed by Petitioner in this proceeding, Exhibits 1004 and 1010, because Patent Owner did not challenge the accuracy of those translations or seek to cross-examine the translators.  *Id.* at 5.  As to the latter, Petitioner asserts that Dr. Darrell did not did not testify regarding the accuracy of the translations in Exhibits 1004 and 1010.  *Id.* at 6.

Patent Owner provided Exhibits 2012 and 2013 to show inconsistencies in Exhibits 1010 and 1004, asserting relevancy, and asserting that they are within the scope of Dr. Darrell's testimony, because Dr. Darrell relies on Exhibits 1004 and 1010.  *See* Paper 50, 2, 7–9.  Patent Owner also argues that another translation of Asahi, Exhibit 2012, submitted by Patent Owner, contradicts paragraph 35 of Asahi, Exhibit 1010.  *See* Paper 50, 8–9.  Patent Owner reasons that Exhibit 2012

---

[12]  Petitioner explains that, in this proceeding, it provided a certified translation of Asahi (Ex. 1010), rather than relying on the uncertified translation (Ex. 2012).  *See* Paper 47, 5.  Petitioner also explains that it provided a certified translation of the entire conference booklet that contains Kawakita (Ex. 1004), rather than relying on Exhibit 2013, because whether the former constitutes a "printed publication" was a potential issue in this proceeding.  *See id.* at 2 n.3.

uses the term "3D image" and does not use the term "stereoscopic viewing," which Asahi uses in paragraph 35, Exhibit 1010. *See id*. Petitioner maintains that Exhibit 2012 does not materially differ or contradict the thrust of Asahi, Exhibit 1010. *See* Paper 54, 1–2. The record supports Petitioner. For example, Patent Owner does not challenge a related statement in paragraph one, wherein Asahi states that "[t]he present invention relates to . . . *extracting three-dimensional data from video images, and to a stereo image formation device that forms stereo images from video images*." Ex. 1010 ¶ 1 (emphasis added). Paragraph 1 of Exhibit 2012 (emphasis added) similarly refers to "an apparatus for extracting 3D data from a video image and *a stereo-image creation apparatus for creating a stereo image from a video image*."

The record also shows that, even if paragraph 35 of Exhibit 1010 refers to a 3D image as a map, instead of a stereoscopic mosaic image, that map image derives from two stereoscopic images, which provide computer vision, and at the least, are capable of being viewed by a human if horizontally aligned. *See, e.g*., Ex. 2014, 87:3–16 (describing Asahi). Moreover, Dr. Darrell testified, during cross-examination about Exhibit 2012, that, in context, "this is a stereoscopic 3D image. So it wouldn't change my opinion." *Id*. at 128:1–2); *see also* Tr. 21:5–19 (Referring to Dr. Darrell's testimony, "[i]n the context of Asahi, where he's talking about a 3D image can be shown to a viewer using mosaics, that a person skilled in the art would understand that means stereoscopic viewing."). Finally, Patent Owner did not move to dismiss as unreliable, Exhibit 1010, which is certified as "an accurate and faithful rendition of the original text" under penalty of perjury. Ex. 1010, 1 (signed by Martin Cross, Patent Translations Inc.). Patent Owner also did not seek to cross-examine Mr. Cross.

Patent Owner also argues that another translation of Kawakita, Exhibit 2013, contradicts Kawakita, Exhibit 1004. *See* Paper 43, 2–3. Patent Owner reasons that Exhibit 2013 does not use the term "faithful" to describe the image reproduction and Dr. Darrell relies on that term. *See id.* Petitioner and Dr. Darrell maintain persuasively that Exhibit 2013 does not materially differ from or contradict the thrust of Exhibit 1004. The latter employs similar words such as "normal" and "proper[]" image reproduction to describe the same "faithful" effect in terms of adjustment or otherwise. *See* Paper 54, 4 (citing Ex. 2013, 5, 6, 8; Ex. 2014, 139:19–140:3, 140:22–141:11, 142:5–21). Patent Owner does not move to exclude Exhibit 1004 as unreliable, which is certified "under penalty of perjury that the foregoing [translation of Kawakita] is true and correct." Ex. 1004, 1 (cover page signed by Christopher Girsch, Park IP Translations). Patent Owner also did not seek to cross-examine Mr. Girsch.

As discussed, the alleged inconsistencies respond to Dr. Darrell's testimony about the references. Based on the foregoing, Petitioner's motion is *denied*.

## 2. Patent Owner's Motion to Exclude Evidence

Patent Owner moves to exclude a Wikipedia article entitled "Stereoscopy" (Ex. 1042), certain passages of Dr. Essa's deposition (Ex. 1043, 52:8–72:11), certain paragraphs of Dr. Darrell's second declaration (Ex. 1044 ¶¶ 15–16, 23–24), and certain passages of Petitioner's Reply (Paper 37, 12–15). *See* Paper 44, 3–11 (Patent Owner's Motion to Exclude). Patent Owner moves to exclude the Wikipedia article (Ex. 1042) based on the assertion that it lacks authentication, constitutes hearsay (Paper 44, 3–5), presents evidence that "is not responsive to arguments raised for the first time in Patent Owner's Response," and is untimely (*id.* at 6 (citing 37 C.F.R. §§ 42.23(b), 42.123)).

IPR2013-00219
Patent 7,477,284 B2

Patent Owner moves to exclude paragraphs 15 and 16 of Dr. Darrell's second declaration and pages 12–13 of Petitioner's Reply because "relying on the untimely [Wikipedia evidence] should be stricken from the record" (Paper 44, 7), and also, any reliance on "the unauthenticated hearsay [Wikipedia] evidence should be stricken from the record" (*id*. at 5). Similarly, Patent Owner challenges the identified passages of Dr. Essa's deposition based on the assertion that the cross-examination relies on the inadmissible Wikipedia article, which is "beyond the scope [of direct] and lacking authentication." *Id*. at 7.

Patent Owner also moves to exclude paragraphs 23 and 24 of Dr. Darrell's second declaration, which refer to aspects of Asahi, and pages 12–15 of Petitioner's Reply, which allegedly rely on that testimony, based on the assertion that the testimony "is not responsive to issues raised for the first time by Patent Owner." *See* Paper 44, 7–8.

i) Cross-Examination, Exhibit 1043 (Dr. Essa's Deposition), and Exhibit 1042 (the Wikipedia Article).

The challenged Wikipedia article, "Stereoscopy," (Ex. 1042), contains 19 web pages of information about stereoscopy. The Wikipedia article pages relevant to this proceeding—those upon which Petitioner primarily relies for cross-examination of Dr. Essa (and relies upon as direct testimony as discussed below)—involve pages 11–13. *See* Ex. 1044 ¶ 16 (citing Ex. 1042, 11–13); Ex. 1043, 52:8–72:11 (passages related to the Wikipedia article, Ex. 1042).[13]

---

[13] Before Petitioner filed the Wikipedia article as Exhibit 1042 or used it during cross-examination of Dr. Essa, Patent Owner and Patent Owner's declarant, Dr. Essa, cited it, albeit not directly, but as a link that appears in another directly relied-upon web-based citation. *See* Ex. 2010 ¶ 27 (Dr. Essa's declaration citing Ex. 2003, a webpage entitled "stereoscopy (stereoscopic imaging)," which, in turn, provides a link to the challenged "Stereoscopy" Wikipedia article cited by Petitioner, Ex. 1042).

IPR2013-00219
Patent 7,477,284 B2

Patent Owner seeks to exclude Dr. Essa's deposition passages spanning from page 52, line 8, to page 72, line 11, on the assertion that Dr. Essa's cross-examination improperly refers to contents in the challenged Wikipedia article. Paper 44, 7. Patent Owner asserts that the lack of authentication of the Wikipedia article renders cross-examination about it inadmissible, and also, that, because the passages "relate to the Wikipedia entry[, Ex. 1042, they] . . . fall outside the scope of [Dr. Essa's] direct testimony." *Id.*

Although a large portion of the challenged deposition pages (Ex. 1043, 52:8–72:11) pertains to cross-examination based on certain portions of the Wikipedia article, several of the pages pertain to cross-examination based on passages in the '003 Patent, from which the '284 Patent claims benefit, or other evidence. For example, the section from page 65, line 2, to page 69, line 17, of the deposition (Ex. 1043), pertains to cross-examination about "exaggerated" and "normal" stereo images as described in the '003 Patent, and related evidence. The thrust of the cross-examination concerns the "exaggerated" stereo concept as described in the '003 Patent—baselines larger than the human inter-ocular baseline. *See* Ex. 1043, 52:8–72:11. Also, without using the Wikipedia article in particular, but using general questioning, Dr. Essa affirmed the underlying thrust of Petitioner's question, by answering "[w]hen presented properly" to Petitioner's question: "[D]o I understand correctly that - - that one can use a imaging system like two stereo cameras or a single stereo camera that has a baseline wider than the approximate distance between human eyes" to "provide a perception of depth?" *See* Ex. 1043, 59:23–60:8; *accord id.* at 60:9–17 (similar colloquy).

Therefore, based on Patent Owner's contentions in its motion, we deny the motion to the extent that it pertains to excluding the portions of Dr. Essa's

IPR2013-00219
Patent 7,477,284 B2

deposition that do not involve, specifically, the Wikipedia article as a basis for impeachment. Patent Owner has not carried the burden on its motion, at least as to the challenged deposition pages that do not involve the Wikipedia article. On the other hand, to simplify issues, and based on Patent Owner's arguments, which rely on the Wikipedia article, we do not rely upon the portions of the deposition that relate to cross-examination of Dr. Essa based on that article: Exhibit 1043, 52:8–59:22, 60:18–65:1, 69:18–72:11.

Similar questioning, which Patent Owner does not challenge, elicited similar and related testimony about baseline distances. *See* Ex. 1043, 59:23–60:17; *id*. at 30:1–33:1 (passages discussed briefly in next paragraph). The questioning shows that Dr. Essa did not dispute clearly Petitioner's contention that a stereoscopic perception of depth may be provided using relative baselines—i.e., when images are recorded at distances that are wider than the distance between human eyes. In contrast, prior to cross-examination, Dr. Essa's direct testimony indicates that two conditions must be met for proper depth perception: 1) recording images at the human inter-ocular distance and 2) horizontally aligning them. *See* Ex. 2010 ¶ 26. Dr. Essa does not testify clearly whether or not the latter alignment can cure the former recording distance.

Accordingly, contrary to Patent Owner's argument challenging the deposition as non-responsive, the cross-examination in the challenged section falls within the scope of Dr. Essa's declaration testimony.[14] It was proper for Petitioner to clarify or challenge Dr. Essa's position regarding the human inter-ocular baseline. *Compare* Ex. 2010 ¶ 26 (testifying that "if the red/cyan images are not

---

[14] As outlined above, Patent Owner's non-responsiveness argument also appears to be directed to cross-examination based on the Wikipedia article. Nevertheless, the non-responsiveness argument is intertwined with the related (unchallenged) evidence employed for cross-examination.

41

generated from the perspective of human eyes *and* properly aligned horizontally"
that "double (overlap) images would appear and make stereoscopic fusion
impossible") (emphasis added), *with* Ex. 1043, 59:23–60:8 (quoted above,
answering "[w]hen presented properly," to a question about whether an image
"provide[s] a perception of depth" when "a single stereo camera . . . has a baseline
wider than the approximate distance between human eyes"); *see also id.* at 30:1–
33:1 (agreeing that the amount of disparity (i.e., depth perception) generally varies
with baseline distance) (deposition section not challenged), 69:2–17 (agreeing,
based on the '003 Patent, that "enlarging the viewing circle means increasing the
baseline to something larger than the approximate distance between human eyes").

Based on the foregoing discussion, Patent Owner has not satisfied its burden
on its Motion to Exclude the particular cross-examination testimony of Dr. Essa at
the following passages of the deposition:  Exhibit 1043: 59:23–60:17; 65:2–69:17.
We do not rely on the following passages that relate to cross-examination of Dr.
Essa based on the Wikipedia article:  Exhibit 1043, 52:8–59:22, 60:18–65:1, and
69:18–72:11.  Similarly, we do not rely on any portion of the Wikipedia article,
Exhibit 1042, for purposes of the cross-examination (Ex. 1043).  We do, however,
consider, to a minor extent, one section of the Wikipedia article (Ex. 1042, 13,
section titled "A practical example"), as direct evidence, as discussed below.

Therefore, we deny Patent Owner's Motion to Exclude Exhibit 1043 at the
following passages: 59:23–60:17; 65:2–69:17.  We dismiss as moot Patent
Owner's Motion to Exclude Exhibit 1043 at the following passages: 52:8–59:22;
60:18–65:1; 69:18–72:11.  We dismiss as moot Patent Owner's Motion to Exclude
Exhibit 1042 for purposes of cross-examination.

IPR2013-00219
Patent 7,477,284 B2

ii) Direct Evidence, Exhibits 1042 and 1044, and Petitioner's Reply

As discussed at the outset of this section, in addition to moving to exclude the entirety of the Wikipedia article, Exhibit 1042, Patent Owner seeks to exclude paragraphs 15, 16, 23, and 24 of Dr. Darrell's second declaration (Ex. 1044), and pages 12–15 of Petitioner's Reply (Paper 37). *See* Paper 44, 3–11.[15] In addition to the authentication challenge to Exhibit 1042, Patent Owner challenges it as hearsay and as non-responsive to Patent Owner's Response. *See* Paper 44, 3–5. Patent Owner challenges pages 12–13 of Petitioner's Reply and paragraphs 15 and 16 of Dr. Darrell's second declaration (Ex. 1044), because they rely on the allegedly non-responsive, unauthenticated, hearsay in the Wikipedia article (Ex. 1042). *See id*.

Although Petitioner first served the Wikipedia article at Dr. Essa's deposition (*see* note 14), Petitioner also filed it with the Reply, as Exhibit 1042, along with Dr. Darrell's second declaration (Ex. 1044), which relies on it, and Mr. Barton's declaration (Ex. 2019), which supports it. *See* Paper 51, 6–7 (noting that Exhibit 1042 is "reproduced with Sony's Reply" and arguing that Mr. Barton's declaration is timely under 37 C.F.R. § 42.64(b)(1) as supplemental evidence and cures hearsay objections to Exhibit 1042). Two challenged paragraphs of Dr. Darrell's second declaration (Ex. 1044 ¶¶ 15, 16) refer to pages 11–13 of Exhibit 1042, the Wikipedia article. Patent Owner objects to Exhibit 1042 as constituting untimely supplemental evidence and unauthenticated hearsay. *See* Ex. 2017 ¶¶ 2–4. For reasons explained below, Mr. Barton's declaration (Ex. 2019) and other authenticating evidence, cures Patent Owner's hearsay and authentication

---

[15] We note that Petitioner's Reply (Paper 37) does not contain argument on page 15. Moreover, Petitioner does not cite to paragraphs 23 and 24 of Exhibit 1044 on pages 12-14 of Paper 37.

objections to a specific section of page 13, to paragraph 15 and to a portion of paragraph 16 of Exhibit 1044, and to the Reply. *See* Paper 51, 7.[16]

Page 13 of the Wikipedia article (Ex. 1042), specifically a section titled "A practical example," and Mr. Barton (Ex. 2019, Ex. 2020), primarily corroborate and bolster, with a specific example of a mountain scene recorded at large baseline distances, Dr. Darrell's testimony (relative and large baseline distances possible), Asahi's disclosure (stereoscopic images obtained from a large baseline), and the '003 Patent disclosure (exaggerated stereographic baselines). Patent Owner does not seek to exclude Dr. Darrell's testimony in paragraphs 6–14, 18, and 29 of Exhibit 1044 that discuss the concept of wide and relative recording baselines. Essentially, in the unchallenged paragraphs of his second declaration, Dr. Darrell describes, in sufficient detail, how skilled artisans would have understood that the baseline distance between recording positions for stereographic images is relative and not limited to the human inter-ocular distance, and that horizontal alignment techniques were known for accommodating different recording distances. *See* Ex. 1044 ¶¶ 6–14, 29.

Patent Owner does not specify the portions of paragraphs 15 and 16 that constitute unauthenticated evidence and hearsay. Apart from the aspect of authentication that involves personal knowledge of the truth of the matter asserted (*see* note 15), paragraph 15 of Exhibit 1044 helps to authenticate the Wikipedia article, referenced as a link within Patent Owner's Exhibit 2003, as the same

---

[16] Based on the arguments presented, we deem a portion of the authentication challenge by Patent Owner and response by Petitioner to be part and parcel of the hearsay challenge and response. *See U.S. v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000) (citing Fed. R. Evid. 901, implying that authentication may require that the proponent shows who posted website information if "offered to prove the truth of the matter asserted").

disclosure as Petitioner's Exhibit 1042. Petitioner's declarant, Mr. Michael

Sander, (Ex. 2018) further helps to authenticate this document, by testifying that

Dr. Essa discussed the Wikipedia article at his deposition, and testifying that it is

substantively the same as Exhibit 1042. Ex. 2018; *see also* Paper 51, 3–4

(discussing Exs. 1043, 1044, 2003, 2018). Patent Owner has not carried the

burden on its motion to exclude the references to the Wikipedia article in

paragraph 15. That paragraph does not contain substantive matter and merely

introduces the later substantive discussion about baseline distances and the

Wikipedia mountain scene ("A practical example") that occurs in paragraph 16.

Challenged paragraph 16 of Dr. Darrell's second declaration also includes

passages that cite pages 11 and 12 of the Wikipedia article (Ex. 1042). We exclude

those passages and pages as hearsay because Mr. Barton does not address them—

he does not cure the hearsay and authentication objections of those pages.

On the other hand, Mr. Barton's declaration and other evidence overcomes

Patent Owner's objection to the remaining portions of paragraph 16. Mr. Barton

testifies that, in 2004, he captured a pair of images to create the stereographic

mountain scene image in the section titled "A practical example" in the Wikipedia

article (Ex. 1042)—the subject of the hearsay objection and the primary subject of

paragraph 16 of Dr. Darrell's second declaration. *See* Ex. 2019 ¶¶ 3–8; Ex. 1044

¶ 16; *see also* Paper 51, 6–8 (discussing Exs. 2019 and 1042). Patent Owner cross-

examined Mr. Barton and does not challenge his declaration. *See* Ex. 2020, 15:9–

23, 19:15–18. Mr. Barton also declares that he edited hundreds of Wikipedia

articles and contributed over 200 photographs to Wikipedia, including several

stereoscopic images. Ex. 2019 ¶ 3. Mr. Barton testifies that he created the

"red/cyan stereoscopic anaglyph image," a mountain scene from Dinosaur Hill

Park, which is displayed and discussed in the Wikipedia article (Ex. 1042), by

recording images at separated camera positions of 100 feet, and then uploading the image into the Wikipedia "Stereoscopy" article. *See* Ex. 2019 ¶¶ 4–8. He essentially confirms his declaration testimony during his deposition. *See* Ex. 2020, 13:3–18:16, 1915–18; Paper 51, 6–7 (discussing Ex. 2019 ¶ 5; Ex. 2020, 5:9–23, 19:15–18; Pet. Reply 2).

The record shows that the mountain scene captured by Mr. Barton appears in the "A practical example" section of Exhibit 1042, which also includes text about the mountain scene. *Compare* Ex. 1042, 13 *with* Ex. 2019 ¶¶ 4–8, Ex. 1044 ¶ 16, and Pet. Reply 2. Patent Owner acknowledges that Mr. Barton testified during his cross-examination about that specific section of the Wikipedia article, including the text. *See* Paper 44, 5 (stating that Mr. Barton did not write the Wikipedia article "not including the text of the 'Practical Example' section on page 13").

Patent Owner's hearsay objection focuses on statements in the Wikipedia article and Petitioner's Reply at page 2 that the images used to create the mountain scene from Dinosaur Hill Park were captured at distances of "100 feet" to produce a stereoscopic image. *See* Ex. 2017 ¶ 3 (asserting Wikipedia has been held to be unreliable (citation omitted)). According to Patent Owner, that statement (about the distance of 100 feet) constitutes "the out-of-court statement offered to prove the truth of the mater asserted." *See id*.; Paper 51, 6–7 (Petitioner's Opposition discussing the objection to Ex. 2017 ¶ 3). Patent Owner correctly characterizes the statement in Exhibit 1042 as hearsay. Nonetheless, based on the foregoing discussion, we find that Mr. Barton's declaration, availability for cross-examination, and the cross-examination testimony, cured the objections. Mr. Barton specifically testified about the 100 feet distance in his declaration and

IPR2013-00219
Patent 7,477,284 B2

during cross-examination, as noted above.[17]  Mr. Barton's declaration testimony is not hearsay in this proceeding, and is reliable.  In any event, Mr. Barton's testimony, Dr. Darrell's testimony, and Mr. Sander's testimony, responsively cure the authentication and hearsay objections related to the direct evidence of "A practical example" as part of Petitioner's Reply.[18]

Despite curing the "A practical example" section of Exhibit 1042 and related portions of paragraph 16, Exhibit 1044, the first two sentences of that paragraph discuss other material in Exhibit 1042 (i.e., pages 11 and 12), which constitutes hearsay that Mr. Barton does not address, as indicated above.  Although Petitioner asserts that Patent Owner's specific hearsay objection focused on one statement

---

[17] Mr. Barton's unchallenged declaration testimony proves the truth of the matter asserted about the "100ft" baseline recordings and other matters regarding the mountain scene in "A practical example."  *See* Ex. 2019 ¶ 5.  Mr. Barton's declaration, Dr. Essa's declaration (relying on Exhibit 2003, which provides a link to the Wikipedia article), and Dr. Darrell's declaration, show that the "A practical example" section of Exhibit 1042 constitutes an exception to hearsay in this proceeding under Fed. R. Evid. 803 (18) *Statements in Learned Treatises, Periodicals, or Pamphlets*:

> A statement contained in a treatise, periodical, or pamphlet if:
>    (A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination [Dr. Darrell and Mr. Barton]; and
>    (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony [Dr, Darrell adopts it, Mr. Barton verifies it, and Dr. Essa indirectly cites it], or by judicial notice.  If admitted, the statement may be read into evidence but not received as an exhibit.

[18] Patent Owner does not dispute that Mr. Barton, Mr. Sander, and Dr. Darrell authenticated Exhibit 1042 to the extent of showing that Exhibit 2003 cites a hyperlink to the Wikipedia article.  *See* Paper 53, 3 (challenging the authentication based on a lack of a showing of "a person with knowledge"); *see also supra* note 17 (discussing related aspects of authentication and hearsay).

47

IPR2013-00219
Patent 7,477,284 B2

(100 feet), Patent Owner also generally asserts in its Reply to Petitioner's Opposition that "Mr. Barton admitted on cross-examination that he did *not* write a majority of the text relied upon by Petitioner and Dr. Darrell" (Paper 53, 2), and that Dr. Darrell and Mr. Sanders did not have personal knowledge of the material in the Wikipedia article, and, therefore, could not have authenticated it (*id*. at 3). On the other hand, as noted above, Patent Owner acknowledges that Mr. Barton testified that he wrote the portions of the Wikipedia article that relate to the mountain scene viewed from Dinosaur Hill Park, which is the subject of the section titled "A practical example." *See also* Ex. 2020, 20:16–24; 22:10–19 (Mr. Barton testifying about portions he wrote). Therefore, the sentences in paragraph 16 in Exhibit 1044 that refer to the portions of the Wikipedia article that do not include "A practical example," and all portions of Exhibit 1042 except "A practical example," are excluded as unreliable hearsay or lacking authentication. The "A practical example" section of Exhibit 1042 and sentences in paragraph 16 of Exhibit 1044 that rely on it are not excluded.

Accordingly, we consider paragraph 16 of Exhibit 1044 with the first two sentences excluded, as follows:

> An anaglyph in the article (see below), depicts a mountain scene, the left and right images of which were captured by "a single camera [that] was walked about one hundred feet (30 m) between pictures." (*Id.* at 13). The method of using wider than human inter-ocular baselines to record scenes with distant objects was well-known to those of ordinary skill in the art as of 1998.

IPR2013-00219
Patent 7,477,284 B2



"Long base line image showing prominent foothill ridges."
*See* Wikipedia, Stereoscopy, Sony-1042 at 13.

The passage above represents a version of paragraph 16 of Exhibit 1044 that remains under consideration after we exclude unreliable portions thereof.

In summary, by providing Mr. Sander's and Mr. Barton's declarations, and by providing both declarants for cross-examination, Petitioner cured the authentication and hearsay objections to the above-specified portions of the Wikipedia article, Dr. Darrell's second declaration, and the Petitioner's Reply. Patent Owner does not object to Mr. Barton's declaration or to portions of Dr. Darrell's second declaration that establish the substance of the sought-after evidence to be excluded: the evidence of record that recording baseline distances are relative to the distance to the objects to be recorded, and may be larger than the human inter-ocular distance.  The thrust of the authentication and hearsay objections relates to the truth about making stereographic images using the specific base-line image capturing distance of 100 feet.  This particular testimony bolsters other evidence of record, and while not necessary to the ultimate conclusion of anticipation or obviousness, serves as a suitable example to facilitate the discussion of relative baselines.

Patent Owner's contentions that the relied-upon portions of the Wikipedia article, and the corresponding portions of Dr. Darrell's second declaration and the Petitioner's Reply, are not responsive to arguments raised by Patent Owner's Response, and are beyond the scope of Dr. Essa's declaration, are improper, and in any event, not persuasive.  *See* Paper 44, 6.  A motion to exclude is not a

IPR2013-00219
Patent 7,477,284 B2

mechanism to argue that a reply contains new arguments or relies on evidence necessary to make out a prima facie case. A motion to exclude, for instance, must state why the evidence is inadmissible (e.g., based on relevance or hearsay), identify the corresponding objection in the record, and explain the objection. *See* 37 C.F.R. § 42.64(c); *Office Patent Trial Practice Guide*, 77 Fed. Reg. at 48,767. Whether a reply contains arguments or evidence that are outside the scope of a proper reply under 37 C.F.R. § 42.23(b) is left to our determination. Therefore, Patent Owner's argument that certain evidence and arguments in the Petitioner's Reply are not responsive to arguments raised by Patent Owner in the Patent Owner Response is improper. In any event, we are not persuaded by the arguments for the following reasons.

In opposition, Petitioner maintains that the proffered evidence responds to Dr. Essa's testimony (Ex. 2010 ¶¶ 28, 59) and similar contentions by Patent Owner that depth perception requires images to be generated at human inter-ocular baselines. *See* Paper 51, 9–12; *see also* Ex. 2010 ¶¶ 63–66 (similar testimony by Dr. Essa related to Asahi). Petitioner particularly explains that "Petitioner could not have reasonably expected [Dr.] Essa to testify that only stereoscopic images recorded from positions separated by a single distance, the human inter-ocular baseline could provide a sense of depth." Paper 51, 9. Despite Patent Owner's argument to the contrary, as discussed in connection with Dr. Essa's deposition testimony and otherwise, the record shows that Petitioner properly replied to the Patent Owner Response and Dr. Essa's declaration. The Petitioner's Reply, Exhibit 1042 at page 13 ("A practical example"), and Exhibit 1044, also respond properly and similarly to Patent Owner's argument that "slightly displaced" precludes relative displacement, including large relative baselines and the

IPR2013-00219
Patent 7,477,284 B2

displacement discussed above in connection with Asahi.  *See* PO Resp. 23–24
(citing Dr. Essa's declaration, Ex. 2010).

Under these circumstances, Petitioner's rationale for relying on "A practical
example" at page 13 of Exhibit 1042 is proper and falls within the ambit of 37
C.F.R. § 42.23 (b) ("reply may only respond to arguments raised in the
corresponding opposition or patent owner response").  In summary, Patent Owner
argued about the human inter-ocular distance, relative baseline widths, slightly
displaced recording positions, and calculating height in Asahi.  Petitioner
responded in its Reply with rebuttal evidence by Dr. Darrell and Mr. Barton.

Patent Owner's similar arguments concerning Asahi, alleging that Dr.
Darrell's testimony (Ex. 1044 ¶¶ 23–24) about "stereoscopic viewing," and the
allegedly related portions of Petitioner's Reply (Paper 37, 12–15) that rely upon it,
do not properly respond to Patent Owner's Response, are not persuasive to carry
the burden of exclusion in its motion.  *See* Paper 44, 9–11.  For similar reasons
discussed above, the record shows that Patent Owner submitted evidence and
argued in its Patent Owner Response that "stereoscopic viewing," as the term is
used in Asahi, only means calculating height or depth, and does not mean
providing a stereoscopic image, according to the '284 Patent, partly because the
aircraft recording system does not record images at inter-ocular baseline distances.
*See* PO Resp. 22–24; Ex. 2010 ¶¶ 55, 64; Paper 51, 10–12 (explaining how the
evidence responds to Patent Owner's arguments about Asahi).  Therefore,
Petitioner's Reply and corresponding evidence properly fall within the scope of,
and respond properly to, Patent Owner's Response (including Dr. Essa's
declaration).

Based on the foregoing discussion, Patent Owner has carried the burden in
its motion to exclude, as hearsay, the above-described portions of paragraph 16 of

51

IPR2013-00219
Patent 7,477,284 B2

Exhibit 1044. Patent Owner has not carried the burden in its motion to exclude the portion of Exhibit 1042 titled "A practical example" at page 13, paragraphs 15 and 16 of Exhibit 1044 (except for portions of paragraph 16), or the pages challenged in Petitioner's Reply.

Therefore, for the reasons discussed above, we *deny* the Motion to Exclude the following: paragraph 15 and the latter portions of paragraph 16 of Exhibit 1044, the portion of Exhibit 1042 titled "A practical example" at page 13, and any portion of Petitioner's Reply. *See also supra* 43 n.16 (discussing identification of challenged pages).

We *grant* the Motion to Exclude with respect to the use of Exhibit 1042 as direct evidence, except for the portion titled "A practical example" at page 13, and the first two sentences of paragraph 16 of Exhibit 1044.

## III. CONCLUSION

Based on the foregoing discussion, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 1–4, 7, 10, 20, 27–29, and 36–38 are unpatentable as follows: a) anticipation of claims 1, 10, 27, 36, and 38 by Kawakita; b) obviousness of claims 1, 10, 27, and 36 over Kawakita; c) obviousness of claims 1, 2, 10, 27, 28, and 36 over Kawakita and Chen; d) obviousness of claims 3 and 29 over Kawakita, Chen, and Kodak; e)  anticipation of claims 1, 3, 20, 27, 29, and 37 by Asahi; and f) obviousness of claims 4 and 7 over Kawakita, Chen, and Allen.

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that Petitioner has shown by a preponderance of the evidence

IPR2013-00219
Patent 7,477,284 B2

that claims 1–4, 7, 10, 20, 27–29, and 36–38 of the '284 Patent are unpatentable on

the grounds set forth in Section III;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence is

*granted-in-part* with respect to the use of Exhibit 1042 as direct evidence, except

for the portion titled "A practical example" at page 13, and *granted-in par*t as to

the first two sentences of paragraph 16 of Exhibit 1044, and otherwise is

*dismissed-in-part* as moot or *denied-in-part*, as specified *supra* in Section II.C.2.;

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence is

*denied*, as specified *supra* in Section II.C.1.; and

FURTHER ORDERED that, because this is a final decision, parties to the

proceeding seeking judicial review of the decision must comply with the notice

and service requirements of 37 C.F.R. § 90.2.

IPR2013-00219
Patent 7,477,284 B2

FOR PETITIONER:

Walter Hanley
Michelle Carniaux
Kenyon & Kenyon, LLP
whanley@kenyon.com
mccarniaux@kenyon.com

FOR PATENT OWNER:

David L. McCombs
David O'Dell
Gregory P. Huh
Haynes and Boone, LLP
David.mccombs.ipr@haynesboone.com
David.odell.ipr@haynesboone.com
Gregory.huh.ipr@haynesboone.com

Robert Gerrity
William Nelson
Tensegrity Law Group, LLP
HumanEyes@tensegritylawgroup.com
William.nelson@tensegritylawgroup.com

Trials@uspto.gov                                        Paper 62
Tel: 571-272-7822                        Entered: November 6, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

SONY CORPORATION,
Petitioner,

v.

YISSUM RESEARCH DEVELOPMENT CO. OF THE HEBREW
UNIVERSITY OF JERUSALEM,
Patent Owner.
————————————

Case IPR2013-00219
Patent 7,477,284 B2[1]
————————————

Before SALLY C. MEDLEY, KARL D. EASTHOM, and
JAMES B. ARPIN, *Administrative Patent Judges*.

ARPIN, *Administrative Patent Judge*.

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

———————————

[1] *Sony Corp. v. Yissum Research Co.*, Case IPR2013-00327 ("IPR2013-00327") has been joined with instant Case IPR2013-00219. IPR2013-00327, Paper 15 (PTAB Sept. 24, 2013). This Rehearing Decision is entered in both cases.

IPR2013-00219
Patent 7,477,284 B2

# I. BACKGROUND

Patent Owner, Yissum Research Development Co. of the Hebrew University of Jerusalem, in its Rehearing Request, seeks withdrawal of our conclusion that Asahi (Ex. 1010) anticipates claims 1, 3, 20, 27, 29, and 37 of U.S. Patent No. 7,477,284 B2 (Ex. 1001, "the '284 Patent") because "the Board's conclusion that Asahi anticipates claims 1, 3, 20, 27, 29, and 37 was incorrect as being based on a misapprehension of the evidence presented." *See* Paper 61("Req. Reh'g"), 1–2.

The applicable standard for a request for rehearing is set forth in 37 C.F.R. § 42.71(d), which provides, in relevant part, the following:

> A party dissatisfied with a decision may file a request for rehearing, without prior authorization from the Board. The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, opposition, or a reply.

For the reasons that follow, we *deny* the requested relief.

# II. DISCUSSION

After reviewing Patent Owner's Rehearing Request, we determine that Patent Owner has not shown that we misapprehended or overlooked any matter previously presented. *See* Req. Reh'g 2. Patent Owner contends that we

> misapprehended or overlooked Dr. [Trevor] Darrell's testimony that to generate images that provide a perception of depth there needs to be almost 99 percent overlap between the *images* from which the lines are taken and Asahi's [Ex. 1009] express teaching that it only utilizes 60 percent overlap in creating its *images*, which was argued in Patent Owner's Motion for Observation at ¶ 3. (Paper 43).

Req. Reh'g 3 (emphasis added).

2

IPR2013-00219
Patent 7,477,284 B2

Specifically, Patent Owner argues that independent claims 1 and 27 of the '284 Patent recite mosaic images that "provide a sense of depth of the scene." *Id.* Further, in our Institution Decision, we determined that "the perception of depth is provided to a person and [our] Final Decision confirmed this understanding noting that 'the sense of depth must be perceived by a person *viewing the display*.'" Paper 16 ("Inst. Dec."), 16–17; Paper 60 ("Fin. Dec."), 13. In addition, claim 1 recites that "at least one imager that moves relative to a scene so as *to acquire a plurality of optical images of at least portions of the scene*, each of at least two of said optical images being viewed from a different respective viewing position." Ex. 1001, col. 13, ll. 63–65 (emphasis added); *see also id.* at col. 16, ll. 6–8 (claim 27). Based on the testimony of Petitioner's declarant, Dr. Darrell, Patent Owner argues that, "for a sense of depth to be perceived by a person, there must be a 99% overlap in the *images where a single line is taken*." Req. Reh'g 3 (emphasis added). Patent Owner argues, however, that "Asahi, which is directed to computer vision and not human vision, explicitly and unequivocally states that it takes *a single line from images* with only 60% overlap." *Id.* (emphasis added). Although Asahi discloses a working example in which 60% overlap is described, we did not determine that Asahi's disclosure was limited to that example. *See* Fin. Dec. 26–32. Moreover, on what appears to be a significant point, Dr. Darrell and Patent Owner's counsel appear to acknowledge that they disagree about whether a line used to create images in Asahi is limited to a using "a single vertical line of an image frame." *See* Ex. 2014, 107:7–25.

Initially, we note that independent claims 1 and 27 recite "a *display* that receives *a plurality of the mosaics* and *displays* [the plurality of the mosaics] so as to provide a sense of depth of the scene" (emphases added). Consequently, it is the *displayed mosaics* that "provide a sense of depth of the scene." Moreover,

3

IPR2013-00219
Patent 7,477,284 B2

Petitioner's declarant, Dr. Darrell, testified that, "if some defects were introduced in the mosaic images recorded [without proper vertical and horizontal alignment], . . . the defects would not be so severe in every case as to preclude depth from being perceived upon viewing an appropriate display of a pair of the mosaics." Fin. Dec. 34–35 (citing Pet. Reply 13–14 (quoting Ex. 1044 ¶ 30)); *see also* Fin. Dec. 20 (Based on testimony of Petitioner's declarant, Dr. Darrell, and Patent Owner's declarant, Dr. Irfan Essa, with respect to Kawakita, we were persuaded that, "although a viewer may not perceive a sense of depth of every portion of a scene *from every sight line*, the viewer still may perceive a 'sense of depth of the scene' despite the presence of disparities in portions of the scene."; emphasis added).

Patent Owner relies on Asahi's discussion of a 60% *scene-to-scene* overlap, drawn from captured images, whereas Patent Owner cross-examined Dr. Darrell concerning overlap of "99 percent from *frame to frame*." Paper 43 ¶ 3 (emphasis added). As Patent Owner acknowledges, according to Asahi, a frame may include two fields, and each field may be a scene. Paper 43, ¶ 3; *see* Ex. 1010 ¶¶ 34–35; Paper 59 ("Tr."), 8:16–23. As noted above, however, claim 1 only requires that the at least one imager acquires a plurality of optical images *of at least portions of the scene*, each from a different respective viewing position, e.g., sight line. *See* Ex. 1001, col. 13, ll. 63–65; *see also* Tr. 70:1 ("And by the way, just to clarify, the images are portions of the scene.").

We neither misapprehended nor overlooked the argument and supporting evidence presented in Patent Owner's Motion for Observation. However, Patent Owner did not provide sufficient evidence or explanation to persuade us that the frame-to-frame overlap allegedly required to provide a sense of depth of a scene is not disclosed broadly by Asahi's scene-to-scene overlap. Asahi's working

4

IPR2013-00219
Patent 7,477,284 B2

example describes a 60% overlap (Ex. 1010 ¶ 30; *see id.*, Fig. 5 (depicting a single example of a two scene overlap of 60%)), but we do not limit the disclosure of Asahi to that one example.  Asahi more broadly discloses "at least three images that overlap in a prescribed proportion" (Ex. 1010 ¶ 9), and Asahi explicitly describes "[a] pair consisting of two images that make up a stereoscopic image" (*id.* ¶ 32).  *See* Fin. Dec. 25.

Patent Owner does not identify where it cross-examined Dr. Darrell explicitly about the 60% scene-to-scene overlap that Asahi discloses with respect to the working example.  Instead, Patent Owner focuses on Dr. Darrell's cross-examination testimony regarding the 99% overlap.  *See* Req. Reh'g 10–11 (citing Ex. 2014, 31, 108–109).  Nevertheless, in the deposition testimony cited by Patent Owner, Dr. Darrell responds "I think so" to a question about "substantial overlap" between scenes, which in the context of the following question, implies "almost 99 percent overlap" in Asahi.  *See* Ex. 2014, 108:20–24 (Patent Owner's following question was: "Similar to what we described earlier in the Kawakita discussion about needing almost 99 percent overlap; correct?," to which Dr. Darrell responded "Correct.").  The cited pages of Dr. Darrell's testimony, however, do not support Patent Owner's characterization of that testimony.

Specifically, after being questioned generally about Asahi's disclosure and the need for overlap for "a complete depiction of that scene," Dr. Darrell testified that "the frame rate would be high enough," (*see* Ex. 2014, 108:1–14), and the specific colloquy (as summarized above) ensued:

> Q. And the result of that [frame rate] would be that the overlap between one frame and the next would be substantial?
> A. I think so.
> Q. Similar to what we described earlier in the Kawakita discussion about needing almost 99 percent overlap; correct?

5

IPR2013-00219
Patent 7,477,284 B2

> A. Correct.  If I understand the scenario, that would be true for any scenario that was extracting a line from a two-dimensional camera.

Req. Reh'g 4 (quoting Ex. 2014, 108:17–109:1).

Therefore, Patent Owner's Motion for Observation did not undermine the findings discussed in the Final Decision and reviewed above, including that Dr. Darrell testified that Asahi's system is capable of producing stereographic images.  *See* Fin. Dec. 25 (citing Ex. 2014, 87:3–21, 92–100:8 (Dr. Darrell describing Asahi's system and testifying that Asahi's system uses "two stereo images" to calculate three-dimensional height data to form maps)), 31 (citing Ex. 1043, 174:21–176:8 (acknowledging that "three dimensional topographical maps" produced according to Asahi may be suitable for human viewing)), 32 (citing Ex. 2014, 100:5–9 (Dr. Darrell responded "yes" when asked:  "Is it your opinion . . . that the stereo images . . . in Asahi are capable of being viewed so as to produce a depth - - or perception of depth in a human.")); *see also* Ex. 1010 ¶ 35 ("stereoscopic viewing is possible using this forward view image, this nadir view image, and this rearward view image").

Patent Owner argues that the teaching of a 60% overlap in Asahi's working example is "*determinative* and confirms Patent Owner's argument – repeatedly made during the present proceeding – that images must be specifically generated to provide a person a perception of depth and that Asahi's images are incapable of doing so."  Req. Reh'g 5.  We disagree.  Patent Owner first raised the alleged discrepancy between the overlap required (i.e., 99%) for a perception of depth and the overlap taught by Asahi (i.e., 60%) in its Motion for Observation (Paper 43 ¶ 3); however, Patent Owner did not mention this alleged discrepancy during the Oral Hearing.  For the reasons set forth above, we did not find Patent Owner's

IPR2013-00219
Patent 7,477,284 B2

argument and supporting evidence, as presented in the Motion for Observation, determinative.  In the Final Decision, we concluded that Petitioner had shown by a preponderance of the evidence that Asahi discloses each and every element recited in claim 1 "[a]fter considering Petitioner's contentions and supporting evidence . . . and Patent Owner's arguments and supporting evidence to the contrary."  Fin. Dec. 32; *see* Req. Reh'g 6.

## III. CONCLUSION

Based on the foregoing discussion, we deny Patent Owner's requested relief to modify the prior Final Written Decision with respect to Asahi.  Patent Owner has not shown that we misapprehended or overlooked a matter previously presented.

## IV. ORDER

For the reasons given, it is ORDERED that the Patent Owner's Rehearing Request is *denied*.

7

IPR2013-00219
Patent 7,477,284 B2

FOR PETITIONER:

Walter Hanley
Michelle Carniaux
Michael E. Sander
Kenyon & Kenyon, LLP
Sony-HumanEyes@kenyon.com
whanley@kenyon.com
mccarniaux@kenyon.com
msander@kenyon.com


FOR PATENT OWNER:

David L. McCombs
David O'Dell
Gregory Huh
Haynes and Boone, LLP
david.mccombs.ipr@haynesboone.com
david.odell.ipr@haynesboone.com
gregory.huh.ipr@haynesboone.com

Robert Gerrity
William Nelson
Tensegrity Law Group, LLP
robert.gerrity@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com

(12) **United States Patent**
Peleg et al.

(10) **Patent No.:** US 7,477,284 B2
(45) **Date of Patent:** Jan. 13, 2009

(54) **SYSTEM AND METHOD FOR CAPTURING AND VIEWING STEREOSCOPIC PANORAMIC IMAGES**

(75) Inventors: **Shmuel Peleg**, Mevaseret Zion (IL); **Moshe Ben-Ezra**, Jerusalem (IL); **Yael Pritch**, Jerusalem (IL)

(73) Assignee: **Yissum Research Development Company of the Hebrew University of Jerusalem**, Jerusalem (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 894 days.

(21) Appl. No.: **09/861,859**

(22) Filed: **Apr. 19, 2001**

(65) **Prior Publication Data**

US 2004/0223051 A1    Nov. 11, 2004
US 2005/0157166 A9    Jul. 21, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/230,562, filed on Aug. 30, 2000, provisional application No. 60/217,152, filed on Jul. 6, 2000, provisional application No. 60/198,381, filed on Apr. 19, 2000, provisional application No. 60/113,962, filed on Dec. 28, 1998, provisional application No. 60/102,720, filed on Sep. 29, 1998, provisional application No. 60/100,721, filed on Sep. 17, 1998.

(51) **Int. Cl.**
*H04N 13/00*    (2006.01)

(52) **U.S. Cl.** ...................................................... **348/53**

(58) **Field of Classification Search** .................. 348/36, 348/42, 51, 158, 218.1, 98, 44, 46, 48, 49, 348/52, 53; 382/154, 232, 294, 299, 284, 382/268; 352/57, 69–70; 396/324; *H04N 13/00*
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,134,644 | A | | 1/1979 | Marks et al. ................ 350/132 |
| 5,455,689 | A | * | 10/1995 | Taylor et al. ................ 358/450 |
| 5,594,498 | A | * | 1/1997 | Fraley ........................ 348/158 |
| 5,649,032 | A | * | 7/1997 | Burt et al. ................... 382/284 |
| 5,657,073 | A | | 8/1997 | Henley et al. |
| 5,721,585 | A | | 2/1998 | Keast et al. .................. 348/36 |
| 5,764,871 | A | * | 6/1998 | Fogel ......................... 345/427 |
| 5,825,466 | A | | 10/1998 | Lo et al. ...................... 355/33 |
| 5,963,664 | A | * | 10/1999 | Kumar et al. ............... 382/154 |
| 5,986,668 | A | * | 11/1999 | Szeliski et al. .............. 345/634 |
| 5,991,444 | A | * | 11/1999 | Burt et al. ................... 382/232 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0361297        4/1990

(Continued)

OTHER PUBLICATIONS

Peleg, Schmuel et al., "Stereo Panorama with a Single Camera", IEEE, 1999, pp. 395-401.

(Continued)

*Primary Examiner*—Tung Vo
(74) *Attorney, Agent, or Firm*—Browdy and Neimark, P.L.L.C.

(57) **ABSTRACT**

Method and apparatus for generating images of a scene from image data of the scene and displaying the images to provide a sense of depth. In some embodiments of the method and apparatus the generated images are mosaics.

**55 Claims, 6 Drawing Sheets**



Petition for *Inter Partes* Review of U.S. Pat. No. 7,477,284
**IPR2013-00219**
EXHIBIT
Sony-_____

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,075,905 A | * | 6/2000 | Herman et al. | ............. 382/284 |
| 6,078,701 A | * | 6/2000 | Hsu et al. | .................. 382/294 |
| 6,083,353 A | * | 7/2000 | Alexander, Jr. | ............ 202/158 |
| 6,141,145 A | | 10/2000 | Nalwa | |
| 6,275,206 B1 | * | 8/2001 | Tsai et al. | ..................... 345/88 |
| 6,278,480 B1 | * | 8/2001 | Kurahashi et al. | ............. 348/59 |
| 6,377,294 B2 | * | 4/2002 | Toyofuku et al. | ............ 348/36 |
| 6,434,280 B1 | * | 8/2002 | Peleg et al. | ............ 382/299 |
| 6,435,969 B1 | * | 8/2002 | Tanaka et al. | ................ 463/44 |
| 6,512,892 B1 | * | 1/2003 | Montgomery et al. | ....... 396/326 |
| 6,522,787 B1 | * | 2/2003 | Kumar et al. | ............ 382/268 |
| 6,532,036 B1 | * | 3/2003 | Peleg et al. | ................. 348/36 |
| 6,532,298 B1 | * | 3/2003 | Cambier et al. | ............ 382/117 |
| 6,535,650 B1 | * | 3/2003 | Poulo et al. | ............ 382/284 |
| 6,643,413 B1 | * | 11/2003 | Shum et al. | ............ 382/284 |
| 6,665,003 B1 | * | 12/2003 | Peleg et al. | ............ 348/36 |
| 6,717,608 B1 | * | 4/2004 | Mancuso et al. | ............ 348/36 |
| 6,750,860 B1 | * | 6/2004 | Shum et al. | ............ 345/419 |
| 6,831,677 B2 | * | 12/2004 | Peleg et al. | ............ 348/36 |
| 6,850,210 B1 | * | 2/2005 | Lipton et al. | .................. 345/6 |
| 6,956,573 B1 | * | 10/2005 | Bergen et al. | ............ 345/473 |
| 2001/0010546 A1 | * | 8/2001 | Chen | .......................... 348/218 |
| 2001/0020976 A1 | | 9/2001 | Peleg et al. | |
| 2001/0038413 A1 | | 11/2001 | Peleg et al. | |
| 2001/0043264 A1 | * | 11/2001 | Sinclair et al. | ................ 348/36 |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 989 436 A2 | | 3/2000 |
| EP | 0989436 | | 3/2000 |
| IL | WO 98/34195 | * | 8/1998 |
| JP | 11 146425 | | 5/1999 |
| JP | 11146425 | | 5/1999 |
| JP | 11 164326 | | 6/1999 |
| JP | 11164326 | | 6/1999 |
| WO | WO 99/17555 | | 4/1999 |
| WO | WO 99/18725 | | 4/1999 |

## OTHER PUBLICATIONS

Ishiguro, H. et al.; "Correspondence, Omni-Directional Stereo"; IEEE Transactions on Patern Analysis and Machine Intelligence, vol. 14, Feb. 1992; pp. 257-262.

Gluckman, J. et al.; "Real-Time Omnidirectional and Panoramic Stereo"; Proc. Of Image Understanding Workshop, IUW98;1998; 5 Pages; Retrieved from the Internet: <http://cis.poly.edu/~gluckman/papers/uw98a.pdf>.

* cited by examiner

Case: 15-1342    Document: 12    Page: 112    Filed: 04/20/2015



$FIG.\ 1$



$FIG.\ 2$

## *F I G. 3*



## *F I G. 4*



Case: 15-1342    Document: 12    Page: 114    Filed: 04/20/2015

# *F I G. 5*





## F I G. 6



## F I G. 7



*F I G. 8*

*F I G. 10*

*F I G. 11*

*F I G. 12*

*F I G. 13*

## $F I G. 9$





## $F I G. 14$

US 7,477,284 B2

1

# SYSTEM AND METHOD FOR CAPTURING AND VIEWING STEREOSCOPIC PANORAMIC IMAGES

## RELATED APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 09/792,638 filed On Feb. 24, 2001, U.S. application Ser. No. 09/726,198 filed on Nov. 29, 2000 now U.S. Pat. No. 6,795,109, and U.S. application Ser. No. 09/396,248 filed on Sep. 16, 1999, now U.S. Pat. No. 6,665,003. U.S. application Ser. No. 09/726,198 is a continuation-in-part of U.S. application Ser. No. 09/396,248. This application also claims the benefit under 119(e) of U.S. provisional application 60/198,381 filed on Apr. 19, 2000, U.S. provisional application 60/217,152 filed Jul. 6, 2000 and U.S. provisional application 60/230,562 filed on Aug. 30, 2000.

## INCORPORATION BY REFERENCE

U.S. patent application Ser. No. 09/396,248, filed Sep. 16, 1999, in the names of Shmuel Peleg, et al., entitled "System and Method for Generating and Displaying Panoramic Images and Movies,"(hereinafter referred to as "the Peleg I patent application") assigned to the assignee of the present application, incorporated herein by reference.

U.S. patent application Ser. No. 09/726,198, filed Nov. 29, 2000, in the names of Shmuel Peleg, et al., entitled "Stereo Panoramic Camera Arrangements For Recording Panoramic Images Useful In A Stereo Panoramic Image Pair," (hereinafter referred to as "the Peleg II patent application") assigned to the assignee of the present application, incorporated herein by reference.

U.S. patent application Ser. No. 09/792,638, filed Feb. 24, 2001, in the names of Shmuel Peleg, et al., entitled "System And Method For Facilitating The Adjustment Of Disparity In A Stereoscopic Panoramic Image Pair,"(hereinafter referred to as "the Peleg III patent application") assigned to the assignee of the present application, incorporated herein by reference.

## FIELD OF THE INVENTION

The invention relates generally to the field of recording and generating images, and more particularly to the generation, displaying and printing of panoramic images stereoscopically. The invention specifically provides a system and method for generating and displaying a stereoscopic panoramic image set, comprising respective at least two panoramic images of a scene, each having a different viewing direction, for contemporaneous viewing by respective left and right eyes of a viewer to provide an apparent stereoscopic image of the scene to the viewer.

## BACKGROUND OF THE INVENTION

Panoramic images are images of a scene having a wide field of view, up to a full 360°. Panoramic images may be recorded using a wide angled lens, a mirror, or the like, providing a wide field of view. Panoramic images having a wider field of view can be generated by, for example, recording a plurality of images around a particular point and, using conventional mosaicing techniques, generating a single mosaic image. Panoramic images may also be generated of simulated scenes using conventional computer graphics techniques. Stereoscopic panoramic images can also be generated from images using various techniques known to those skilled

2

in the art. In one technique, described in Joshua Gluckman, et al., "Real-Time Omnidirectional And Panoramic Stereo," DARPA Image Understanding Workshop, 1998, two omnidirectional cameras, vertically displaced along a common axis, record panoramic images of the surrounding scene. Since the cameras are displaced, the pair of images recorded by the cameras, when considered in combination, will provide depth information for objects in the scene surrounding the cameras. However, since the displacement is vertical, the recorded images are inappropriate for human stereo panoramic perception.

## SUMMARY OF THE INVENTION

The invention provides a new and improved system and method for generating and displaying a stereoscopic panoramic image set, comprising respective at least two panoramic images of a scene, each having a different viewing direction, for contemporaneous viewing by respective left and right eyes of a viewer to provide an apparent stereoscopic image of the scene to the viewer.

In brief summary, the invention provides an arrangement for ordering images for use in generating and utilizing images comprising a stereoscopic image set. The arrangement includes at least one stereoscopic data source, at least one utilization device and a distribution channel. The at least one stereoscopic data source records images from which a stereoscopic image set can be generated. The utilization device is provided to facilitate viewing, printing, or otherwise utilizing the stereoscopic image set. The distribution channel facilitates transferring information between the stereoscopic data source and the utilization device, the information including the images as recorded by the stereoscopic data source or the stereoscopic image set itself. If a stereoscopic image set is to comprise a plurality of mosaic images, the mosaic images may be generated by the stereoscopic data source, the image utilization device and/or the distribution channel.

A number of stereoscopic data sources of diverse configurations are disclosed, including fixed and moving mirrors, prisms, and lenses, which may be used in the stereoscopic data source in the stereoscopic image arrangement.

## BRIEF DESCRIPTION OF THE DRAWINGS

This invention is pointed out with particularity in the appended claims. The above and further advantages of this invention may be better understood by referring to the following description taken in conjunction with the accompanying drawings, in which:

FIG. **1** schematically depicts a stereoscopic panoramic image arrangement for recording, generating and displaying stereoscopic panoramic images, constructed in accordance with the invention;

FIG. **2** schematically depicts an exterior plan view of an illustrative stereoscopic data source for use in connection with the arrangement depicted in FIG. **1**;

FIG. **3** depicts a functional block diagram of the stereoscopic data source depicted in FIG. **2**;

FIG. **4** depicts a functional block diagram of an illustrative viewing device depicted in FIG. **3**;

FIG. **5** is useful in understanding the operations performed by the stereoscopic panoramic image arrangement depicted in FIG. **1** in connection with generating a stereoscopic panoramic image set;

FIG. **6** is useful in understanding the arrangement for generating and displaying lenticular prints; and

US 7,477,284 B2

3

FIGS. **7** through **14** depict illustrative image recording arrangements that may be used in connection with the stereoscopic data source described in connection with FIGS. **2** and **3**.

## DETAILED DESCRIPTION OF AN ILLUSTRATIVE EMBODIMENT

FIG. **1** schematically depicts a stereoscopic panoramic image arrangement **10** for recording, generating and displaying stereoscopic panoramic images, constructed in accordance with the invention. With reference to FIG. **1**, the stereoscopic panoramic image arrangement **10** includes one or more stereoscopic data sources **11**A through **11**N (generally identified by reference numeral **11**$n$) and one or more viewing devices **12**A through **12**M (generally identified by reference numeral **12**$m$). Generally, each stereoscopic data source **11**$n$ records images and generates therefrom at least one stereoscopic panoramic image set comprising a set of panoramic images. Each stereoscopic data source **11**$n$ can also transmit respective stereoscopic panoramic image sets that it generates through a distribution channel **13** to one or more of the viewing devices **12**$m$ for viewing, generation of lenticular prints, or other disposition as will be apparent to those skilled in the art.

An illustrative stereoscopic data source **11**$n$ will be described below in connection with FIGS. **2** and **3**. Generally, the stereoscopic data source **11**$n$ will include an image recording arrangement, an image processing arrangement and a communication arrangement. The image recording arrangement records one or more images from which a stereoscopic panoramic image set is generated. The image recording arrangement may be similar to those described in the Peleg I or Peleg II patent applications. If the image recording arrangement is similar to that described in the Peleg I patent application, or to those described in the Peleg II patent application for which the arrangement is rotated and/or translated to facilitate recording of images from which a panoramic image is generated, at least the image recording arrangement records a series of images as it is rotated around an axis comprising a center of rotation, translated along a path, or any combination of rotation and translation. As the image recording arrangement is rotated and/or translated, it records a series of images from which the image processing arrangement generates at least one set of panoramic images comprising a stereoscopic panoramic image set as described in the Peleg I patent application, or as described below in connection with FIG. **5**. Generally, in generating a stereoscopic panoramic image set, the image recording arrangement will record a series of images. For each panoramic image in a stereoscopic panoramic image set, the image processing arrangement will generate the panoramic image by mosaicing together strips from successive ones of the images. The strips obtained from the respective images may all have the same displacement from the center of the respective images, as described in the Peleg I patent applications, or they may have different displacements, as described in the Peleg III patent application. Alternatively, as noted above, the panoramic images may be generated as described below in connection with FIG. **5**.

Alternatively, the image recording arrangement may be similar to those described in the Peleg II patent application. For several of the image recording arrangements that are described in the Peleg II patent application, the respective arrangements may also be rotated and/or translated to facilitate recording of a series of images from which strips may be mosaiced together to generate a set of panoramic images

4

comprising a stereoscopic panoramic image set. On the other hand, for others of the image recording arrangement described in the Peleg II patent application, the respective arrangements may be those including omni-cameras, which arrangements can directly record panoramic images for a stereoscopic panoramic image set without requiring mosaicing.

The communication arrangement facilitates transmission of the stereoscopic panoramic image set to the distribution channel **13** for distribution to one or more of the viewing devices **12**$m$. Generally, information defining the stereoscopic panoramic image set transferred by the communication arrangement will be in digital form, and the communication arrangement may include any arrangement that facilitates transfer of digital data between two devices, which may be at the same location or at different locations. Illustrative communication arrangements include, for example, a direct connection, such as a wire, cable or optical fiber connection, a wireless connection, any other arrangement for facilitating the transfer of information in digital form, or any combination thereof. A direct connection may include, for example, a direct network connection, an indirect connection to a network through, for example, a computer, a connection through the public switched telephony network, and the like. A wireless connection may include, for example, a radio connection, a cellular telephone connection, an infrared connection, and the like

An illustrative viewing device will be described below in connection with FIG. **4**. Generally, the viewing device will include an communication arrangement, an image storage arrangement and a display, printer or other device for generating images for viewing by a viewer. The viewing device's communication arrangement facilitates reception of the stereoscopic panoramic image set from the distribution channel **13**. Generally, information defining the stereoscopic panoramic image set received by the communication arrangement will be in digital form, and the communication arrangement may include a direct connection, such as a wire, cable or optical fiber connection, a wireless connection, such as a cellular telephone connection, or any other arrangement for facilitating the transfer of information in digital form.

The image storage arrangement stores the digital information comprising a stereoscopic panoramic image set as received by the viewing device's communication arrangement from the distribution channel **13** for later display. Depending on the amount of information that can be stored in the image storage arrangement and the amount of information comprising an stereoscopic panoramic image set, the image storage arrangement may have the capacity to store information comprising only one stereoscopic panoramic image set, or it may have the capacity to store information comprising a plurality of stereoscopic panoramic image sets.

The display, if provided, will display at least a portion of one or more of the images comprising a stereoscopic panoramic image set. It will be appreciated that, if the display displays at least a portion of one of the images, the image, when viewed, will not be stereoscopic. On the other hand, if the display displays at least a portion of both images using, for example, a lenticular lens, as will be described below in connection with FIG. **6**, the images, when viewed, will be stereoscopic. If a printer is provided, the printer can generate hardcopy prints of one or more of the images comprising a stereoscopic panoramic image set, and may generate, for example, lenticular prints, as will be described below in connection with FIG. **6**, which can be viewed by a viewer using a lenticular lens to provide a stereoscopic image of the scene represented by the stereoscopic panoramic image set.

US 7,477,284 B2

5

It will be appreciated that both each stereoscopic data source 11$n$ and viewing device 12$m$ may also include control arrangements for facilitating control thereof by a respective operator. For example, if the stereoscopic data source 11$n$ includes an image recording arrangement that is to be rotated and/or translated, it can include a control to enable the image recording arrangement to rotate and/or translate. In addition, the stereoscopic data source 11$n$ can include controls to allow an operator to actuate the image recording arrangement to facilitate recording of images of a scene, to enable generation by the image processing arrangement of a stereoscopic panoramic image set for the scene, and to enable the communication arrangement to transmit an stereoscopic panoramic image set to the distribution channel 13 for transfer to one or more of the viewing devices.

Similarly, the respective viewing device 12$m$ can include a control to facilitate receiving of stereoscopic panoramic image sets from the distribution channel 13 and storage by the image storage arrangement. In addition, the respective viewing device 12$m$ can include a control to facilitate selection of a stereoscopic panoramic image set for display, selection of display mode, and selection of a portion of the stereoscopic panoramic image set to be displayed. The viewing device 12$m$ may be able to selectively display, as well as at least portions of a stereoscopic panoramic image set, at least portions of individual panoramic images of the stereoscopic panoramic image set as respective display modes, and the selection of the display mode can facilitate display of one or more of the panoramic images of the selected stereoscopic panoramic image set. In addition, the viewing device 12$m$ can include a control to facilitate selection of a respective portion of an stereoscopic panoramic image set that is to be displayed, or the portion of an individual image from the stereoscopic panoramic image set that is to be displayed of the viewing device 12$m$ provides such display modes.

As noted above, a viewing device 12$m$ can, instead of or in addition to providing a display for displaying an stereoscopic panoramic image set with a lenticular lens to provide for stereoscopic viewing, provide a printer or similar device for generating a hardcopy print of at least a portion of one or both of the images comprising a stereoscopic panoramic image set, or a hardcopy print of at least a portion of the stereoscopic panoramic image set that, when viewed through a lenticular lens, would provide a stereoscopic panorama. A viewing device 12$m$ that provides a printer or similar device can include controls for enabling it to generate such hardcopy prints.

With this background, an illustrative stereoscopic data source 11$n$ will be described in connection with FIGS. 2 and 3. FIG. 2 depicts an exterior plan view of the illustrative stereoscopic data source 11$n$, and FIG. 3 depicts a functional block diagram of the illustrative stereoscopic data source. Generally, the illustrative stereoscopic data source 11$n$ is a portable device that can be, for example, hand-held by an operator, mounted on a vehicle, or the like, and rotated and/or translated to facilitate recording of the series of images from which the stereoscopic panoramic image set is generated. In addition, the transfers the digital information comprising the stereoscopic panoramic image set over a cellular telephone communication link. With reference to FIG. 2, the illustrative stereoscopic data source 11$n$ includes a housing 20 that houses and supports a video camera 21, an operator control panel 22, a display 23 and an antenna 24. The video camera 21 provides the image recording arrangement described above, and the operator control panel 22 comprises a plurality of controls that may be actuated to enable the video camera 21 to perform predetermined operations. The controls can be

6

implemented in a number of ways, including, for example, pushbuttons that may be depressed by the operator to actuate the respective control.

After the operator energizes the stereoscopic data source 11$n$ by actuating a respective control on the operator control panel 22, he or she can directs the video camera 21 in a particular direction. The display 23 can display an image indicating what the video camera 21 can record. The operator can enable the video camera by actuating a control on the operator control panel 22. As the operator actuates the image recording control, and rotates and/or translates the stereoscopic data source 11$n$, he or she can enable the video camera 21 to record a series of images from which a stereoscopic panoramic image set can be generated. After the stereoscopic data source 11$n$ has recorded a series of images, the operator can release the image recording control, at which point the video camera 21 can stop recording of images.

After the stereoscopic data source 11$n$ has recorded a series of images, the operator can actuate another control on the operator control panel to enable the stereoscopic data source 11$n$ to generate the panoramic images comprising the stereoscopic panoramic image set. After at least one of the panoramic images has been generated, the operator can actuate another control on the operator control panel 22 to enable the stereoscopic data source 11$n$ to display at least a portion the generated panoramic image in the display 23, with the portion being selectable by use of the same or another control on the operator control panel 22. Similarly, after at least two panoramic images of the stereoscopic panoramic image set have been generated, the operator can actuate a control on the operator control panel 22 to enable the stereoscopic data source 11$n$ to display them in a manner so that they can be viewed stereoscopically. The stereoscopic data source 11$n$ may display the stereoscopic panoramic image set in a manner such that any number of kinds of appliances may be required to facilitate stereoscopic viewing, including, for example, a lenticular lens, glasses with polarized lenses or lenses of different color, or other appliances as will be appreciated by those skilled in the art, with the stereoscopic data source 11$n$ displaying the stereoscopic panoramic image set in a corresponding manner.

In addition, after the stereoscopic data source 11$n$ has generated the panoramic images comprising the stereoscopic panoramic image set, it can transmit them to the distribution channel for distribution to respective ones of the viewing devices 12$m$. As noted above, the illustrative stereoscopic data source 11$n$ makes use of a cellular telephone connection to transfer information to the distribution channel 13. Accordingly, the operator can actuate one or more other controls on the operator control panel 22 to enable the stereoscopic data source 11$n$ to establish a cellular telephone call to the distribution channel 13 through a cellular provider (not shown). In that case, the stereoscopic data source 11$n$ can establish a cellular link through the antenna 24.

FIG. 3 depicts a functional block diagram of the stereoscopic data source 11$n$ described above in connection with FIG. 2. With reference to FIG. 3, the stereoscopic data source 11$n$ includes an image capture unit 30, a local memory unit 31, a processing unit 32, one or more local displays 33A, 33B, . . . , and a communication unit 34, as well as the operator control panel 22. The image capture unit 30, local memory unit 31 and processing unit 32 together form the video camera 21 described above in connection with FIG. 2, and the local displays 33A, 33B, . . . form the display 23 described above in connection with FIG. 2. The capture unit 30 will include, for example, an image sensor, aperture, lenses, and/or the like to facilitate capturing or acquiring of the respective images. The

US 7,477,284 B2

7

image sensor may be any of a number of conventional image sensors, including, for example, CCD (charge coupled devices), film, and the like.

Generally, after the operator energizes the stereoscopic data source 11n by actuating a respective control on the operator control panel 22, the processing unit can control the capture unit 30, in particular the image sensor, to begin receiving images, and send them to a local display, for example, local display 33A, for display to the operator. When the operator actuates the image recording control on the operator control panel 22, the processing unit 32, in addition to sending images from the image sensor to the local display 33A for display to the operator, will send the images to the local memory unit 31 for storage. In addition, when the operator actuates the stereoscopic panoramic image set generation control on the operator control panel 22, the processing unit 32 will generate the panoramic images comprising the stereoscopic panoramic image set and can display them in the local displays 33A, 33B, . . . .

Furthermore, when the operator actuates the stereoscopic panoramic image set transmission control on the operator control panel 22, the processing unit 32 enables the panoramic images comprising the stereoscopic panoramic image set to be transmitted through the communication unit 34 to the distribution channel 13. In that operation, since, as noted above, the stereoscopic data source 11n makes use of a cellular telephone links to facilitate transfer of stereoscopic panoramic image sets to the distribution channel 13, the processing unit 32 can initiate a cellular telephone call to the distribution channel 13 and, after the distribution channel 13 responds, cooperate with the distribution channel 13 to facilitate transmission of the stereoscopic panoramic image set to the distribution channel 13. The processing unit 32 can use a predetermined telephone number in initiating the cellular telephone call, or it can make use of a telephone number provided by the operator through the operator control panel 22. Accordingly, the operator control panel 22 can include a numeric keypad that the operator can use to provide the telephone number. It will be appreciated that the processing unit 32, prior to transferring the information comprising the stereoscopic panoramic image set, can also encode the information using any of a plurality of encoding or compression algorithms, such as the well known JPEG or GIF algorithms, which can facilitate a reduction of the time that might be required to transfer the information.

As noted above, the viewing devices selectively receive panoramic images comprising respective ones of the stereoscopic panoramic image sets generated by the stereoscopic data sources 11n and display them to an operator. FIG. 4 depicts a functional block diagram of an illustrative viewing device 12m constructed in accordance with the invention. With reference to FIG. 4, the illustrative viewing device 12m includes a receiver 40, a decoder 41, a display unit 42 and a direction control unit 43. The receiver 40 is provided to receive information defining the panoramic images comprising a stereoscopic panoramic image set from the distribution channel 13. The receiver 40 provides the information to the decoder 41 for decoding. After the decoder 41 has decoded the digital information, it can provide it to the display unit 42 for display to the operator. The display unit 42 includes a display device for displaying images to a viewer and may also include sufficient memory for storing panoramic images comprising one or more stereoscopic panoramic image sets. If the display unit 42 does include sufficient memory for storing panoramic images comprising a plurality of stereoscopic panoramic image sets, the viewing device 12m can also include a control that allows an operator to select a

8

stereoscopic panoramic image set for display. If the display unit 42 is unable to display the entire stereoscopic panoramic image set at one time, the direction control unit 43 can allow a viewer to select a portion of the stereoscopic panoramic image set to be displayed.

The display unit 42 preferably displays the stereoscopic panoramic image set in a stereoscopic manner. In that case, the display unit 42 may display respective images of the stereoscopic panoramic image set in separate left and right displays, each of which can be viewed by a respective one of the viewer's eyes. A binocular device may be provided having respective ocular devices to that displays a respective image, or portion thereof, to a respective one of the eyes of the viewer. Alternatively, the display unit 42 may display the panoramic images such that, when viewed using any of a number of kinds of appliances used facilitate stereoscopic viewing, including, for example, a lenticular lens, glasses with polarized lenses or lenses of different color, or other appliances as will be appreciated by those skilled in the art, the images will be viewed stereoscopically.

As noted above, as described in connection with the Peleg I and II applications, two panoramic images comprising a stereoscopic panoramic image set can be generated using two strips from each of a series of images recorded by the stereoscopic data source 11n. Alternatively, a stereoscopic panoramic image set, comprising a plurality of panoramic images, may be generated that, when the panoramic images are viewed in sets, will provide a stereoscopic image. This will be described in connection with FIG. 5. With reference to FIG. 5, FIG. 5 depicts a series of successive image 50(1), 50(2), . . . 50(3) (generally identified by reference numeral 50(i)) that are recorded by the stereoscopic data source 11n as the stereoscopic data source 11n is translated and/or rotated. A plurality of panoramic images 51a, 51b . . . comprising a stereoscopic panoramic image set are generated using respective strips $a_1, a_2, \ldots a_3, b_1, b_2, \ldots b_3, \ldots$ from the respective images 50(i). Strips $a_1, a_2, \ldots a_3$ that are used in image 51a all from the same horizontal displacement from the center of the respective images 50(i), strips $b_1, b_2 \ldots b_3$ that are used in image 51b are all from same horizontal displacement from the center of the respective images 50(i), and so forth. It will be appreciated that, if the images 51(i) are viewed in pairs, they will provide stereoscopic depth since they will effectively have different viewing directions.

As further noted above, the display 23, 33A, 33B (stereoscopic data source 11n) and display 42 (viewing device 12m) can display panoramic images comprising a stereoscopic panoramic image set using a lenticular lens, which can provide a stereoscopic image. This will be described in connection with FIG. 6. With reference to FIG. 6, the lenticular lens 61 includes a flat rear surface and a curved forward surface. The panoramic images from a stereoscopic panoramic image set are projected, in segments, at the flat rear surface of the lenticular lens, and the viewer views the stereoscopic image by looking towards the forward surface. For the illustrative lenticular lens 61 depicted in FIG. 6, three segments are depicted 61(1) through 61(3) (generally identified by reference numeral 61(s)), each of which is associated with a curved forward surface. Each segment 61(s), in turn, is provided with a respective segment of each of the panoramic images, identified by reference numeral 62(s)(A), 62(s)(B), 62(s)(C) (generally identified by reference numeral 62(s)(p), where index "p" refers to the respective panoramic image. As illustrated in FIG. 6, by viewing the lenticular lens from a particular direction, the viewer can selectively view one of the three images 63A, 63B, 63C (generally identified by reference numeral 63p). Thus, for example, if a viewer views the

US 7,477,284 B2

9

lenticular lens **61** from the right (from above, as shown in FIG. **6**), he or she can view the image comprising segments **62**(*s*)(C). On the other hand, if a viewer views the lenticular lens from the left (from below as shown in FIG. **6**), he or she can view the image comprising segments **62**(*s*)(A). Finally, if a viewer views the lenticular lens from directly on, he or she can view the image comprising segments **62**(*s*)(B). If, for example the viewer views the lenticular lens such that the left eye views the lens from the right and the left eye views the lens from the left, and if the panoramic image used for segments **62**(*s*)(A) is the left panoramic image of the stereoscopic panoramic image set and the panoramic image used for segments **62**(*s*)(C) is the right panoramic image of the same stereoscopic panoramic image set, the viewer will view the image stereoscopically.

As noted above, the image recording arrangement, which includes the video camera **21** of the illustrative stereoscopic data source **11***n*, maybe similar to those described in the Peleg I or Peleg II patent applications. As described in those applications, when the camera that records the images that are to be used in generating the panoramic images comprising the stereoscopic panoramic image set is rotated, the center of rotation of the camera will preferably be to the rear of the camera's center of projection to provide that strips obtained from each images will be from a different viewing direction, thereby to facilitate generation of respective panoramic images for the stereoscopic panoramic image set. It will be appreciated, however, that the image recording arrangement used with a stereoscopic data source **11***n* may have any of a number of other forms, several of which are schematically depicted in FIGS. **7** through **14**, which can provide that the effective center of projection is in front of the camera. In those cases, since the effective center of projection is in front of the camera, the center of rotation of the camera can intersect the camera. FIGS. **7** through **9** depict image recording arrangements **100**, **110** and **120** that make use of fixed or rotating mirrors or mirror segments, and FIGS. **10** through **12** depict image recording arrangements **130**, **140**, **150** that make use of fixed or rotating prisms or prism segment, respectively, FIG. **13** depicts an image recording arrangement **160** that makes use of a lens, and FIG. **14** depicts an image recording arrangement **170** that makes use of a plurality of cameras arrayed linearly. Each image recording arrangement **100**, **110**, **120**, **130**, **140**, **150**, **160**, includes a respective camera **101**, **111**, **121**, **131**, **141**, **151**, **161**, which may be a still or video camera. Image recording arrangement **170** makes use of a plurality of cameras, which may be still or video cameras.

Thus, with reference to FIG. **7**, that FIG. schematically depicts an image recording arrangement **100** including a camera **101** and a mirror **102** that is oriented at a fixed angle with respect to the camera's axis **103**. The angle is selected so as to be between zero and ninety degrees to facilitate reflecting rays **104**A through **104**C toward the camera's image sensor **105**. As shown in FIG. **7**, the rays **104**A, **104**B and **104**C (generally identified by reference numeral **104**) as directed toward the image recording arrangement from a scene (not shown) are reflected off the mirror **102** and directed to regions **106**A, **106**B and **106**C, respectively to facilitate recording of an image of the scene. As shown in FIG. **7**, the rays **104**A, **104**B and **104**C represent respective viewing directions. Strips including the respective regions can be used in generating respective images for an stereoscopic panoramic image set as described above. As shown in FIG. **7**, the mirror **102** serves to relocate the apparent center of projection for the rays **104** from a point O in the optical system **107** of the camera **101** to a point O' well ahead of the camera **101** and the rear of the mirror **102**. This will allow the camera **101** to be rotated

10

around a center of rotation that passes through the camera **102**, and that can even pass through the camera's center of projection O.

With reference to FIG. **8**, that FIG. schematically depicts an image recording arrangement **110** including a camera **111** and a mirror **112** that can be oriented at a plurality of angular orientations with respect to the camera's axis **113**. The angles are selected so as to be between zero and ninety degrees to facilitate reflecting rays **114**A and **114**B toward the center of the camera's image sensor **115**. As shown in FIG. **7**, the rays **114**A and **114**B (generally identified by reference numeral **114**) as directed toward the image recording arrangement **114** from a scene (not shown) are reflected off the mirror **112** and directed to the same region toward the center of the image sensor **115**, with images **16**A, **16**B, . . . being recorded at each of the angular orientations. As shown in FIG. **8**, the rays **114**A and **114**B represent respective viewing directions. The camera **111** records respective images for each of the angular positions at which the mirror **112** is oriented to facilitate recording of respective images of the scene. Strips including the respective regions can be used in generating respective images for an stereoscopic panoramic image set as described above. As shown in FIG. **7**, the mirror **112** serves to relocate the apparent center of projection for the rays **114** from a point O in the optical system **117** of the camera **111** to a point O' that conforms to the center of rotation of the mirror **112**. As with camera **101**, this will allow the camera **111** to be rotated around a center of rotation that passes through the camera **111**, and that can even pass through the camera's center of projection O.

With reference to FIG. **9**, that FIG. schematically depicts an image recording arrangement **120** including a camera **121** and respective mirror segments **122**A, **122**B that are positioned on opposite sides of the camera's axis **123** and oriented at complementary fixed angles with respect thereto. The angles is selected so as to be between zero and ninety degrees to facilitate reflecting rays **124**A and **124**B toward the camera's image sensor **125**. As shown in FIG. **9**, the rays **124**A and **124**B (generally identified by reference numeral **124**) as directed toward the image recording arrangement from a scene (not shown) are reflected off the mirror segments **122**A, **122**B and directed to regions **126**A and **126**B, respectively to facilitate recording of an image of the scene. If, as is the case in connection with arrangement **120**, there is a gap between the mirror segments **122**A and **122**C, a ray **124**B in the gap will be directed to a region **126**B between regions **126**A and **126**C. As shown in FIG. **9**, the rays **124**, **124**B and **124**C represent respective viewing directions. Strips including the respective regions can be used in generating respective images for an stereoscopic panoramic image set as described above. As shown in FIG. **7**, the mirror segments **122**A, **122**B jointly serve to relocate the apparent center of projection for the rays **104** from a point O in the optical system **127** of the camera **121** to a point O' ahead of the camera **101** and between the mirror segments **122**A, **122**B. This will allow the camera **121** to be rotated around a center of rotation that passes through the camera **121**, and that can even pass through the camera's center of projection O.

FIGS. **10** and **12** schematically depict image recording arrangements **130**, **150** that are similar to respective image recording arrangement **100**, **120** described above in connection with FIG. **7**, **9** except that, instead of using mirrors, the respective image recording arrangement **130**, **150** includes a respective prism **132** (in the case of FIG. **10**), or prism segments **152** (in the case of FIG. **12**), with prism **132**, and prism segments **152**A, **152**C, being disposed at a fixed angle with respect to the camera's axis **134**, **154**. As with image record-

US 7,477,284 B2

11

12

ing arrangement **100**, in image recording arrangement **130**, the rays **134**A, **134**B and **134**C (generally identified by reference numeral **134**) directed toward the image recording arrangement from a scene (not shown) are refracted by the prism **132** and directed to regions **136**A, **136**B and **136**C, respectively, to facilitate recording of an image of the scene, and strips including the respective regions can be used in generating respective images for an stereoscopic panoramic image set as described above. Similarly, as with image recording arrangement **122**, in image recording arrangement **150**, the rays **154**A, **154**B and **154**C (generally identified by reference numeral **154**) as directed toward the image recording arrangement from a scene (not shown) are refracted by off the prism segments **152**A, **152**C and directed to regions **156**A and **156**C, respectively, to facilitate recording of an image of the scene. If, as is the case in connection with arrangement **150**, there is a gap between the prism segments **152**A and **152**C, a ray **154**B in the gap will be directed to a region **156**B between regions **156**A and **156**C. As shown in FIG. 9, the rays **134**,**134**B and **134**C (FIG. **10**), and rays **154**A, **154**B and **154**C (FIG. **12**), represent respective viewing directions. The prism **132** and prism segments **152** serve to relocate the apparent center of projection for the rays **134**, **154** from a point O in the optical system **137**, **157** of the camera **131**, **151** to a point O' that conforms to the center of projection of the respective camera. As with cameras **101**, **121**, this will allow the camera **131**, **151** to be rotated around a center of rotation that passes through the camera **131**, **151** and that can even pass through the camera's center of projection O.

FIG. **11** schematically depicts image recording arrangement **140** that is similar to respective image recording arrangement **110** described above in connection with FIG. **8**, except that, instead of using mirrors, the image recording arrangement **140** includes a prism **142**, which can be disposed a plurality of respective angles with respect to the camera's axis **144**. As with image recording arrangement **110**, in image recording arrangement **140**, the rays **144**A, **144**B, . . . (generally identified by reference numeral **144**) directed toward the image recording arrangement from a scene (not shown) are refracted by the prism **142** and directed toward a region toward the center of the image sensor **145**; the camera **141** records respective images **146**A, **146**B, . . . for the angular positions at which the mirror **142** is oriented to facilitate recording of respective images of the scene. As shown in FIG. **11**, the rays **144**A, **144**B, . . . represent respective viewing directions. The prism **142** serves to relocate the apparent center of projection for the rays **144** from a point O in the optical system **147** of the camera **141** to a point O' that conforms to the center of rotation of the respective camera. As with camera **111**, this will allow the camera **141** to be rotated around a center of rotation that passes through the camera **141** and that can even pass through the camera's center of projection O.

FIG. **13** schematically depicts image recording arrangement **160** that is similar to image recording arrangements **120** and **150** described above in connection with FIGS. 9 and 12, except that, instead of using mirror segments or prism segments, the image recording arrangements **160** includes a lens **162**. As with image recording arrangement **100**, in image recording arrangement **130**, the rays **164**A, **164**B and **164**C (generally identified by reference numeral **164**) directed toward the image recording arrangement from a scene (not shown) are refracted by the lens and directed to regions **166**A, **166**B and **166**C, respectively, to facilitate recording of an image of the scene, and strips including the respective regions can be used in generating respective images for a stereoscopic panoramic image set as described above. As shown in FIG.

13, the rays **164**, **164**B and **164**C represent respective viewing directions. The lens **162** serves to relocate the apparent center of projection for the rays **164** from a point O in the optical system **167** of the camera **161** to a point O' that conforms to the center of rotation of the camera **161**. As with cameras **121**, **151**, this will allow the camera **161** to be rotated around a center of rotation that passes through the camera **161** and that can even pass through the camera's center of projection O.

It will be appreciated that, in each of the arrangements described above in connection with FIGS. 7 through 13, the respective arrangement records images of a scene, with different portions of the images being from different viewing directions using a single camera, which facilitates generation of respective panoramic images for a stereoscopic panoramic image set that, when viewed contemporaneously, will allow for stereoscopic viewing of images of a scene. FIG. 14 depicts an arrangement **170** that makes use of a plurality of cameras **171**A . . . **171**K (generally identified by reference numeral **171**$k$) mounted linearly on a platform **172**. It will be appreciated that, when the arrangement **170** is pointed in a particular direction to facilitate recording of respective images by the cameras **171**$k$, in the images recorded by the cameras **171**$k$, strips in the "K" respective images as recorded by the respective cameras will be from different viewing directions. As the arrangement **170** is rotated around a center of rotation, and/or translated along a path, the cameras **171**$k$ are enabled to record a series of images as described above. In generating respective panoramic images for a stereoscopic panoramic image set, respective strips the series of images recorded by each respective camera **171**$k'$, **171**$k''$, . . . may be mosaiced together to form a respective panoramic image. That is, for example, for camera **171**$k'$, "S" strips $S_1^{-1}, S_1^{-2}, \ldots S_1^{-S}, S_2^{-1}, \ldots S_J^{-S}$ (generally identified by reference numeral $S_1^{-S}$) are obtained from each of "I" images, the "s-th" strip $S_1^{-S}, S_2^{-S}, S_3^{-S}$ from successive images i=1, 2, 3, . . . can be mosaiced together to form a respective panoramic image that can be used in a stereoscopic panoramic image set. Accordingly, it will be appreciated that an arrangement **170** can be used to generate a stereoscopic panoramic image set comprising "S" times "K" panoramic images, that can be used for viewing, printing, and the like.

The invention provides a number of advantages. In particular, the invention provides an arrangement, including a stereoscopic data source for recording images of a scene for use in generating a stereoscopic image set and a viewing device for displaying the stereoscopic image set to provide stereoscopic views of the scene, generating prints, and the like.

It will be appreciated that numerous modifications may be made to the arrangement described herein. For example, although the arrangement has been described as generating, displaying, printing, and so forth, panoramic images, it will be appreciated that the arrangement may instead generate, display, print, and so forth, regular "non-panoramic" images.

In addition, although the stereoscopic data source has been described as generating the stereoscopic image set, it will be appreciated that the stereoscopic data source may record a series of images from which the stereoscopic panoramic image set may be generated. After the stereoscopic data source has recorded the series of images, it can transmit them to the distribution channel **13** for distribution to one or more viewing devices. The distribution channel **13** or viewing devices may themselves generate the images comprising stereoscopic image set. In that case, it will be appreciated that the distribution channel and/or one or more viewing devices will include the components for generating the stereoscopic panoramic image set, which were described above as comprising part of the stereoscopic data source.

A76

US 7,477,284 B2

13

Furthermore, although particular mechanisms for facilitating generally contemporaneous viewing of at least portions of images of a stereoscopic image set have been described, it will be appreciated that other mechanisms may be used instead or in addition, including, but not limited to, glasses with lenses of different colors, glasses with lenses of opposite polarizations, alternatively displaying at least two images of an stereoscopic image set sufficiently rapidly so that depth can be viewed, and other mechanisms as will be appreciated by those skilled in the art.

In addition, although the cameras described above in connection with FIGS. **7** through **14** have been described as comprising conventional still or video cameras, it will be appreciated that they may comprise cameras in which image recording elements are provided only in the portions of the respective image planes from which strips will be obtained for use in generating the respective images of the stereoscopic image set.

Furthermore, although the invention has been described such that segments of respective images from a stereoscopic panoramic image set are displayed and viewed through a lenticular lens, it will be appreciated that they may instead be printed and viewed through a lenticular lens, printed directly on the rear of the lenticular lens, or other arrangements as will be apparent to those skilled in the art. If, for example, the images are printed on the rear of the lenticular lens, it will be appreciated that the lenticular curved forward surface may be formed before, during or after the images are printed.

In addition, although, in the description above in connection with FIG. **5**, the strips for each panoramic image of the stereoscopic panoramic image set are indicated as being from the same horizontal displacement in the successive images, it will be appreciated that they may be from different horizontal displacements as described in the Peleg III patent application. This may be useful in connection with to accommodate adjustment of disparity if desired to accommodate stereoscopic depth.

It will be appreciated that a system in accordance with the invention can be constructed in whole or in part from special purpose hardware or a general purpose computer system, or any combination thereof, any portion of which may be controlled by a suitable program. Any program may be composed of instructions encoded in a computer-readable medium that may in whole or in part comprise part of or be stored on the system in a conventional manner, or it may in whole or in part be provided in to the system over a network or other mechanism for transferring information in a conventional manner. In addition, it will be appreciated that the system may be operated and/or otherwise controlled by means of information provided by an operator using operator input elements (not shown) which may be connected directly to the system or which may transfer the information to the system over a network or other mechanism for transferring information in a conventional manner.

The foregoing description has been limited to a specific embodiment of this invention. It will be apparent, however, that various variations and modifications may be made to the invention, with the attainment of some or all of the advantages of the invention. It is the object of the appended claims to cover these and such other variations and modifications as come within the true spirit and scope of the invention.

What is claimed as new and desired to be secured by Letters Patent of the United States is:

**1**. Imaging apparatus comprising:

at least one imager that moves relative to a scene so as to acquire a plurality of optical images of at least portions of the scene, each of at least two of said optical images being viewed from a different respective viewing position;

14

a processor that receives image data representative of said at least two of the optical images and processes the data to divide each image into a plurality of segments and to generate a plurality of mosaics of the scene, such that:

each mosaic contains segments taken from different ones of said optical images;

segments relating to at least one part of the scene are derived from at least two optical images and appear in at least two mosaics;

the different segments of the two optical images in a given mosaic represent different parts of the scene; and

a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene.

**2**. Imaging apparatus according to claim **1** wherein the imaging apparatus is a portable hand-held device including a housing for accommodating the at least one imager, the processor and the display.

**3**. Imaging apparatus according to claim **1** and comprising communication apparatus that transmits image data from the imaging apparatus.

**4**. Imaging apparatus according to claim **3** wherein the communication apparatus is housed in a housing that also accommodates the at least one imager, the processor and the display.

**5**. Imaging apparatus according to claim **3** wherein the image data transmitted by the communication apparatus comprises at least a portion of a mosaic.

**6**. Imaging apparatus according to claim **3** wherein the image data transmitted by the communication apparatus comprises image data provided by the at least one imager.

**7**. Imaging apparatus according to claim **3** wherein the communication apparatus comprises apparatus for transmitting the data over a wireless communication channel.

**8**. Imaging apparatus according to claim **7** wherein the communication channel comprises a cellular telephone channel.

**9**. Imaging apparatus according to claim **1** wherein the display displays at least two of the mosaics one after another sufficiently rapidly to provide the sense of depth.

**10**. Imaging apparatus according to claim **1** wherein the display displays the at least two mosaics so that each eye sees a different one of the mosaics.

**11**. Imaging apparatus according to claim **1** wherein mosaics of the plurality of mosaics comprise panoramic mosaics.

**12**. Imaging apparatus according to claim **1** wherein the processor adjusts disparity between mosaics of the plurality of mosaics to provide selected visual effects.

**13**. Imaging apparatus according to claim **12** wherein the processor adjusts disparity between mosaics of the plurality of mosaics to provide at least one selected disparity for objects in the scene.

**14**. Imaging apparatus according to claim **12** wherein the processor adjusts disparity between mosaics so that a disparity for objects at a finite distance in the scene is at least a disparity required for human stereo fusion.

**15**. Imaging apparatus according to claim **12** wherein the processor adjusts disparity between mosaics so that disparity for all objects in the scene is within a predetermined range.

**16**. Imaging apparatus according to claim **12** wherein the processor adjusts disparity for different objects in the scene differently.

**17**. Imaging apparatus according to claim **1** wherein the at least one imager acquires image data from the scene used to generate a mosaic at a same time.

US 7,477,284 B2

15 16

**18**. Imaging apparatus according to claim **1** wherein the at least one imager acquires image data of the scene used to generate at least two mosaics of the plurality of mosaics at a same time.

**19**. Imaging apparatus according to claim **1**, comprising a housing that accommodates the at least one imager, the processor and the display.

**20**. Imaging apparatus according to claim **1**, wherein the processor is adapted to generate at least three series of image strips, each of said series comprising strips of a series of images of a scene as would be recorded by a camera from a respective series of positions relative to the scene, the image strips of the respective series representing strips of the respective images, said strips being displaced from one another by at least one selected displacement; and being further adapted to mosaic the respective series of image strips together thereby to construct said plurality of mosaics of the scene.

**21**. Imaging apparatus according to claim **10**, wherein the display is a lenticular print.

**22**. Imaging apparatus comprising:

at least one imager that moves relative to a scene so as to acquire a plurality of optical images of at least portions of the scene, each of at least two of said optical images being viewed from a different respective viewing position;

a processor that receives image data representative of said at least two of the optical images and processes the data to divide each image into a plurality of segments and to generate a plurality of mosaics of the scene, such that each mosaic contains segments taken from different ones of said optical images and such that at least two of the optical images contributes a different segment to each of at least two of the mosaics and such that the different segments of the two optical images in a given mosaic represent different parts of the scene; and

a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene.

**23**. Imaging apparatus according to claim **22** and comprising communication apparatus that transmits image data from the imaging apparatus.

**24**. Imaging apparatus according to claim **22** wherein the display displays at least two of the mosaics one after another sufficiently rapidly to provide the sense of depth.

**25**. Imaging apparatus according to claim **1**, wherein, in respect of any two of said optical images that both contribute at least two different segments to each of any two mosaics, the segments contributed by both optical images to a first one of the mosaics are all to the left of the segments contributed by both optical images to a second one of the mosaics.

**26**. Imaging apparatus comprising:

at least one imager that moves relative to a scene so as to acquire a plurality of optical images of at least portions of the scene, each of at least two of said optical images being viewed from a different respective viewing position;

a processor that receives image data responsive to said at least two of the optical images and processes the data to divide each image into a plurality of segments and to generate a plurality of mosaics of the scene, such that:

each mosaic contains segments taken from different ones of said optical images;

at least two of the optical images contributes a different segment to each of at least two of the mosaics; and

the different segments of the two optical images in a given mosaic represent different parts of the scene;

wherein respective first segments of each optical image contributed to a first mosaic image are always to the left

of respective second segments of the respective optical image contributed to a second mosaic image; and

a display that receives a plurality of the mosaics and displays them so as to provide a sense of depth of the scene.

**27**. Imaging apparatus comprising:

at least one imager that moves relative to a scene so as to acquire a plurality of optical images of at least portions of the scene, each of at least two of said optical images being viewed from a different respective viewing position;

a processor that receives image data representative of said at least two of the optical images and processes the data to divide each image into a plurality of segments and to generate a plurality of mosaics of the scene, such that:

each mosaic contains segments taken from different ones of said optical images;

at least two different segments in each mosaic relate to a different part of the scene that appears in each of the two respective optical images;

segments relating to at least one part of the scene are derived from at least two optical images and appear in at least two mosaics; and

in respect of any two of said optical images that both contribute at least two different segments to each of any two mosaics, the segments contributed by both optical images to a first one of the mosaics are all to the left of the segments contributed by both optical images to a second one of the mosaics; and

a display that receives a plurality of mosaics and displays them so as to provide a sense of depth of the scene.

**28**. Imaging apparatus according to claim **27** wherein the imaging apparatus is a portable hand-held device including a housing for accommodating the at least one imager, the processor and the display.

**29**. Imaging apparatus according to claim **27** and comprising communication apparatus that transmits image data from the imaging apparatus.

**30**. Imaging apparatus according to claim **29** wherein the communication apparatus is housed in a housing that also accommodates the at least one imager, the processor and the display.

**31**. Imaging apparatus according to claim **29** wherein the image data transmitted by the communication apparatus comprises at least a portion of a mosaic.

**32**. Imaging apparatus according to claim **29** wherein the image data transmitted by the communication apparatus comprises image data provided by the at least one imager.

**33**. Imaging apparatus according to claim **29** wherein the communication apparatus comprises apparatus for transmitting the data over a wireless communication channel.

**34**. Imaging apparatus according to claim **33** wherein the communication channel comprises a cellular telephone channel.

**35**. Imaging apparatus according to claim **27** wherein the display displays at least two of the mosaics one after another sufficiently rapidly to provide the sense of depth.

**36**. Imaging apparatus according to claim **27** wherein the display displays at least two of the mosaics so that each eye sees a different one of the mosaics.

**37**. Imaging apparatus according to claim **27**, wherein the processor is adapted to generate at least three series of image strips, each of said series comprising strips of a series of images of a scene as would be recorded by a camera from a respective series of positions relative to the scene, the image strips of the respective series representing strips of the respective images, said strips being displaced from one another by at least one selected displacement; and being further adapted to

US 7,477,284 B2

17 18

mosaic the respective series of image strips together thereby to construct said plurality of mosaics of the scene.

**38**. A method for processing image data representative of at least portions of a scene acquired by at least one imager that moves relative to a scene so as to acquire a plurality of optical images of the scene, each of at least two of said optical images being viewed from a different respective viewing position, the method comprising:

dividing each image into a plurality of segments and generating a plurality of mosaics of the scene, such that:

each mosaic contains segments taken from different ones of said optical images;

segments relating to at least one part of the scene are derived from at least two optical images and appear in at least two mosaics;

the different segments of the two optical images in a given mosaic represent different parts of the scene; and

in respect of any two of said optical images that both contribute at least two different segments to each of any two mosaics, the segments contributed by both optical images to a first one of the mosaics are all to the left of the segments contributed by both optical images to a second one of the mosaics; and

displaying a plurality of the mosaics so as to provide a sense of depth of the scene.

**39**. The method according to claim **38** wherein said displaying comprises displaying at least two of the mosaics one after another sufficiently rapidly to provide the sense of depth.

**40**. The method according to claim **38** wherein said displaying comprises displays the at least two mosaics so that each eye sees a different one of the mosaics.

**41**. The method according to claim **38** wherein said generating comprises adjusting disparity between mosaics of the plurality of mosaics to provide selected visual effects.

**42**. The method according to claim **41** wherein said adjusting disparity between mosaics of the plurality of mosaics comprises providing at least one selected disparity for objects in the scene.

**43**. The method according to claim **41** wherein said adjusting disparity between mosaics of the plurality of mosaics comprises providing a at least disparity for objects at a finite distance in the scene that is required for human stereo fusion.

**44**. The method according to claim **41** wherein said adjusting disparity between mosaics of the plurality of mosaics is performed so that disparity for all objects in the scene is within a predetermined range.

**45**. The method according to claim **41** wherein said adjusting disparity between mosaics of the plurality of mosaics comprises adjusting disparity for different objects in the scene differently.

**46**. The method according to claim **38**, wherein: said dividing comprises generating at least three series of image strips, each of said series comprising strips of a series of images of a scene as would be recorded by a camera from a respective series of positions relative to the scene, the image strips of the respective series representing strips of the respective images, said strips being displaced from one another by at least one selected displacement; and said generating comprises mosaicking the respective series of image strips together thereby to construct said plurality of mosaics of the scene.

**47**. Method for processing image data representative of at least portions of a scene acquired by at least one imager that moves relative to a scene so as to acquire a plurality of optical images of the scene, each of at least two of said optical images being viewed from a different respective viewing position, the method comprising:

dividing each image into a plurality of segments and generating a plurality of mosaics of the scene, such that:

each mosaic contains segments taken from different ones of said optical images;

at least two different segments in each mosaic relate to a different part of the scene that appears in each of the two respective optical images;

segments relating to at least one part of the scene are derived from at least two optical images and appear in at least two mosaics; and

in respect of any two of said optical images that both contribute at least two different segments to each of any two mosaics, the segments contributed by both optical images to a first one of the mosaics are all to the left of the segments contributed by both optical images to a second one of the mosaics; and

displaying a plurality of the mosaics so as to provide a sense of depth of the scene.

**48**. The method according to claim **47** wherein said displaying comprises displaying at least two of the mosaics one after another sufficiently rapidly to provide the sense of depth.

**49**. The method according to claim **47** wherein said displaying comprises displays the at least two mosaics so that each eye sees a different one of the mosaics.

**50**. The method according to claim **47** wherein said generating comprises adjusting disparity between mosaics of the plurality of mosaics to provide selected visual effects.

**51**. The method according to claim **50** wherein said adjusting disparity between mosaics of the plurality of mosaics comprises providing at least one selected disparity for objects in the scene.

**52**. The method according to claim **50** wherein said adjusting disparity between mosaics of the plurality of mosaics comprises providing a at least disparity for objects at a finite distance in the scene that is required for human stereo fusion.

**53**. The method according to claim **50** wherein said adjusting disparity between mosaics of the plurality of mosaics is performed so that disparity for all objects in the scene is within a predetermined range.

**54**. The method according to claim **50** wherein said adjusting disparity between mosaics of the plurality of mosaics comprises adjusting disparity for different objects in the scene differently.

**55**. The method according to claim **47**, wherein: said dividing comprises generating at least three series of image strips, each of said series comprising strips of a series of images of a scene as would be recorded by a camera from a respective series of positions relative to the scene, the image strips of the respective series representing strips of the respective images, said strips being displaced from one another by at least one selected displacement; and said generating comprises mosaicking the respective series of image strips together thereby to construct said plurality of mosaics of the scene.

\* \* \* \* \*

**<u>C</u>ERTIFICATE <u>O</u>F <u>S</u>ERVICE <u>A</u>ND <u>F</u>ILING**

I certify that I electronically filed the foregoing document using the Court's

CM/ECF filing system on April 20, 2015.  All counsel of record were served via

CM/ECF on April 20, 2015.


<u>*/s/ John A. Dragseth*            </u>
John A. Dragseth

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that Yissum's Opening Brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). The relevant portions of the brief, including all footnotes, contain 8,607 words, as determined by Microsoft Word.

Dated:  April 20, 2015

/s/ John A. Dragseth
John A. Dragseth
Fish & Richardson P.C.
3200 RBC Plaza
60 S. Sixth Street
Minneapolis, MN 55402
(612) 335-5070

*Attorneys for Appellant,*
Yissum, Inc.